ROSS v CONSUMERS POWER COMPANY (ON REHEARING)

WILLIS v NIENOW

WILLIS v DEPARTMENT OF SOCIAL SERVICES

SIENER v DEPARTMENT OF MENTAL HEALTH

ROCCO v DEPARTMENT OF MENTAL HEALTH

REGULSKI v MURPHY

TREZZI v DETROIT

DISAPPEARING LAKES ASSOCIATION v DEPARTMENT OF NATURAL RESOURCES

ZAVALA v ZINSER

Docket Nos. 64241, 68861, 68885, 69672, 70177, 70246, 70456, 70598, 71266. Argued August 16, 1983 (Calendar Nos. 1-9).—Decided December 28, 1984. Released January 22, 1985 . Rehearing denied in *Zavala,* 421 Mich 1202.

Michael Ross and Ruth Ross, his mother, brought an action against Consumers Power Company in the Jackson Circuit Court for damages for injuries suffered by Michael Ross in the course of his employment in the construction of a drain to be incorporated into the John Saines Project 1 Drainage District when construction machinery near him came into contact with a Consumers' electric line, causing him severe electrical burns. Consumers brought a third-party action against the drainage district and Wendell A. Gee, the Jackson County Drain Commissioner, alleging negligence in failing to notify it of the impending construction and in failing to make arrangements to safeguard the construction workers. The circuit court, Charles J. Falahee, J., granted the third-party defendants' motions for summary judgment on the ground of governmental immunity. Consumers appealed, and the Court of Appeals, V. J. Brennan, P.J., and Bronson and Cynar, JJ., reversed and remanded the case to the circuit court, holding that upon application of the "essence of governing" test the drainage district was not immune from tort liability (Docket No. 78-2140). The judgment of the Court of Appeals was affirmed by an equally divided Supreme Court. 415 Mich 1 (1982). On rehearing the drainage district appeals.

Mary O. Willis, administratrix of the estate of Jeffrey Willis,

deceased, brought actions in the Muskegon Circuit Court against Dennis Nienow, director of a juvenile care facility operated by the Department of Social Services, Erma Knox, a counselor at the facility, and Cyndi Hunt, a student intern, and in the Court of Claims against the Department of Social Services, alleging negligence in the death of Jeffrey Willis by drowning while on a swimming outing supervised by Knox and Hunt. The Muskegon Circuit Court, R. Max Daniels, J., granted summary judgment for Nienow, Knox, and Hunt, and the Court of Claims, Jack W. Warren, J., granted summary judgment for the Department of Social Services, both on the ground of governmental immunity. The Court of Appeals, D. F. Walsh, P.J., and MacKenzie and Ernst, JJ., affirmed the judgment of the Court of Claims, but reversed the judgment of the circuit court (Docket Nos. 50894, 52848). The defendants appeal and the plaintiff cross-appeals.

Russell Siener, Jr., brought an action in the Wayne Circuit Court against the Department of Mental Health for injuries he received while a patient at Hawthorn Center, a mental health facility for emotionally disturbed children, as a result of an assault by another patient during a field trip, alleging negligence in the supervision and control of the group of patients to which Siener had been assigned. The court, Thomas L. Brown, J., denied the defendant's motion for summary judgment on the ground of governmental immunity. The Court of Appeals, Danhof, C.J., and R. B. Burns and Wahls, JJ., vacated the order denying the motion and remanded for further proceedings (Docket No. 56406). The plaintiff appeals.

James R. Rocco, for himself and as the personal representative of the estate of Daniel Rocco, deceased, and Judith Lynne Rocco, brought an action in the Court of Claims against the Department of Mental Health, the Department of Social Services, and the Ypsilanti Regional Psychiatric Hospital for damages arising out of the killing of Daniel Rocco while a patient at the hospital by another patient, alleging negligence in the supervision of the assailant and breach of a contractual duty to protect the decedent. The court, Jack W. Warren, J., granted the defendants' motion for summary judgment on the ground of governmental immunity. The Court of Appeals, M. J. Kelly and J. J. Kelley, JJ. (Allen, P.J., concurring in part and dissenting in part), affirmed the judgment of the Court of Claims with respect to the negligence claim, but reversed with respect to the contract claim (Docket No. 55334). The defendants appeal and the plaintiff cross-appeals.

James Regulski brought an action in the Wayne Circuit Court

against the Wayne-Westland School District, William Murphy, director of the district's vocational building trades program, and Leo Hansen, teacher of the building trades class, for injuries received during the construction of a house as part of the program, alleging negligence in failing to supervise the plaintiff. The court, Maureen P. Reilly, J., granted the defendants' motion for summary judgment on the ground of governmental immunity. The Court of Appeals, V. J. Brennan, P.J., and D. C. Riley and Payant, JJ., affirmed in an opinion per curiam (Docket No. 57956). The plaintiff appeals.

Elvera Trezzi, administratrix of the estates of Rosa Brigolin, deceased, and Gino Brigolin, deceased, brought an action in the Wayne Circuit Court against the City of Detroit, Philip Torbit, a police dispatcher, and unidentified city "911" emergency assistance operators, for damages arising from the deaths of Rosa and Gino Brigolin, alleging negligence in assigning low priority to requests for assistance at the Brigolin residence which allowed time for intruders to inflict injuries on the Brigolins that resulted in their deaths. The court, Charles Kaufman, J., granted the city summary judgment on the ground of governmental immunity. Torbit settled, and the claim against the operators was dismissed. The Court of Appeals, Danhof, C.J., and Ernst, J. (Bronson, J., concurring in part and dissenting in part), affirmed (Docket No. 58039). The plaintiff appeals.

Disappearing Lakes Association and other associations of property owners in the vicinities of Square Lake and Little Square Lake in Oakland County brought actions in the Court of Claims against the Department of Natural Resources and in the Oakland Circuit Court against Orion Township, the Oakland County Planning Commission, and others, for damages to their property resulting from drops in the water levels of the lakes after the department permitted the dredging of canals in the area. The actions were consolidated in the Court of Claims. The court, Frederick C. Ziem, J., granted summary judgment for the defendant on the ground of governmental immunity. The Court of Appeals, Allen, P.J., and Martin, J. (Cynar, J., concurring in the result only), affirmed (Docket Nos. 59191, 59640). The plaintiffs appeal.

Jose B. Zavala and Maria Zavala brought an action in the Wayne Circuit Court against the City of Detroit, Andrea Zinser and Freida Y. Harris, Detroit police officers, and persons involved in a fight outside a Detroit bar for damages resulting from a gunshot that wounded Jose Zavala during the fight. The plaintiffs alleged that the police officers had been negligent in failing

to stop the fight and in failing to prevent the shooting of Jose Zavala. The court, Maureen P. Reilly, J., granted the city's and the officers' motion for summary judgment on the ground of governmental immunity. The Court of Appeals, D. C. Riley, P.J., and D. F. Walsh, J. (N. J. Kaufman, J., dissenting), affirmed, but remanded to permit the plaintiffs to make a record on their motion to amend their complaint to allege discrimination by the defendants in violation of 42 USC 1983 (Docket No. 59195). The plaintiffs appeal.

In an opinion per curiam, signed by Chief Justice Williams, and Justices Ryan, Brickley, Cavanagh, and Boyle, the Supreme Court *held:*

1) All state and local governmental agencies

a) are liable under the governmental tort liability act for injuries arising out of the failure to keep highways in reasonable repair, for negligent operation of a government-owned motor vehicle by an officer, agent, or employee of the agency, and for dangerous or defective conditions in public buildings under the agency's control;

b) are liable in tort for injuries arising out of the performance of a proprietary function, *i.e.,* any activity conducted primarily for pecuniary profit, excluding activities normally supported by taxes or fees;

c) are immune from tort liability for injuries arising out of the exercise or discharge of a non-proprietary, governmental function, *i.e.,* any activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law (an agency's *ultra vires* activities are therefore not entitled to immunity);

d) are vicariously liable for the negligent operation of government-owned motor vehicles by their officers, employees, and agents (vicarious liability for all other torts may be imposed on a governmental agency only when its officer, employee, or agent, acting during the course of his employment and within the scope of his authority, commits a tort while engaged in an activity which is non-governmental or proprietary, or which falls within a statutory exception);

2) Judges, legislators, and the highest executive officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their judicial, legislative, and executive authority; lower level officers, employees, and agents are immune from tort liability only when they are

a) acting during the course of their employment and are acting, or reasonably believe they are acting, within the scope of their authority;

b) acting in good faith; and

c) performing discretionary-decisional acts, *i.e.,* those which involve significant decision-making that entails personal deliberation, decision and judgment, as opposed to ministerial-operational acts, *i.e.,* those which involve the execution or implementation of a decision and entail only minor decision-making;

3) If the officer, agent, or employee is acting within the course of his employment and the scope of his authority, the governmental agency may pay for, engage, or furnish an attorney; represent the officer, agent, or employee in the action; and compromise, settle, pay, or indemnify claims or judgments against the officer, agent, or employee. Such action, however, does not impose tort liability upon the governmental agency.

1. The governmental tort liability act sets forth four categories of activity for which tort liability may be imposed. All governmental agencies, both state and local are statutorily liable for bodily injury and property damage arising out of the failure to keep their highways in reasonable repair; the negligent operation of a government-owned motor vehicle by the agency's officer, agent, or employee; and dangerous or defective conditions in public buildings under the agency's control. In addition, the state and its agencies, departments, and commissions are liable when engaged in a proprietary function. The heart of the act is § 7, which provides broad immunity from tort liability to governmental agencies whenever they are engaged in the exercise or discharge of a governmental function. The act allows a governmental agency to provide legal assistance to and reimbursement of settlements and judgments levied against its officers, agents, and employees under certain circumstances. However, the act does not define under what circumstances such officers, agents, and employees may be held liable for their tortious acts. Nor does it specifically address the question whether a governmental agency may be held vicariously liable for such torts under a theory of *respondeat superior.*

2. Sovereign immunity is an ancient common-law concept which stated that the "sovereign" was immune from suit unless he consented to the action because the sovereign (the king) either was somehow "divine" or above the law, could commit no wrong, and was, therefore, never properly sued, or was superior to the courts which he had created and vested with a portion of his power. From statehood forward, Michigan jurisprudence recognized that the sovereign (the state) was immune from all suits, including suits for tortious injuries which it had caused. The rationale for sovereign immunity was never grounded in a belief that the state could do no wrong. Rather,

sovereign immunity existed in Michigan because the state, as creator of the courts, was not subject to them or their jurisdiction. Thus, the original Michigan rule held that the state was immune from all suits except to the extent that it consented to be sued in its courts. Sovereign immunity was not, however, an absolute bar to recovery against the state; the Legislature could and did consent to suits. In 1939, the Legislature created the Court of Claims, giving it exclusive jurisdiction to hear and determine all claims and demands against the state and any of its agencies. By creating a court with jurisdiction over the state, the Legislature destroyed the theoretical basis for sovereign immunity. However, the Legislature retained sovereign immunity from tort liability in § 24 of the Court of Claims Act. Case law made clear the distinction between immunity from suit and immunity from liability and subsequently emphasized that the common-law doctrine of sovereign immunity from tort liability could not be waived or abrogated except by statute. In addition, sovereign immunity from tort liability was recognized as a defense only when the state was engaged in the exercise or discharge of a governmental function. The Legislature thereafter impliedly acknowledged that the state enjoyed immunity only when it was engaged in the exercise or discharge of a governmental function.

3. Common-law governmental immunity for municipalities was abolished in *Williams v Detroit,* 364 Mich 231 (1961), and in anticipation of a similar demise of immunity for counties, townships, and villages, the Legislature enacted the governmental tort liability act. The first sentence of § 7 was intended to not only restore governmental immunity to non-sovereign governmental agencies, but to provide uniform treatment for state and local agencies. Furthermore, the affirmance of common-law sovereign immunity in the second sentence of § 7 was a clear directive that this Court henceforth could not further extend *Williams* and judicially abrogate the state's sovereign immunity. Therefore, at the time § 7 was enacted, the state was immune from tort liability when it was engaged in the exercise or discharge of a governmental function, unless a statutory exception was applicable. This same immunity is reiterated by the first and second sentences of § 7.

4. Sovereign and governmental immunity from tort liability exist only when governmental agencies are engaged in the exercise or discharge of a governmental function. Although governmental function is not defined in the act, it is a term of art which has been used by the courts of this state to describe those activities of government which because of their public

nature should not give rise to liability at common law. Previous tests of what is a governmental function have proved difficult to apply.

The "proprietary function" test provides that since government is instituted for the equal benefit, security, and protection of its people, a governmental agency cannot claim that it is engaged in a governmental function when the activity makes a profit for itself or for private individuals. Decisions of the Supreme Court have differed, however, as to how much, if any, incidental profit can be generated before an activity is deemed to be proprietary. By enacting § 13 of the governmental tort liability act, the Legislature adopted the common-law proprietary function test, but made it clear that activities which generate an incidental profit may still be considered governmental functions. The governmental immunity act was intended to provide uniform liability and immunity to both state and local governmental agencies. There is no satisfactory reason to treat state and non-sovereign governmental agencies differently. Moreover, the proprietary function exception to common-law governmental immunity was well established at the time § 13 was enacted. If the Legislature had wished to abolish this rule as to non-sovereign governmental agencies, it would have done so in more explicit language. Therefore, the common-law proprietary function exception to governmental immunity from tort liability is reaffirmed, and the statutory definition of proprietary function is applicable to all governmental agencies, state and local. In short, although § 13 of the governmental immunity act applies only to state governmental agencies, the same terms and principles embodied therein must be judicially applied to non-sovereign governmental agencies.

The "common good of all" test is rather amorphous and difficult to apply because almost all government activity is in some sense directed toward the public good. Nevertheless, it is rare when a particular activity benefits every member of the state equally. Because application of the common good of all test could result in either immunity or liability depending upon the viewpoint of the particular decision-maker, it cannot be incorporated into the definition of governmental function.

The "essence to/of governing" tests represent attempts to describe and pinpoint those activities which are uniquely and generally associated with government. Relatively few activities can qualify for immunity under the essence to governing test since they must have no common analogy to the private sector. Moreover, governmental activities which appear unique at the time a particular case is decided may not be so in the future.

The essence of governing test provides more flexibility because it focuses on whether the activity can be effectively accomplished only by government. Unfortunately, this approach is also flawed. For example, private construction companies may be able to engineer, construct, and maintain drains more effectively than the local drainage district. Nevertheless, the drainage district is statutorily responsible for providing an efficient and systematic drainage system to safeguard the public health and welfare. Private enterprise may also decline to engage in or abandon an activity which benefits the public good because it is not sufficiently profitable, not because it cannot effectively accomplish the activity. If a governmental agency thereafter assumes the responsibility in order to provide or continue to make available necessary public services, it risks tort liability. Finally, both tests fail to specify precisely what activity must be evaluated.

5. The fundamental problem with the "common good of all" and "essence to/of governing" definitions of governmental function is that they require the judiciary to make value judgments as to which activities government should be allowed to engage in without being held responsible for the consequences thereof. This type of subjective inquiry necessarily results in legitimate differences of opinion. In contrast, the immunity from tort liability provided by § 7 is expressed in the broadest possible language—it extends immunity to *all* governmental agencies for *all* tort liability *whenever* they are engaged in the exercise or discharge of a governmental function. This broad grant of immunity, when coupled with the four narrowly drawn statutory exceptions, suggests that the Legislature intended that the term "governmental function" be interpreted in a broad manner. The Legislature's refusal to abolish completely sovereign and governmental immunity, despite this Court's recent attempts to do so, evidences a clear legislative judgment that public and private tortfeasors should be treated differently. Therefore a governmental function is an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law. When a governmental agency engages in mandated or authorized activities, it is immune from tort liability, unless the activity is proprietary in nature or falls within one of the other statutory exceptions to the governmental immunity act. Whenever a governmental agency engages in an activity which is not expressly or impliedly mandated or authorized by constitution, statute, or other law (*i.e.*, an *ultra vires* activity), it is not engaging in the exercise or discharge of

a governmental function. The agency is liable for any injuries or damages incurred as a result of its tortious conduct.

6. The tort liability of a governmental agency can be premised on two distinct theories. The plaintiff may allege that the agency itself acted, or failed to act, in a tortious manner. In such situations, the agency will be held directly liable for its torts if the activity in which it was engaged constituted a non-governmental or proprietary function, or fell within the statutory "highway," "motor vehicle," or "public building" exceptions. The plaintiff may also allege that the governmental agency is vicariously liable for the torts of its officers, employees and agents. This vicarious liability is premised on the employer-employee or principal-agent relationship which exists between the agency and the individual tortfeasor.

Allegations of vicarious tort liability generally arise where an employment relationship exists between the governmental agency and the individual tortfeasor. *Respondeat superior* liability generally can be imposed only where the individual tortfeasor acted during the course of employment and within the scope of authority. If either of these conditions is not met, a governmental agency cannot be held vicariously liable. Even when the tort is committed during the employee's course of employment and was within the scope of authority, the governmental agency is not automatically liable. Where the individual tortfeasor is acting on behalf of his employer, the focus should be on the activity which the individual was engaged in at the time the tort was committed. A governmental agency can be held vicariously liable only when its officer, employee, or agent, acting during the course of employment and within the scope of authority, commits a tort while engaged in an activity which is non-governmental or proprietary, or which falls within a statutory exception. The agency is vicariously liable in these situations because it is in effect furthering its own interest or performing activities for which liability has been statutorily imposed. However, if the activity in which the tortfeasor was engaged at the time the tort was committed constituted the exercise or discharge of a governmental function (*i.e.,* the activity was expressly or impliedly mandated or authorized by constitution, statute, or other law), the agency is immune pursuant to § 7 of the governmental immunity act.

7. The governmental immunity act does not address whether or when individual officers, employees, and agents are immune from tort liability. It merely authorizes governmental agencies to defend, indemnify, and insure officers and employees who have committed negligent torts during the course of their

employment and while acting within the scope of their authority. The Supreme Court is persuaded that judges, legislators, and the highest executive officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their respective judicial, legislative, and executive authority. Lower level officials, employees, and agents are immune from tort liability only when they are

1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority;

2) acting in good faith; and

3) performing discretionary, as opposed to ministerial, acts.

Under this test, no individual immunity exists for *ultra vires* activities.

The distinction between discretionary and ministerial acts is that the former involves significant decision-making, while the latter involves the execution of a decision and might entail some minor decision-making. For clarity, the word "operational" should be added so the operative term would be "ministerial-operational" acts. Many persons are given some measure of discretionary authority in order to perform their duties effectively. Therefore, to determine the existence and scope of a person's immunity from tort liability in a particular situation, the specific acts complained of, rather than the general nature of the activity, must be examined. The ultimate goal is to afford the officer, employee, or agent enough freedom to decide the best method of carrying out his duties, while ensuring that the goal is realized in a conscientious manner.

It is obvious that the immunity extended to individuals is far less than that afforded governmental agencies, a result intended by the Legislature. The threat of personal liability for engaging in *ultra vires* activities or tortiously executing one's duties may be the most effective way of deterring improper conduct. However, a governmental agency is statutorily authorized to defend or indemnify its officers, employees, and agents in its discretion under certain circumstances. This statutory authorization could be the basis for a contractual agreement of representation and indemnification.

8. In *Ross,* the trial court correctly found that the drainage district is immune from tort liability. *Ross* involves only the direct liability of a non-sovereign governmental agency for its negligence in contracting out, supervising, and inspecting the construction of a drain. The crucial inquiry is whether these activities, from which the injuries arose, constitute the exercise or discharge of a non-proprietary, governmental function.

There is no allegation that any of these activities were conducted by the district primarily for pecuniary profit. The Legislature is required to provide for the protection and promotion of public health and the state's natural resources. The Drain Code is a comprehensive act governing the establishment of drainage districts and construction of drains. A drainage district has the power to contract and the drain commissioner is specifically authorized to let out construction contracts under prescribed circumstances. Furthermore, the commissioner, or a competent designatee, is required to inspect and approve all construction work. Any right to supervise the actual construction of a drain is impliedly authorized by the district's general power over the establishment, construction, and maintenance of drains.

9. In the *Willis* cases, the state and the Department of Social Services are entitled to sovereign immunity form tort liability since the injuries arose while they and their employees were engaged in the exercise or discharge of a governmental function. In addition, the plaintiff failed to state a claim of intentional tort against any of the defendants. There is no suggestion that the supervision of children during recreational activities was not during the course of defendants' employment or within the scope of their authority. There is no allegation of bad faith. Assuming that each defendant had the authority to, and in fact did, decide who would participate in the outing, as well as when and where it would be conducted, these were discretionary-decisional acts entitled to immunity. However, the execution of these decisions, which included the care and supervision of the participating children, were ministerial-operational acts that entailed only minor decision-making. As to defendant Nienow, the decision to hire Knox and Hunt was a discretionary-decisional act entitled to immunity. There is no allegation that the swimming outing was conducted primarily for pecuniary profit. Furthermore, recreational activities for delinquent and neglected children residing in state facilities are impliedly authorized by statute. The Social Welfare Act requires the DSS to operate halfway houses and regional detention facilities with the goal of providing an effective program of out-of-home care. Recreational activities can be an important part of such a program. Implicit in the authority to conduct such activities is the authority to decide who will participate in them. Finally, the DSS is expressly required by statute to care for and supervise children residing in state facilities. The Youth Rehabilitation Services Act requires the DSS to supervise and operate state facilities and programs for the proper care of delinquent and neglected children. Even if this statute

did not exist, the care of resident children implies a responsibility to supervise them in order to prevent, as far as is practicable, any unnecessary injury.

10. In *Siener,* the defendants are entitled to sovereign immunity from tort liability because the injury arose while they and their employees were engaged in the exercise or discharge of a governmental function. Educational and recreational field trips for emotionally disturbed in-patient children are impliedly authorized by constitution and statute and the Department of Mental Health and the Hawthorn Center are expressly and impliedly required by statute to adequately control and supervise in-patients of mental health facilities. Implicit in the notion of caring for emotionally disturbed patients is the responsibility to control and supervise them to prevent, as far as is practicable, any unnecessary injury. The Mental Health Code enumerates certain rights possessed by recipients of mental health services. The statute's purpose is to ensure that patients are treated in a humane manner and that their privacy is maintained. The statute focuses on the duty of the health care facility towards its patients. None of the sections discusses the rights and responsibilities between patients. The statute's primary purpose is to protect the patient from certain abuses by the mental health facility or its staff. When this purpose is read into § 722 of the code, it is clear that this provision was meant to prevent the staff of a mental health care facility from abusing the patients in its care. It was not the intention of the Legislature to abolish governmental immunity in those cases where one patient attacks another.

11. In *Rocco,* defendants are entitled to sovereign immunity from tort liability because the injuries arose while they and their employees were engaged in the exercise or discharge of a governmental function. As in *Siener,* the argument that § 722 is an exception to the governmental immunity act is rejected. There is no suggestion that defendants' employees were not acting during the course of their employment or within the scope of their authority. Although plaintiffs paid for the care rendered to decedent by the hospital, there is no allegation that the hospital provided such care primarily for pecuniary profit. The Mental Health Code specifically limits the total financial liability of a recipient of mental health services to the cost of the services rendered.

The Department of Mental Health, the DSS, and a mental health facility have an express and implied responsibility to care for, control, and supervise residents of state facilities. The

evaluation of patients upon admission and periodically thereafter is expressly mandated by the code.

The plaintiffs' contract claim should not be dismissed. The plaintiffs alleged that they contracted and agreed with defendants for decedent's care and treatment, that they paid valuable consideration for decedent's care, and that the defendants breached their contractual duties to the plaintiffs and the decedent. These allegations are sufficient to withstand defendants' motion for summary judgment. If a plaintiff successfully pleads and establishes a non-tort cause of action § 7 will not bar recovery simply because the underlying facts could have also established a tort cause of action.

12. In *Regulski,* the operation of the building trades class was not a proprietary function. Since the injuries arose while the district and its employees were engaged in the exercise or discharge of a governmental function, the district is entitled to governmental immunity from tort liability. Summary judgment for the individual defendants, however, must be reversed and the case remanded for trial. Instruction and supervision are essentially ministerial-operational activities for which there is no immunity from tort liability. As to the allegation of inadequate safety measures, if any of the defendants were responsible for establishing the school's policy as to the type of eye protective devices that would be provided to the students, the type of first aid supplies to have at the building site, and what emergency transportation measures would be provided, that defendant is immune from tort liability because these are discretionary-decisional acts. However, they can be held liable for failing to comply with the School Code and the school's safety policy because the actual provision of eye protective devices, first aid supplies, and emergency transportation involves only ministerial-operational acts.

13. In *Trezzi,* the city is entitled to governmental immunity from tort liability because the injuries arose while the city's employees were engaged in the exercise or discharge of a governmental function. There is no suggestion that the employees were not acting during the course of their employment or within the scope of their authority. There is no allegation that the 911 emergency system was operated primarily for pecuniary profit. The 911 emergency assistance system and the police dispatch system, including internal procedures for determining the seriousness of calls and dispatching vehicles, are impliedly authorized by constitution, statute, and city charter.

14. In *Disappearing Lakes Ass'n,* the state and the DNR are entitled to sovereign immunity from tort liability since the

injuries arose while they and their employees were engaged in the exercise or discharge of a governmental function. There is no suggestion that defendants' employees were not acting during the course of their employment or within the scope of their authority. Nor is there any allegation that the issuance of dredging permits was conducted primarily for pecuniary profit. The DNR is statutorily required to issue dredging permits once certain conditions are met and to revoke them if there is sufficient cause. In determining whether a permit should be issued, renewed or revoked, the DNR is impliedly authorized to conduct studies and inspect the proposed and current dredging sites, although such actions are not required. The DNR is expressly authorized to impose conditions on the dredging in order to avoid adverse environmental consequences.

The Court of Appeals conclusion that plaintiffs had insufficiently pleaded a nuisance cause of action is not clearly erroneous. Plaintiffs essentially asserted only a negligence claim.

15. In *Zavala*, the city and the officers are entitled to governmental immunity from tort liability because the injuries arose while the city's employees were engaged in the exercise or discharge of a governmental function. Police officers, especially when faced with a potentially dangerous situation, must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public, the cessation of unlawful conduct, and the apprehension of wrongdoers. The determination of what type of action to take is a discretionary-decisional act entitled to immunity. Once that decision has been made, however, the execution thereof must be performed in a proper manner. Since plaintiffs merely alleged negligent performance of a discretionary-decisional act, summary judgment for the individual officers was properly granted. Because the officers were acting during the course of their employment and within the scope of their authority, there is no allegation that the city and its employees were engaged in activities conducted primarily for pecuniary profit, and the decision to request and await backup assistance is impliedly authorized by constitution, statute, and city charter, the city is entitled to governmental immunity from tort liability.

*Ross,* reversed in part.

*Willis,* affirmed.

*Siener,* affirmed.

*Rocco,* affirmed.

*Regulski,* reversed in part.

*Trezzi,* affirmed.

*Disappearing Lakes,* affirmed.

*Zavala,* affirmed.

Justice Levin, dissenting in part, would hold that under the second sentence of § 7 of the governmental tort liability act, the State of Michigan and its departments are absolutely immune from tort liability except to the extent that the Legislature has waived the sovereign immunity of the state. Under the first sentence of § 7, which immunizes non-sovereign political units only when engaged in the exercise or discharge of a governmental function, consideration should be given, in determining whether the non-sovereign political unit was engaged in a governmental function, to whether the specific activity complained of:

1) involved either policy formulation or quasi-judicial decision-making;

2) represented a failure to prevent harm from a source not subject to governmental control;

3) is without a common analogy in the private sector.

The governmental tort liability act does not provide immunity from tort liability to public officers or employees. Courts should decide claims of immunity asserted by public officers or employees on the basis of the factors traditionally considered at common law, *i.e.,* whether the officer or employee:

1) acted within the scope of his official function;

2) acted in good faith;

3) exercised quasi-judicial or policy-making discretionary authority.

1. The question whether the state or its agencies, prior to the governmental tort liability act, was subject to liability for torts committed in the exercise or discharge of a non-governmental activity had never been settled. The governmental tort liability act was drafted under the apparent assumption that the state and its agencies enjoyed a total sovereign immunity from tort liability. The view that the state's common-law sovereign immunity was limited to torts arising out of *governmental functions* would render both the second sentence of § 7 and all of § 13 of the act superfluous. The second sentence of § 7 affirms the common-law sovereign immunity of the state and its agencies as it existed. If the state's common-law sovereign immunity as it existed was limited to governmental functions, this sentence would have been wholly unnecessary because the first sentence of § 7 provides statutory immunity to the state and its agencies when engaged in the exercise or discharge of a governmental function.

Section 13 provides that the state shall not be immune in

tort suits arising out of the performance of a proprietary function as defined in the act. If the state's common-law sovereign immunity had been limited to governmental functions, this statutory waiver of immunity would have been wholly unnecessary because there would have been no immunity to waive; proprietary functions would not have been immune because they were not governmental functions.

The Legislature did not intend the second sentence of § 7 and § 13 of the act to be mere surplusage. The view that the state's common-law sovereign immunity extended only to governmental functions renders two statutory provisions superfluous and frustrates the apparent legislative intent to affirm greater immunity for the state than the immunity being provided in the act for other units of government.

2. The Supreme Court abolished the doctrine of governmental immunity for municipal corporations; however, the Court declined to abolish the doctrine of sovereign immunity for the state. Subsequently, the Legislature enacted the governmental tort liability act, the primary purpose of which appears to have been to restore immunity to non-sovereign governmental units. To achieve this purpose, the Legislature provided in the first sentence of § 7 that "[e]xcept as in this act otherwise provided, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function." The act thereby conferred uniform statutory immunity on all governmental entities—both the state and non-sovereign political units alike—when engaged in the exercise or discharge of a governmental function. To make clear that, by restoring to municipal corporations immunity for governmental functions and making uniform the immunity of all governmental entities for governmental functions, it was not thereby waiving the state's common-law absolute sovereign immunity for non-governmental functions, the Legislature provided in the second sentence of § 7 that "[e]xcept as otherwise provided herein, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed heretofore, which immunity is affirmed." The "which immunity is affirmed" clause codified the state's common-law sovereign immunity from tort liability—an absolute immunity except to the extent it is waived by the Legislature.

3. A non-sovereign political unit, when engaged in the exercise or discharge of a governmental function, has statutory governmental immunity under the first sentence of § 7. When

not engaged in a governmental function, it is not immune. Three tests have emerged for defining "governmental function":

1) The common good of all test: whether the act is for the common good of all without the element of special corporate benefit or pecuniary profit;

2) The essence of governing test: limiting the term "governmental function" to activities that are *sui generis* governmental in that they have no common analogy in the private sector; and

3) The essence of governing test: founded upon the inquiry whether the purpose, planning, and carrying out of the activity, because of its unique character or governmental mandate, can be effectively accomplished only by the government.

The phrase "governmental function" cannot, however, be reduced to a single, readily applied test. Representative factors to be considered in deciding whether a non-sovereign political unit is engaged in a "governmental function" and to be applied to the specific activity that constitutes the basis of a plaintiff's complaint and not be counted up or tallied to reach a result are:

1) Did the specific activity complained of involve either policy formulation or quasi-judicial decision-making?

2) Did the specific activity complained of represent a failure to prevent harm from a source not subject to governmental control?

3) Is the specific activity complained of without a common analogy in the private sector?

The importance of each of these considerations will vary from case to case, and the proper weight to be given to each factor must be independently evaluated in light of the particular activity about which the plaintiff complains.

4. The immunity of a public officer or employee from personal tort liability for actions within the scope of official authority and in the performance of official duties is an immunity separate and distinct from sovereign and governmental immunities. Neither § 7 nor any other provision of the governmental tort liability act provides protection for public officers or employees. It is apparent that whatever immunity public employees have in this state is provided by the common law. When a common-law claim of immunity is asserted by a public officer or employee, factors generally considered are whether the officer or employee:

1) was acting within the scope of his official function;

2) was acting in good faith;

3) was exercising quasi-judicial or policy-making discretionary authority.

The scope of immunity granted a public officer or employee in any given situation turns on the specific character of the act complained of, not on the general nature of the job. Accordingly, it is not determinative that the officer or employee has some general discretionary authority if the act complained of is properly characterized as ministerial. The discretionary decisions intended to be protected by official immunity are those that involve policy formulation and those that are quasi-judicial in nature. If judges and legislators acted within the scope of their official function, they are absolutely immune. Other public officers or employees only possess official immunity if they acted within the scope of their official function, they acted in good faith, and, when the specific activity complained of by the plaintiff is focused upon, they exercised quasi-judicial or policy-making discretionary authority.

5. The opinion of the Court states that the phrase "governmental function" should be construed in a "broad manner" because § 7 extends immunity to all governmental agencies for all tort liability whenever they are engaged in the exercise or discharge of a governmental function. The language of § 7, however, might just as readily be read as providing a more limited immunity, absolving all governmental agencies from all tort liability only when they are engaged in the exercise or discharge of a governmental function. It can be agreed that the Legislature has evidenced a clear legislative judgment that public and private tortfeasors should be treated differently. That does not suggest, however, that the Legislature intended to immunize most of the activities undertaken by governmental agencies. It can also be agreed that the people, by mandating or authorizing the government to engage in certain activities, have determined that these activities are governmental in nature. It does not follow, however, that by mandating or authorizing the government to engage in certain activities, the people have determined that the government should be immune for each and every act connected with the performance of that activity. Virtually all government activity is expressly or impliedly mandated or authorized by the constitution, a statute, or other law. By perusing the statute books rather than focusing on the specific activity complained of by the plaintiff, the Court casts the net of governmental immunity too far, enabling a governmental entity to expand the scope of its own

immunity by promulgating an ordinance or other law relating to its activities.

6. In *Ross,* the specific activity complained of does not constitute a "governmental function." The factors weighing against immunity are: first, no policy formulation is involved, nor is the activity quasi-judicial in nature. That the defendant happens to be a governmental entity does not, in and of itself, inject any degree of policy formulation into the activity. Supervision and inspection of construction work has generally been held to be operational in nature. Second, the failures to warn, supervise, and inspect in respect to a specific construction site where a governmental construction project was in progress did not represent a failure to prevent harm from a source not subject to governmental control. Third, the activity has a common analogy in the private sector; it is not an activity primarily performed and accomplished by the government. Thus, the district is not immune under § 7 for allegedly permitting the employees of a construction company hired by the district to construct the drain to work too close to Consumers' power lines without notifying Consumers, without warning the workers about the danger, and without supervising and inspecting the work so as to prevent the accident that occurred. In addition, the district is not immune under § 7 for hiring a contractor that was not properly licensed and competent.

7. In *Willis I,* the public officers or employees are not immune from liability for the specific activity that forms the basis of plaintiff's complaint. First, all three defendants acted within the scope of their official function. Second, the defendants were not exercising quasi-judicial or policy-making discretionary authority, but rather were performing a ministerial act. This conclusion renders it unnecessary to consider whether the public officers or employees acted in good faith. Although Knox, Hunt, and Nienow were acting within the scope of their official function, they are not immune because the specific activity complained of—permitting Willis to swim under dangerous circumstances—was not done in the exercise of discretionary quasi-judicial or policy-making authority.

8. In *Willis II,* the defendants are immune. The state has statutory sovereign immunity from tort liability pursuant to the second sentence of § 7. The scope of the statutory sovereign immunity is absolute except to the extent that it has been waived by the Legislature. The Legislature has not waived the state's immunity for torts committed in connection with the operation of a state-operated juvenile care facility.

9. In *Siener,* the defendants are immune. The state and its agencies have absolute sovereign immunity from tort liability

pursuant to the second sentence of § 7 unless that immunity has been waived by the Legislature. The Legislature waived the state's immunity with respect to mental health centers in the Mental Health Code by providing that any recipient of mental health services physically, sexually, or otherwise abused shall have a right to pursue injunctive and other appropriate civil relief. Although the language of this section can be read to provide a right to civil relief for any mental health patient who is abused, whether that abuse is inflicted by a Mental Health Department employee or by another patient, the underlying purpose of the Mental Health Code is to set certain standards and requirements for the treatment of recipients of mental health services by the staff and employees of mental health facilities. The statute nowhere suggests a legislative intent to impose liability on the government for injuries inflicted by other patients. The Legislature has not waived the state's sovereign immunity where a complaint alleges injuries inflicted by another patient in a mental health facility.

10. In *Rocco,* although as in *Siener,* the Mental Health Code does not provide a cause of action where the injury complained of was inflicted by another mental health patient, nor does the Mental Health Code constitute a legislative waiver of the state's sovereign immunity provided by the second sentence of § 7, the language of § 7 speaks only to immunity from tort liability; it does not grant immunity from contract claims. The state is subject to action on contract claims. Nothing in § 7 suggests an intent to establish a statutory sovereign immunity for causes of action relating to contracts. Because the plaintiffs have alleged a separate and legally distinct cause of action for breach of an implied contract, the cause should be remanded for consideration of the merits of the alleged breach of an implied contract.

11. In *Regulski,* neither the district nor the individual defendants are immune. School districts have the governmental immunity provided to governmental agencies by the first sentence of § 7, rather than the absolute sovereign immunity provided to the state by the second sentence. The state and a political subdivision are separate and distinct entities for purposes of the act. "Political subdivision," in turn, is defined as including a school district. Accordingly, a school district is a political subdivision and is therefore not synonymous with, but is rather distinct from, the state. None of the activities complained of by the plaintiff are governmental functions. All the factors weigh against immunity. Allowing the plaintiff to work on a building trades class construction project when no supervisor was present, without adequate instruction concerning the

dangers involved and the proper methods for doing the work, without safety goggles or glasses, and without adequate emergency supplies and facilities available in case a mishap should occur, neither involve policy formulation or are quasi-judicial in nature. While the school district did not directly inflict the injury, the failure of teachers adequately to teach or supervise Regulski represented a failure to prevent harm from a source subject to governmental control. In addition, teaching has a common analogy in the private sector, and construction work involving wood is generally performed by persons or concerns other than government.

The individual defendants also do not have official immunity against the plaintiff's allegations. Both the teacher of the class and the director of the vocational building trades program were acting within the scope of their official functions with respect to the supervision, instruction, conduct, and emergency preparations of the course. The officers were not, however, exercising quasi-judicial or policy-making discretionary authority with respect to the activities alleged. The supervision of classroom activities does not involve the exercise of discretionary authority to which official immunity attaches.

12. In *Trezzi,* the City of Detroit was engaged in the exercise or discharge of a governmental function and therefore is immune pursuant to the first sentence of § 7. The determination of the priority to be given to an incoming call for assistance, in light of available manpower and other demands for assistance at the time, constitutes a policy decision regarding the most effective utilization of police resources. Assuming that emergency operators are guided by a preexisting priority designation system, the city did not, by adopting guidelines, change the nature of the decision or diminish its *statutory immunity* from liability. The fact that the basis of the complaint is that the government failed to prevent harm from a source not subject to governmental control weighs in favor of immunity. Finally, the classification of calls for police assistance does not have a common analogy in the private sector. The coordination of requests for police emergency assistance afforded by the emergency system is performed and accomplished uniquely by the government.

13. In *Disappearing Lakes,* the state and its agencies possess absolute sovereign immunity pursuant to the second sentence of § 7 unless that immunity has been waived by the Legislature. The Legislature has not waived immunity for decisions granting or denying dredging permits.

14. In *Zavala,* an officer's decision to call and wait for back-

up assistance rather than to intervene in a disturbance constitutes a governmental function. First, a decision regarding how to handle an observed breach of the peace does not involve policy formulation and is not quasi-judicial in nature, weighing against immunity. The complaint that the police officers failed to prevent the shooting that caused the plaintiff injury supports a finding of immunity. This case presents perhaps the archetypical example of a complaint relating to what the government did not do for the claimant. A decision that government should assume a greater degree of the burdens of personal misfortune arising from its failure to shield individual citizens from harmful occurrences such as crime belongs to the political rather than to the judicial process. Third, a decision to await back-up assistance rather than act immediately to break up a disturbance does not have a common analogy in the private sector. The task of breaking up a fight and arresting those engaged in disorderly conduct—and thus the decision concerning the number of officers required to perform that task safely—is uniquely performed and accomplished by government. This factor weighs in favor of immunity in this case. On balance, the decision to request and await back-up assistance rather than act immediately to break up the fight was a "governmental function" for which the City of Detroit is immune under the first sentence of § 7.

The individual defendants were acting within the scope of their official function. The failure to intervene in a fight occurring a few feet away does not evidence recklessness or a corruption of malicious purpose where the officers did act by requesting back-up assistance. The officers, however, were not exercising quasi-judicial or policy-making discretionary authority. The officers do not have official immunity.

93 Mich App 687; 287 NW2d 319 (1979) reversed in part.

113 Mich App 30; 317 NW2d 273 (1982) affirmed.

117 Mich App 179; 323 NW2d 642 (1982) affirmed.

114 Mich App 792; 319 NW2d 674 (1982) affirmed.

119 Mich App 418; 326 NW2d 528 (1982) reversed in part.

120 Mich App 506; 328 NW2d 70 (1982) affirmed.

121 Mich App 61; 328 NW2d 570 (1982) affirmed.

123 Mich App 352; 333 NW2d 278 (1983) affirmed.

*W. E. Wisner* and *Dennis L. Viglione* for Consumers Power.

*Parker, Adams, Mazur & Matyjaszek, P.C.* (by

*James D. Adams),* for John Saines Project 1 Drainage District.

Amici Curiae in *Ross:*

*Donald A. Pailen,* Corporation Counsel, and *William Dietrich, William L. Woodard,* and *Abigail Elias,* Assistant Corporation Counsel, for the City of Detroit.

*Bauckham, Reed, Lang, Schaefer & Travis, P.C.* (by *Robert F. Travis),* for Michigan Townships Association.

*Robert H. Fredericks, II,* for the Oakland County Drain Commissioner and the Michigan Association of County Drain Commissioners.

*Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, P.C.* (by *Joseph V. Walker, John P. Jacobs,* and *Christine D. Oldani),* for the State Bar of Michigan, Public Corporation Law Section.

*Baxter & Hammond* (by *Stephen D. Turner* and *Robert S. Lipak)* for Mary O. Willis.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *William K. Basinger* and *Thomas L. Casey,* Assistant Attorneys General, for defendants Nienow, Knox, and the Department of Social Services and *Alan F. Hoffman* and *Thomas L. Casey,* Assistant Attorneys General for the Department of Mental Health, Department of Social Services, and Ypsilanti Regional Psychiatric Hospital and *Theodore E. Hughes* and *Thomas L. Casey,* Assistant Attorneys General, for the Department of Natural Resources.

*Cholette, Perkins & Buchanan* (by *Edward D. Wells)* for defendant Hunt.

Amici Curiae in *Willis:*

*Goodman, Eden, Millender & Bedrosian* (by *William H. Goodman*), *Mogill, Posner, Cohen & Weiss* (by *Kenneth M. Mogill* and *Marjory B. Cohen*), *Bush, Bennett & Magid, P.C.* (by *Neal Bush* and *Jody I. Lewitter*), *Richard M. Goodman, P.C.* (by *Susan E. Lister*), and *Harper, Hurwitz, LaBelle & Stacey* (by *Julie H. Hurwitz*) for Michigan Trial Lawyers Association.

*Barris, Sott, Denn & Driker* (by *Eugene Driker* and *Morley Witus*) for the City of Troy.

*Grant & Busch* (by *Gary M. Busch*) for Russell Siener, Jr.

*Charfoos, Christensen, Gilbert & Archer, P.C.* (by *Adrienne G. Southgate*), for James L. Rocco.

*Harry D. Hirsch, Jr.,* and *E. R. Whinham,* of counsel, for James Regulski.

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.* (by *Millard Becker, Jr.,* and *Rosalind H. Rochkind*), for defendants Murphy, Hansen, and the Wayne-Westland School District.

*Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Steven G. Silverman*) for Elvera Trezzi.

*Marston, Sachs, Nunn, Kates, Kadushin & O'Hare, P.C.* (by *Elizabeth J. Larin*), for Disappearing Lakes Association and others.

*Howard Schwartz (Gagleard, Addis, Imbrunone & Gagleard,* by *Michael A. Gagleard,* of counsel) for plaintiffs Zavala.

Per Curiam. These nine cases require us to reexamine the extent of immunity from tort liability which the governmental tort liability act, MCL 691.1401 *et seq.;* MSA 3.996(101) *et seq.,* and the common law provide to the state and its agencies, non-sovereign governmental agencies, and the officers, agents, and employees of these state and local governmental agencies. We hold:

1) All governmental agencies (state and local) are statutorily liable for injuries arising out of the failure to keep highways in reasonable repair (MCL 691.1402; MSA 3.996[102]), negligent operation of a government-owned motor vehicle by an officer, agent, or employee (MCL 691.1405; MSA 3.996[105]), and dangerous or defective conditions in public buildings under the agency's control (MCL 691.1406; MSA 3.996[106]).

2) All governmental agencies (state and local) have tort liability for injuries arising out of the performance of a proprietary function. "Proprietary function" is defined as any activity conducted primarily for pecuniary profit, excluding activities normally supported by taxes or fees (see MCL 691.1413; MSA 3.996[113]).

3) All governmental agencies (state and local) are immune from tort liability for injuries arising out of the exercise or discharge of a non-proprietary, governmental function. "Governmental function" is defined as any activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law. An agency's *ultra vires* activities are therefore not entitled to immunity.

4) All governmental agencies (state and local) are vicariously liable for the negligent operation of government-owned motor vehicles by their officers, employees, and agents (MCL 691.1405; MSA 3.996[105]). Vicarious liability for all other torts

may be imposed on a governmental agency only when its officer, employee, or agent, acting during the course of his employment and within the scope of his authority, commits a tort while engaged in an activity which is non-governmental or proprietary, or which falls within a statutory exception.

5) Judges, legislators, and the highest executive officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their respective judicial, legislative, and executive authority. Lower level officers, employees, and agents are immune from tort liability only when they are

a) acting during the course of their employment and are acting, or reasonably believe they are acting, within the scope of their authority;

b) acting in good faith; and

c) performing discretionary-decisional, as opposed to ministerial-operational, acts.

"Discretionary-decisional" acts are those which involve significant decision-making that entails personal deliberation, decision, and judgment. "Ministerial-operational" acts involve the execution or implementation of a decision and entail only minor decision-making.

6) If the officer, agent, or employee is acting within the course of his employment and the scope of his authority, the governmental agency may pay for, engage, or furnish an attorney; represent the officer, agent, or .employee in the action; and compromise, settle, pay, or indemnify claims or judgments against the officer, agent, or employee. Such action, however, does not impose tort liability upon the governmental agency (MCL 691.1408; MSA 3.996[108]).

## I. *The Governmental Tort Liability Act*

The causes of action in each of these cases arose after the governmental immunity statute was enacted.[1] The title of the act, as amended,[2] states that it is

"AN ACT to make uniform the liability of municipal corporations, political subdivisions, and the state, its agencies and departments, when engaged in the exercise or discharge of a governmental function, for injuries to property and persons; to define and limit this liability; to define and limit the liability of the state when engaged in a proprietary function; to authorize the purchase of liability insurance to protect against loss arising out of this liability; to provide for defending certain claims made against public officers and paying damages sought or awarded against them; to provide for the legal defense of public officers and employees; to provide for reimbursement of public officers and employees for certain legal expenses; and to repeal certain acts and parts of acts."

The governmental immunity act sets forth four categories of activity for which tort liability may be imposed. All governmental agencies, both state and local[3] are statutorily liable for bodily injury and property damage arising out of the failure to

[1] 1964 PA 170.

[2] 1964 PA 170 was amended by 1970 PA 155 and 1978 PA 141.

[3] Section 1 of the governmental tort liability act contains the following definitions:

"(a) 'Municipal corporation' means any city, village, township or charter township, or any combination thereof, when acting jointly.

"(b) 'Political subdivision' means any municipal corporation, county, township, charter township, school district, port district, or metropolitan district, or any combination thereof, when acting jointly, and any district or authority formed by 1 or more political subdivisions.

"(c) 'State' means the state of Michigan and its agencies, departments, and commissions, and shall include every public university and college of the state, whether established as a constitutional corporation or otherwise.

"(d) 'Governmental agency' means the state, political subdivisions, and municipal corporations as herein defined." MCL 691.1401; MSA 3.996(101).

keep their highways in reasonable repair,[4] the negligent operation of a government-owned motor vehicle by the agency's officer, agent, or employee,[5] and dangerous or defective conditions in public buildings under the agency's control.[6] In addition, the state and its agencies, departments, and commissions are liable when engaged in a proprietary function.[7]

[4] MCL 691.1402; MSA 3.996(102) provides in relevant part:

"Each governmental agency having jurisdiction over any highway shall maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel. Any person sustaining bodily injury or damage to his property by reason of failure of any governmental agency to keep any highway under its jurisdiction in reasonable repair, and in condition reasonably safe and fit for travel, may recover the damages suffered by him from such governmental agency. The liability, procedure and remedy as to county roads under the jurisdiction of a county road commission shall be as provided in section 21, chapter 4 of Act No. 283 of the Public Acts of 1909, as amended, being section 224.21 of the Compiled Laws of 1948. The duty of the state and the county road commissions to repair and maintain highways, and the liability therefor, shall extend only to the improved portion of the highway designed for vehicular travel and shall not include sidewalks, crosswalks or any other installation outside of the improved portion of the highway designed for vehicular travel."

[5] MCL 691.1405; MSA 3.996(105) provides:

"Governmental agencies shall be liable for bodily injury and property damage resulting from the negligent operation by any officer, agent, or employee of the governmental agency, of a motor vehicle of which the governmental agency is owner, as defined in Act No. 300 of the Public Acts of 1949, as amended, being sections 257.1 to 257.923 of the Compiled Laws of 1948.

[6] MCL 691.1406; MSA 3.996(106) provides in relevant part:

"Governmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public. Governmental agencies are liable for bodily injury and property damage resulting from a dangerous or defective condition of a public building if the governmental agency had actual or constructive knowledge of the defect and, for a reasonable time after acquiring knowledge, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition. Knowledge of the dangerous and defective condition of the public building and time to repair the same shall be conclusively presumed when such defect existed so as to be readily apparent to an ordinary observant person for a period of 90 days or longer before the injury took place."

[7] MCL 691.1413; MSA 3.996(113) provides:

The heart of the act is § 7, which provides broad immunity from tort liability to governmental agencies whenever they are engaged in the exercise or discharge of a governmental function:

"Except as in this act otherwise provided, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided herein, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed heretofore, which immunity is affirmed." MCL 691.1407; MSA 3.996(107).

Two problems are readily apparent in interpreting this provision. First, the second sentence statutorily affirms the law of sovereign (state) immunity from tort liability as it existed at the time the statute was enacted. Thus, this Court must examine the history of sovereign immunity to determine the exact parameters of the state's immunity. Second, "governmental function" is not defined in the act. This Court has struggled for more than a century to reach a consensus on this term's definition and application in a myriad of factual situations.

Finally, the act allows a governmental agency to provide legal assistance to and reimbursement of settlements and judgments levied against its officers, agents, and employees under certain circum-

"The immunity of the state shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as herein defined. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the state, excluding, however, any activity normally supported by taxes or fees. No action shall be brought against the state for injury or property damage arising out of the operation of proprietary function, except for injury or loss suffered on or after July 1, 1965."

stances.[8] However, the act does not define under what circumstances such officers, agents, and employees may be held liable for their tortious acts. Nor does it specifically address the question of whether a governmental agency may be held vicariously liable for such torts under a theory of *respondeat superior.* We must again resort to an analysis of common law to determine the parameters of official liability.

In resolving the questions presented by this act, our goal has been to create a cohesive, uniform, and workable set of rules which will readily define the injured party's rights and the governmental agency's liability. We recognize that our case law on these questions is confused, often irreconcilable, and of little guidance to the bench and bar. We have made great efforts to reexamine our prior collective and individual views on this subject in order to formulate an approach which is faithful to the statutory language and legislative intent. Wherever possible and necessary, we have reaffirmed our prior decisions. The consensus which our efforts produce today should not be viewed as this Court's individual or collective determinations of what would be most fair or just or the best public policy. The consensus does reflect, however, what we believe the Legislature intended the law to be in this area.

## II. *Sovereign (State) Immunity*

Although the concepts of "sovereign immunity" and "governmental immunity" are related, they have distinct origins and histories:

" '[S]overeign' immunity and 'governmental' immunity are not synonymous. True, they have been over the years used interchangeably in decisions, but a delin-

[8] MCL 691.1408; MSA 3.996(108).

eation may be helpful. *Sovereign* immunity is a specific term limited in its application to the State and to the departments, commissions, boards, institutions, and instrumentalities of the State. The reason is the State is the only sovereignty in our system of government, except as the States delegated part of their implicit sovereignty to the Federal government.

\* \* \*

"Over the years, by judicial construction, this 'sovereign' immunity has been transmogrified into 'governmental' immunity and made applicable to the 'inferior' divisions of government, *i.e.,* townships, school districts, villages, cities, and counties, but with an important distinction. These subdivisions of government enjoyed the immunity only when engaged in 'governmental' as distinguished from 'proprietary' functions." *Myers v Genesee County Auditor,* 375 Mich 1, 6, 8-9; 133 NW2d 190 (1965) (opinion by O'HARA, J.) (emphasis in the original).

Sovereign immunity is an ancient common-law concept that predates the statehood of Michigan by centuries. The sovereign immunity rule stated that the "sovereign" was immune from suit unless he consented to the action. Over the years, lawyers and judges have articulated two bases for this rule. The first rationale developed from the perception that the sovereign (the king) was somehow "divine" or above the law. As such, the king could commit no wrong and was, therefore, never properly sued. The second explanation was that the king was superior to the courts which he had created and vested with a portion of his power. As such, while the sovereign could do wrong, there was no entity with power to enter judgment against the sovereign. Only by the sovereign's consent (essentially, a self-inflicted judgment) could a party recover for an injury caused by the sovereign. This rule, with its dual rationale, was

the common-law rule for all sovereigns in the early nineteenth century.[9]

From statehood forward, Michigan jurisprudence recognized that the sovereign (the state) was immune from *all* suits, including suits for tortious injuries which it had caused. The rationale for sovereign immunity was never grounded in a belief that the state could do no wrong. Rather, sovereign immunity existed in Michigan because the state, as creator of the courts, was not subject to them or their jurisdiction. As the Supreme Court stated in *Michigan State Bank v Hastings,* 1 Doug 225, 236 (Mich, 1844):

"The principle is well settled that, while a state may sue, it cannot be sued in its own courts, unless, indeed, it consents to submit itself to their jurisdiction. * * * [A]n act of the legislature, conferring jurisdiction upon the courts in the particular case, is the usual mode by which the state consents to submit its rights to the judgment of the judiciary."

Thus, the original Michigan rule held that the state was immune from all suits except to the extent that it consented to be sued in its courts.

Sovereign immunity was not, however, an absolute bar to recovery against the state. As noted in *Hastings,* the Legislature could and did consent to

[9] See, *e.g.,* Borchard, *Governmental Responsibility in Tort,* 36 Yale L J 1, 17-41 (1926); 3 Holdsworth, History of English Law (5th ed), pp 458-469; Jaffe, *Suits Against Government and Officers: Sovereign Immunity,* 77 Harv L Rev 1, 3-4, 19-20 (1963); Prosser, Torts (4th ed), § 131, pp 970-971.

In Michigan, the basis for non-sovereign governmental immunity is the state's common-law sovereign immunity. As the Supreme Court explained in *Nicholson v Detroit,* 129 Mich 246, 258; 88 NW 695 (1902):

"The true theory is that the township or city represents the State in causing these things to be done, and like the State, it enjoys immunity from responsibility in case of injury to individuals * * * [because, in] imparting a portion of its powers, the State also imparts its own immunity."

suits. In 1842, the difficulties caused by legislative disposition of every claim against the state led to the creation of the Board of State Auditors. The Legislature authorized the board to hear and decide claims against the state.[10] In effect, the Board of State Auditors exercised the "sovereign" legislative power to consent to suit or to assert sovereign immunity. However, when the board chose not to consent to "suit," the issue was not appealable to the state courts. As the Supreme Court stated in *People ex rel Ayres v Board of State Auditors,* 42 Mich 422, 427-428; 4 NW 274 (1880):

"[N]o claim against the State could, under the old Constitution, be allowed except by the Legislature. The State has never, before or since, allowed itself to be sued in its own courts * * *.
"* * * In providing for a different method of determining claims against the State, it was not deemed proper to include it within the judicial power * * *."[11]

In the 1920's, most of this general claims function was transferred to the State Administrative Board. Among other matters, the board was statutorily authorized to inquire into, settle, and pay claims for injuries incurred by state employees during the course of their employment,[12] and to entertain and pay claims for damages arising out of the negligent construction, improvement, or maintenance of state trunk line highways.[13] In addition, it had the discretionary power to hear and determine claims against the state arising from the "negligence, malfeasance or misfeasance

[10] 1842 PA 12; 1843 PA 74. See also Const 1850, art 8, § 4; 1851 PA 142; Const 1908, art 6, § 20.

[11] See also *People ex rel Dewey v Bd of State Auditors,* 32 Mich 191 (1875); *People ex rel Gratiot County Treasurer v Auditor General,* 38 Mich 746 (1878).

[12] 1927 PA 133.

[13] 1925 PA 374.

of any state officer, employe, commission, department, board, institution, or other governmental division * * *."[14]

In 1939, the Legislature created the Court of Claims. 1939 PA 135, § 2. The Court of Claims was given exclusive jurisdiction "[t]o hear and determine all claims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the state and any of its departments, commissions, boards, institutions, arms or agencies." § 8(1). By creating a court with jurisdiction over the state, the Legislature destroyed the theoretical basis for sovereign immunity. There was now an entity with power to hear cases against the state, and individual consent to suit was no longer required. However, the Legislature retained sovereign immunity from tort liability in § 24:

"This act shall in no manner be construed as enlarging the present liabilities of the state and any of its departments, commissions, boards, institutions, arms or agencies."

The distinction between immunity from suit and immunity from liability was made clear in *Manion v State Highway Comm'r*, 303 Mich 1, 19-21; 5 NW2d 527 (1942). There, plaintiff sued for injuries received while employed by the State Highway Commission. The state successfully moved to dismiss the suit on the grounds that the injuries were sustained during the maintenance of a highway, which was a governmental function. In determining exactly what immunity the Legislature had waived by enacting 1939 PA 135, the majority wrote:

---

[14] 1929 PA 259.

"The State, as sovereign, is immune from suit save as it consents to be sued, and any relinquishment of sovereign immunity must be strictly interpreted * * *.

*"There is a distinction between sovereign immunity from suit and sovereign immunity from liability. The latter exists when the sovereign is engaged in a governmental function.* The former may be waived without a waiver of the latter. Section 24 of the court of claims act * * * reads:

" 'This act shall in no manner be construed as enlarging the present liabilities of the State and any of its departments, commissions, boards, institutions, arms or agencies.'

"I construe this to mean that the State's immunity from liability while engaged in a governmental function is preserved because the waiver of this defense would enlarge the 'present liabilities of the State.'

\* \* \*

"The State is not liable in this instance because of its sovereign immunity from liability in the performance of a governmental function and not because of its sovereign immunity from suit." (Emphasis added.)

Subsequent decisions emphasized that the common-law doctrine of sovereign immunity from tort liability could not be waived or abrogated except by statute. *Mead v Michigan Public Service Comm,* 303 Mich 168, 173; 5 NW2d 740 (1942); *McNair v State Highway Dep't,* 305 Mich 181, 187; 9 NW2d 52 (1943). In addition, sovereign immunity from tort liability was recognized as a defense only when the state was engaged in the exercise or discharge of a governmental function. See, *e.g., Daszkiewicz v Detroit Bd of Ed,* 301 Mich 212, 220; 3 NW2d 71 (1942); *Mead, supra,* p 171; *Thomas v Dep't of State Highways,* 398 Mich 1, 11, fn 5; 247 NW2d 530 (1976); *Bofysil v Dep't of State Highways,* 44 Mich App 118, 126; 205 NW2d 222 (1972),

*lv den* 389 Mich 768 (1973).[15]

In 1943, the Legislature abolished a significant portion of the state's sovereign immunity from tort liability by amending § 24 of 1939 PA 135. The state was now liable for injuries caused by the misfeasance or negligence of its officers and employees while acting within the scope of their employment. 1943 PA 237, § 24.[16] However, 1943

---

[15] Earlier decisions had also impliedly recognized that injuries occurring as a result of a state agency's exercise or discharge of a governmental function were not compensable. See, *e.g., Ferris v Detroit Bd of Ed,* 122 Mich 315; 81 NW 98 (1899); *Whitehead v Detroit Bd of Ed,* 139 Mich 490; 102 NW 1028 (1905); *Daniels v Grand Rapids Bd of Ed,* 191 Mich 339; 158 NW 23 (1916); *Robinson v Washtenaw Circuit Judge,* 228 Mich 225; 199 NW 618 (1924); *McDonnell v Brozo,* 285 Mich 38 (1938). See also *Pound v Garden City School Dist,* 372 Mich 499; 127 NW2d 390 (1964); *McCann v State of Michigan,* 398 Mich 65; 247 NW2d 521 (1976). Although several of these cases involved boards of education, such governmental agencies have traditionally been classified as state agencies for tort liability purposes. *Attorney General ex rel Kies v Lowrey,* 131 Mich 639, 644; 92 NW 289 (1902), *aff'd* 199 US 233; 26 S Ct 27; 50 L Ed 167 (1905); *Whitehead, supra,* p 494; *Sayers v School Dist No 1, Fractional,* 366 Mich 217, 219; 114 NW2d 191 (1962); *Pittman v City of Taylor,* 398 Mich 41, 55-59; 247 NW2d 512 (1976) (dissenting opinion of COLEMAN, J.), and cases cited therein; *Bofysil v Dep't of State Highways,* 44 Mich App 118, 125; 205 NW2d 222 (1972).

In *Myers v Genesee County Auditor,* 375 Mich 1, 9; 133 NW2d 190 (1965), Justice O'HARA concluded that common-law sovereign immunity was absolute except as provided for by statute, *i.e.,* there is no "governmental function" requirement. Not only was this erroneous conclusion dicta (only the governmental immunity of a county hospital was at issue), but the opinion was joined by only one other justice. Furthermore, the opinion failed to cite any supporting authority and did not mention any of the aforementioned cases to the contrary. Finally, this proposition has never been cited in any other decision of this Court and was distinguished twice in the Court of Appeals on the basis of *Sayers, supra.* See *Picard v Greisinger,* 2 Mich App 96, 98-99; 138 NW2d 508 (1965); *Williams v Primary School Dist #3, Green Twp,* 3 Mich App 468, 473; 142 NW2d 894 (1966).

[16] 1943 PA 237, § 24 provided:

"Upon the happening of any event subsequent to November 1, 1943, which gives rise to a cause of action, the state hereby waives its immunity from liability for the torts of its officers and employees and consents to have its liability for such torts determined in accordance with the same rules of law as apply to an action in the circuit court against an individual or a corporation, and the state hereby assumes liability for such acts, and jurisdiction is hereby conferred upon the

PA 237 was repealed soon thereafter by 1945 PA 87, § 2, thus resurrecting the state's previous common-law sovereign immunity from tort liability. 1945 PA 87, § 1, however, created a limited statutory exception to this common-law immunity—the state was liable for damages arising out of the negligent operation of a state-owned motor vehicle by a state employee. The fact that the state was engaged in a governmental function at the time of the injury was not a defense.[17] Thus, the Legislature impliedly acknowledged that the state enjoyed immunity only when it was engaged in the exercise or discharge of a governmental function.

The viability of the doctrine of sovereign immunity was not seriously assailed until *Williams v Detroit*, 364 Mich 231; 111 NW2d 1 (1961). There,

court of claims to hear and determine all claims against the state to recover damages for injuries to property or for personal injury caused by the misfeasance or negligence of the officers or employees of the state while acting as such officer or employee. Such claim must be submitted pursuant to procedural provisions of the court of claims act. The provisions of this act shall not apply to (a) any claim for injury to or death of a prisoner, or for services rendered while an inmate of a penal institution; (b) any claim arising out of the injury to or death of an inmate of any state institution in connection with the rendition of medical or surgical treatment; (c) any claim for property damage or personal injury caused by the Michigan state troops and/or the national guard when called into the service of the state."

[17] 1945 PA 87 provided:

"AN ACT to abolish the defense of governmental function in certain actions brought against the state of Michigan; and to repeal section 24 of Act No. 135 of the Public Acts of 1939, as amended by Act No. 237 of the Public Acts of 1943.

"Section 1. In all actions brought in the court of claims against the state of Michigan to recover damages resulting from the negligent operation by an officer, agent or employee of the state of Michigan of a motor vehicle of which the state of Michigan is owner as defined by Act No. 302 of the Public Acts of 1915, as amended, the fact that the state of Michigan was in the ownership or operation of such motor vehicle, engaged in a governmental function, shall not be a defense to such action: Provided, That this act shall not be construed to impose upon other owners of motor vehicles by the provisions of Act No. 302 of the Public Acts of 1915, as amended.

"Section 2. Section 24 of Act No. 135 of the Public Acts of 1939, as amended by Act No. 237 of the Public Acts of 1943, is hereby repealed."

plaintiff's decedent fell down an elevator shaft in a city building while moving furniture out of city offices. The majority held that the city was immune from liability because the injury was incurred while the city was performing a governmental function. In the future, however, this would not be so. Justice EDWARDS, joined by Justices SMITH, T. M. KAVANAGH, and SOURIS, wrote:

"From this date forward the judicial doctrine of governmental immunity from ordinary torts no longer exists in Michigan. In this case, we overrule preceding court-made law to the contrary." *Williams, supra,* p 250.

However, Justice BLACK's concurring opinion held that immunity from liability would only be abolished for municipalities, not for the state and its subdivisions:

"We are *not* considering today—as the opinions of both Brothers suggest—'the doctrine of governmental immunity.' That doctrine includes within its purview the State and 'its departments, commissions, boards, institutions, arms or agencies.' * * * We *are* considering the common-law rule that *municipal corporations* are immune from tort liability. 'Municipal corporations' are distinctively definable * * * and care should be taken that today's decision is confined thereto." *Id.,* p 278 (emphasis in original).

Thus, by a 4-4 vote, sovereign immunity was reaffirmed. Justice BLACK's position was thereafter adopted in *McDowell v State Highway Comm'r,* 365 Mich 268, 270-271; 112 NW2d 491 (1961).[18]

---

[18] The *McDowell* Court wrote:

" 'The legislature has received, considered, and acted upon such recommendations in the past, as is demonstrated by the enactment of PA 1943, No 237, and by the enactment of PA 1945, No 87. By these acts the defense of sovereign immunity was first abolished and then

In reaction to this Court's abolition of common-law governmental immunity for municipalities in *Williams,* and in anticipation of a similar demise of immunity for counties, townships, and villages,[19] the Legislature enacted the governmental immunity act in 1964. The first sentence of § 7 was intended to not only restore governmental immunity to non-sovereign governmental agencies, but to provide uniform treatment for state and local agencies.[20] Furthermore, the affirmance of com-

restored except as to causes of action based upon negligent operation of State-owned motor vehicles. * * * However, the doctrine of sovereign immunity which presently exists in Michigan is not the archaic, obsolete, "king can do no wrong" edition of 1066, but consists of a pattern of deliberate legislative choices which achieved its present form, so far as the State itself is concerned, by the enactment of PA 1945, No 87, and the amendment thereof by PA 1960, No 33. * * * [T]he fact that the legislature amends a statute in 1960 does show that the legislature is giving continuing consideration to, and acting with respect to, the doctrine of sovereign immunity. If the express re-establishments of the doctrine of sovereign immunity by the legislature in 1945 is obsolete, illogical, harsh, cruel, et cetera, then the legislature should be called upon to modify or abolish the doctrine.

" 'So far as the State itself is concerned, the doctrine of sovereign immunity as it presently exists in Michigan is a creature of the legislature. The doctrine has been modified by the legislature, abolished by the legislature, re-established by the legislature, and further modified by the legislature.'

"The judiciary has no right or power to repeal statutes. * * * [T]he legislature has willed that the present defendants be and remain immune from liability for torts such as these plaintiffs have alleged. There they must stand, legally, until the legislature wills to the contrary." *McDowell, supra,* 365 Mich 270-271.

See also *Sayers, supra; Lewis v Genesee County,* 370 Mich 110; 121 NW2d 417 (1963).

[19] The common-law governmental immunity of counties, townships, and villages was abolished in *Myers v Genesee County Auditor,* 375 Mich 1; 133 NW2d 190 (1965), and *Keenan v County of Midland,* 377 Mich 57; 138 NW2d 759 (1966).

[20] City Attorney Allen G. Hertler of Royal Oak, Michigan, a member of the special committee that drafted the governmental immunity act, stated:

"In lobbying for this legislation, its proponents traded heavily on the paradoxical state of existing law which found the State and its agencies, including school districts, still enjoying the defense of governmental immunity, while municipal corporations could no longer

mon-law sovereign immunity in the second sentence of § 7 was a clear directive that this Court henceforth could not further extend *Williams* and judicially abrogate the state's sovereign immunity. See *Thomas, supra,* 398 Mich 10.

Therefore, at the time § 7 was enacted, the state was immune from tort liability when it was engaged in the exercise or discharge of a governmental function, unless a statutory exception was applicable. This same immunity is reiterated by the first and second sentences of § 7.

Subsequent decisions of this Court did not change the parameters of statutory sovereign immunity. In *Maki v East Tawas,* 385 Mich 151; 188 NW2d 593 (1971), this Court affirmed the Court of Appeals determination that § 7 was unconstitutional because it violated the title-object clause of Const 1963, art 4, § 24.[21] During the pendency of the case before this Court, however, the Legislature amended the title of the governmental immunity act to remedy the constitutional problem. It did not modify § 7 in any significant respect.[22] Such action indicates that the Legislature did not intend to change the scope of statutory sovereign or governmental immunity from that intended in* the original 1964 version of § 7.

employ this defense. We sought to achieve legislation that would put all government on the same basis. * * * This statute puts all agencies of government on the same footing with regard to tort liability." Abels, *Report of Committee on Tort Liability,* 28 NIMLO Municipal L Rev 432, 463-464 (1965).

[21] Section 7 was found unconstitutional because it granted immunity from *all* tort liability. In contrast, the title of the governmental immunity act created immunity for injuries caused by negligence alone. Since negligence is only one species of tort, § 7 unconstitutionally conferred much broader immunity than the title allowed. Section 7 was deemed independent from the remainder of the act and was severed. *Maki, supra,* 385 Mich 158-159.

[22] To cure the constitutional defect, the Legislature merely omitted the reference to negligence in the act's title. See 1970 PA 155, § 1. The changes in § 7 were merely stylistic.

The net effect of *Maki* was that statutory sovereign and governmental immunity did not exist until August 1, 1970, the effective date of the Legislature's amendment ,of the act's title. Causes of action arising before this date were governed by this Court's common-law decisions. *Pittman v City of Taylor,* 398 Mich 41, 46; 247 NW2d 512 (1976) (opinion of KAVANAGH, C.J.).

*Pittman* subsequently abolished common-law sovereign immunity as to that case and those cases pending as of November 23, 1976 (the date *Pittman* was decided) which had raised an express challenge to common-law "governmental" *(i.e.,* sovereign) immunity. *Id.,* p 50.[23] However, the lead opinion specifically noted that its holding abol-

[23] In determining that this Court had the authority to abolish common-law sovereign immunity, the lead opinion stated:

"In reaching this result we reexamined the case of *McDowell v State Highway Commissioner,* 365 Mich 268; 112 NW2d 491 (1961). In *McDowell,* the majority of the Court concluded that 1945 PA 87 granted statutory tort immunity to the state. This conclusion, we believe, was erroneous. The Legislature in 1945 PA 87 did not statutorily grant to the state governmental tort immunity. Rather, it repealed the statutory waiver of immunity found in 1943 PA 237 and returned the state to the common-law immunity it had enjoyed prior to the 1943 amendment. This conclusion was correctly explained by Justice EDWARDS dissenting in *McDowell:*

"'By this statute [1945 PA 87], the legislature repealed PA 1939, No 135, § 24, as amended by PA 1943, No 237, the amendment being a legislative grant of the right of maintaining tort actions against the State. By enactment of this statute, the legislature moved to abolish the judicial doctrine of governmental immunity. By repealing this statute, the legislature returned to its prior posture which was no statutory provision on the subject whatsoever.'" *Pittman, supra,* 398 Mich 46-47, fn 1.

*Cf.* fn 18, *supra.*

The majority believed that the reasons given in *Williams* for abolishing common-law governmental immunity for municipalities were equally applicable to sovereign immunity. In addition, there was no good reason to treat state and non-sovereign governmental units differently. *Id.,* p 48. *Pittman,* however, has limited applicability. Only those cases pending or filed as of November 23, 1976, involving causes of action arising before August 1, 1970 (the date § 7 became effective), could take advantage of the demise of common-law sovereign immunity.

ished only *common-law* immunity; the statutory immunity conferred by the governmental immunity act had to be given effect, unless it was unconstitutional to do so. *Id.,* p 49, fn 8. Since *Pittman* was decided long after the Legislature enacted and amended the act, it is not relevant to determining the legislative intent behind the second sentence of § 7.

In summary, at the time § 7 was enacted and became effective, the state enjoyed immunity from tort liability at common law whenever it was engaged in the exercise or discharge of a governmental function, unless a statutory exception was applicable. This common-law sovereign immunity was codified by the second sentence of § 7. The immunity granted to the state by the first sentence of § 7 is essentially coextensive with this common-law immunity. We note that this interpretation furthers the Legislature's intent to create uniform standards of liability for state and non-sovereign governmental agencies.

III. *Definition of "Governmental Function"*

Sovereign and governmental immunity from tort liability exist only when governmental agencies are "engaged in the exercise or discharge of a governmental function." § 7. Although "governmental function" is not defined in the act, it "is a term of art which has been used by the courts of this state to describe those activities of government which due to their public nature should not give rise to liability at common law." *Thomas v Dep't of State Highways,* 398 Mich 1, 9; 247 NW2d 530 (1976). There is a substantial body of case law defining this term. The initial question which must be resolved is whether the phrase "governmental function" is to be interpreted in light of present-day governmental activities, or whether the Legis-

lature intended § 7 to have, as its fixed meaning, the common-law definition which existed at the time § 7 became effective.

In *Thomas, supra,* pp 9-11, a majority of the Court concluded that we were bound by the common-law definition.[24] However, this holding was overruled in *Parker v Highland Park,* 404 Mich 183; 273 NW2d 413 (1978). In holding that the operation of a general hospital by a city is not a governmental function, Justice Fitzgerald, joined by Chief Justice Kavanagh and Justice Levin, wrote:

"[W]e [do not] believe that the Legislature intended that we must today hold the operation of a hospital to be a governmental function because we did so in 1902 and 1950. As was stated in the Kavanagh-Fitzgerald dissenting opinion in *Thomas v Dep't of State Highways,* 398 Mich 1, 17, fn 4; 247 NW2d 530 (1976), to read the second sentence of MCL 691.1407; MSA 3.996(107) as 'preserving for all time state governmental immunity heretofore recognized by case-law' would be to 'assume that the Legislature failed to recognize that the evolution of case law precedent is exclusively committed to the judicial branch of government.'

"Determining whether or not a certain activity is or is not a 'governmental function' is a matter of statutory interpretation. In the absence of a legislative definition of the term, statutory interpretation is a function committed to the judiciary. The term 'governmental function' is particularly subject to judicial interpretation because the phrase is of judicial origin." *Id.,* p 192.

---

[24] The majority reasoned that words and phrases which have acquired a common-law meaning are interpreted in the same manner when used in statutes dealing with the same subject matter. The Legislature, in using the term "governmental function" to describe the limits of governmental immunity, intended that activities which were considered governmental functions when the statute was enacted should also enjoy statutory immunity. This conclusion was bolstered by the second sentence of § 7, which affirmed the case law precedent concerning sovereign immunity.

Justice MOODY reached a similar conclusion in his concurring opinion. *Id.,* pp 197-199.[25]

We decline this opportunity to overrule this aspect of *Parker.* We note that the Legislature was certainly aware of our conflicting "morass" of case law concerning the definition of "governmental function" when it enacted § 7. The Legislature could have statutorily defined the term, as it did with "proprietary function" in § 13, but it has not done so. Furthermore, judicial development and refinement of the concept of governmental function allows us to keep abreast of the changing activities and needs of government and its people.

## A. *Prior Definitions of "Governmental Function"*

Prior to 1976, the decisions of this Court generally fell into two categories. A governmental agency could not assert the defense of sovereign or governmental immunity from tort liability if it was engaged in a "proprietary" function[26] or did not act for the "common good of all."[27] In 1976, the

[25] Subsequent decisions of this Court did not overrule *Parker* on this point. In *Perry v Kalamazoo State Hospital,* 404 Mich 205; 273 NW2d 421 (1978), which was decided the same day as *Parker,* Justice RYAN, joined by Justices WILLIAMS and COLEMAN, again expressed their view that the phrase "governmental function" must be defined by common-law precedent. *Id.,* pp 210-212. Justice MOODY briefly mentioned his contrary view in his concurrence, *id.,* p 215, but the remaining three members of the Court did not. However, since these same four justices had espoused the "anti-freeze" position in *Parker,* it is clear that they intended the same result in *Perry.*

In *Ross v Consumers Power Co,* 415 Mich 1; 327 NW2d 293 (1982), Justices RYAN, WILLIAMS, and COLEMAN again expressed their views. *Id.,* pp 14-15. Justice KAVANAGH's opinion, joined by Chief Justice FITZGERALD and Justice LEVIN, did not mention the issue, but there is no indication that they had abandoned their prior views. The late Justice MOODY took no part in the decision. Thus, *Parker* was affirmed on this point because of the 3-3 decision.

[26] See Cooperrider, *The Court, The Legislature, and Governmental Tort Liability in Michigan,* 72 Mich L Rev 187, 229-237 (1973), and cases discussed therein.

[27] See Cooperrider, *supra,* pp 219-229 and cases discussed therein. The "common good of all" test has been recently reaffirmed by

"essence to governing" test was articulated by the *Thomas* dissent. Under this test, a function is not governmental unless the particular activity involved is essential to governing in that it has no common analogy to the private sector. *Thomas, supra,* p 21 (KAVANAGH, C.J., and FITZGERALD, J., *dissenting*).[28] A similar "of essence to governing"

---

several members of this Court as the sole definition of "governmental function." See *Tilford v Wayne County General Hospital,* 403 Mich 293, 301-302; 269 NW2d 153 (1978) (RYAN, J., *concurring); Parker, supra,* p 191, fn 3 (opinion of FITZGERALD, J.), and pp 203-204 (RYAN, J., *dissenting); Perry, supra,* pp 211-212; *Bush v Oscoda Area Schools,* 405 Mich 716, 735, fn 2; 275 NW2d 268 (1979) (RYAN, J., *dissenting); Ross, supra,* pp 6-8 (opinion of RYAN, J.).

Sovereign and governmental immunity from tort liability has also been denied at common law where the governmental agency created certain types of trespasses or nuisances. See Cooperrider, *supra,* pp 238-249, and cases discussed therein. See also *Rosario v City of Lansing,* 403 Mich 124; 268 NW2d 230 (1978), and *Gerzeski v Dep't of State Highways,* 403 Mich 149; 268 NW2d 525 (1978), for a thorough discussion of the different types of nuisances and trespasses. In light of our resolution of *Disappearing Lakes, infra,* we need not determine at this time whether this exception remains viable.

[28] The *Thomas* dissent wrote:

"The test then, of 'governmental function' for purposes of the immunity statute, must be phrased in terms of the nature of the specific function. We conclude that a function is not 'governmental' in this context unless the particular activity that this function entails is uniquely associated with those activities having 'no common analogy in the private sector because they reflect the imperative element in government, the implementation of this right and duty to govern.' Thus, a government is immune only when it is planning and carrying out duties which, due to their peculiar nature, can only be done by a government. The mere fact that a governmental agency is doing a certain act does not make such act a 'governmental function' if a private person or corporation may undertake the same act. Thus, 'governmental function' is not delineated by questions of the broad scope of an activity undertaken or by financial or insurance considerations which may be indicative of a governmental undertaking, but rather by viewing the precise action allegedly giving rise to liability, and determining whether such action is *sui generis* governmental—of essence to governing. * * * [C]ertain aspects of the exercise of the executive, legislative, or judicial powers are by their very nature governmental functions and necessarily removed from the undertakings of the private sector. * * *

* * *

"The parameter of 'governmental function' will most often run along the line of distinction between decisional and planning aspects

test was created by the late Justice BLAIR MOODY, JR. Rather than requiring that the activity have no common analogy, Justice MOODY believed that the governmental agency must show that "the purpose, planning and carrying out of the activity, due to its unique character or governmental mandate, can be effectively accomplished only by the government." *Parker, supra,* p 200.[29]

Unfortunately, each of these tests has proved difficult to apply.

*"Proprietary Function" Test.* Since government is instituted for the equal benefit, security, and protection of its people,[30] a governmental agency cannot claim that it is engaged in a governmental function when the activity makes a profit for itself or for private individuals. Decisions of this Court have differed, however, as to how much, if any, incidental profit can be generated before an activity is deemed to be proprietary.[31] By enacting § 13 of the governmental immunity act, the Legislature adopted the common-law "proprietary function" test but made it clear that activities which generate an incidental profit may still be considered governmental functions:

"The immunity of the state shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as herein defined. Proprietary function shall mean any

of governmental duties on the one hand, and operational aspects on the other." *Thomas, supra,* pp 21-22.

See also *Parker, supra,* p 193 (opinion of FITZGERALD, J.); *Perry, supra,* p 215 (KAVANAGH, C.J., *dissenting*).

[29] Even if the activity in question did not meet this test, the governmental agency could still be found immune from tort liability if such liability "would be an unacceptable interference with government's ability to govern * * *." *Parker, supra,* p 200. See also *Perry, supra,* p 214.

[30] Const 1835, art 1, § 2; Const 1908, art 2, § 1; Const 1963, art 1, § 1.

[31] See Cooperrider, *supra,* pp 229-237, and cases discussed therein.

activity which is conducted primarily for the purpose of producing a pecuniary profit for the state, excluding, however, any activity normally supported by taxes or fees."

However, the enactment of § 13 presents two problems. First, it can be argued that if proprietary functions have always been considered nongovernmental in nature, there would have been no need to enact the first sentence of § 13. Stated another way, the statutory waiver of immunity from tort liability for proprietary functions would have been totally unnecessary because such functions have never enjoyed immunity.

We do not believe that § 13 is mere surplusage. As with the second sentence of § 7, the Legislature wished to codify the "proprietary function" test and to define clearly the parameters thereof to prevent this Court from further modifying the common-law test. Nevertheless, in order to avoid rendering the first sentence surplusage, we will no longer define "governmental function" with reference to "proprietary function." The question whether a particular activity is governmental or proprietary in nature involves two separate inquiries. A governmental agency which performs a proprietary function is not immune from tort liability pursuant to § 13; however, the converse is not necessarily true. An activity may generate no profit (i.e., be nonproprietary), but may still be nongovernmental in nature, as hereinafter defined, and thus subject to tort liability pursuant to § 7.[32]

The second problem is that § 13 applies only to

[32] Such an interpretation satisfies the recurring concern that the proprietary/governmental function dichotomy rests on a false premise, i.e., if an activity does not fall into the first category, it necessarily falls into the latter. See Cooperrider, supra, p 282; Parker, supra, p 193, and fn 8 (opinion of FITZGERALD, J.); McCann, supra, 398 Mich 79 (opinion of RYAN, J.); Thomas, supra, 398 Mich 19 (KAVANAGH, C.J., and FITZGERALD, J., dissenting).

the state and its agencies, departments and commissions. The failure to include non-sovereign governmental agencies could be interpreted as bestowing governmental immunity upon their proprietary activities. We decline to read § 13 in such a manner because we do not believe the Legislature intended such a result.

The governmental immunity act was intended to provide uniform liability and immunity to both state and local governmental agencies. A strict *"expressio unius est exclusio alterius"* reading of § 13 would destroy this uniformity. As noted in *Pittman, supra,* p 48, there is no satisfactory reason to treat state and non-sovereign governmental agencies differently. Moreover, the "proprietary function" exception to common-law governmental immunity was well established at the time § 13 was enacted. If the Legislature had wished to abolish this rule as to non-sovereign governmental agencies, it would have done so in more explicit language.

Therefore, we reaffirm the common-law "proprietary function" exception to governmental immunity from tort liability, and we conclude that the statutory definition of "proprietary function" is applicable to all governmental agencies, state and local. In short, although § 13 of the governmental immunity act applies only to state governmental agencies, the same terms and principles embodied therein will be judicially applied to non-sovereign governmental agencies.

*"Common Good of All" Test.* This test was aptly summarized by Justice Ryan in *Ross, supra,* p 7:

"The expression "common good of all" has been used for more than a half century in cases discussing the doctrine of governmental immunity. Originally, it was intended to distinguish between governmental activity

which has an exclusively public purpose as opposed to that which is 'of special corporate benefit or pecuniary profit.' See *Bolster v City of Lawrence,* 225 Mass 387; 114 NE 722 (1917). The expression was first employed in our state's jurisprudence in cases concerning the immunity or liability of municipal corporations to distinguish between 'governmental' and 'proprietary' municipal functions. *Gunther v Cheboygan County Road Comm'rs,* 225 Mich 619, 621; 196 NW 386 (1923). See also *Martinson v Alpena,* 328 Mich 595; 44 NW2d 148 (1950), and cases cited therein. More recently the expression has been used in governmental immunity cases interpreting MCL 691.1407; MSA 3.996(107) to describe the standard by which an activity of a governmental agency is judged to be a governmental function and therefore immune from tort liability at the common law."

The proponents of the "essence to governing" test have criticized the "common good of all" test. They argue that governmental agencies often engage in activities which arguably contribute to the common good. Nevertheless, these same activities are often accomplished by non-governmental entities which do not enjoy immunity from tort liability. The mere fact that a governmental agency engages in such an activity does not convert the activity into a governmental function. *Ross, supra,* pp 29-30 (opinion of KAVANAGH, J.); *Parker, supra,* pp 194-195 (opinion of FITZGERALD, J.).

Aside from these criticisms, we also note that the "common good of all" test is rather amorphous and difficult to apply. Almost all government activity is in some sense directed toward the public good. Nevertheless, it is rare when a particular activity benefits every member of the state equally. For example, a state mental hospital, such as that involved in *Perry,* is theoretically open to every member of the state who requires psychiatric treatment. In practice, however, only a small percentage of the state population actually uses

the facility. Similarly, a municipal hospital, such as that involved in *Parker,* is generally open only to local residents even though it is a public facility. Finally, although the drain constructed in *Ross* was planned, designed, constructed, and maintained pursuant to the state Drain Code's comprehensive system of water management control, it directly benefited only the Jackson County landowners whose land was drained. Because application of the "common good of all" test could result in either immunity or liability depending upon the viewpoint of the particular decision-maker, we decline to incorporate this test into the definition of "governmental function."

*"Essence to/of Governing"* Tests. These tests represent attempts to describe and pinpoint those activities which are uniquely and generally associated with government. Relatively few activities can qualify for immunity under the "essence of governing" test since they must have no common analogy to the private sector. As the *Thomas* dissent noted, their test would generally grant immunity only to executive, legislative, or judicial decision-making and planning—the execution of these decisions would be susceptible to tort liability. *Thomas, supra,* pp 21-22. Moreover, governmental activities which appear unique at the time a particular case is decided may not be so in the future. Private enterprise has ventured into such "unique" activities as providing private security forces and establishing jail facilities. Some activities which a governmental agency is required by law to undertake and provide to the public, and which have consistently been afforded immunity from tort liability, have common private sector counterparts, *e.g.,* public schools and state mental health facilities.

Justice MOODY's "essence of governing" test pro-

vides more flexibility because it focuses on whether the activity can be effectively accomplished only by government. Unfortunately, this approach is also flawed. For example, as noted in *Ross, supra,* pp 23-24 (opinion of RYAN, J.), many storm drains in the state are privately financed and built by individual landowners who require them. Private construction companies may be able to engineer, construct, and maintain drains more effectively than the local drainage district. Nevertheless, the fact remains that the drainage district is statutorily responsible for providing an efficient and systematic drainage system to safeguard the public health and welfare. Private enterprise may also decline to engage in or abandon an activity which benefits the public good *(e.g.,* a hospital or health care facility) because it is not sufficiently profitable, not because it cannot effectively accomplish the activity. If a governmental agency thereafter assumes the responsibility in order to provide or continue to make available necessary public services, it risks tort liability.

Finally, both tests fail to specify precisely what activity must be evaluated. As noted in *Ross, supra,* pp 22-23 (opinion of RYAN, J.), if the actual physical construction of a drain, sewer, or other public project is the activity which must be evaluated, immunity will never be afforded to the governmental agency which undertakes the construction itself, since the private sector often undertakes similar projects. This would be true even where the project is mandated by statute.

## B. *New Definition of "Governmental Function"*

The fundamental problem with the "common good of all" and "essence to/of governing" definitions of "governmental function" is that they require the judiciary to make value judgments as to

which activities government should be allowed to engage in without being held responsible for the unfortunate consequences thereof. This type of subjective inquiry necessarily results in legitimate difference of opinion. In contrast, the immunity from tort liability provided by § 7 is expressed in the broadest possible language—it extends immunity to *all* governmental agencies for *all* tort liability *whenever* they are engaged in the exercise or discharge of a governmental function. This broad grant of immunity, when coupled with the four narrowly drawn statutory exceptions, suggests that the Legislature intended that the term "governmental function" be interpreted in a broad manner.

The Legislature's refusal to abolish completely sovereign and governmental immunity, despite this Court's recent attempts to do so, evidences a clear legislative judgment that public and private tortfeasors should be treated differently. This disparate treatment is not totally unjustifiable. The California Law Commission, after an extensive and careful study of the problems presented by sovereign and governmental immunity, concluded:

"The problems involved in drawing standards for governmental liability and governmental immunity are of immense difficulty. Government cannot merely be liable as private persons are for public entities are fundamentally different from private persons. Private persons do not make laws. Private persons do not issue and revoke licenses to engage in various professions and occupations. Private persons do not quarantine sick persons and do not commit mentally disturbed persons to involuntary confinement. Private persons do not prosecute and incarcerate violators of the law or administer prison systems. Only public entities are required to build and maintain thousands of miles of streets, sidewalks and highways. Unlike many private persons, a public entity often cannot reduce its risk of potential

liability by refusing to engage in a particular activity, for government must continue to govern and is required to furnish services that cannot be adequately provided by any other agency. Moreover, in our system of government, decision-making has been allocated among three branches of government—legislative, executive and judicial—and in many cases decisions made by the legislative and executive branches should not be subject to review in tort suits for damages, for this would take the ultimate decision-making authority away from those who are responsible politically for making the decisions." 4 California Law Revision Comm Reports, Recommendations & Studies, p 810 (1963).

Our task therefore must be to devise an objective definition of "governmental function" which will further this legislative judgment.

Const 1963, art 1, § 1 sets forth a simple, fundamental concept of government.

"All political power is inherent in the people. Government is instituted for their equal benefit, security and protection."

In our organized society, people, through the state constitution they have ratified and the laws enacted by representatives they have elected, require or authorize their government to perform certain activities in their behalf. People allow government to handle these matters for a variety of reasons. Often, an individual or group of people cannot accomplish an activity or project because of, *e.g.,* the amount of financing required, the tremendous risks involved, or the size or scope of the project or activity. Regardless of the reason, however, the fact that the people have delegated these responsibilities to government indicates their belief that a particular activity or function is one which the government must or can undertake to meet their individual and collective needs. In

other words, the people, by mandating or authorizing the government to engage in certain activities, have determined that these activities are governmental in nature.

· Conversely, activities which are not mandated or authorized by the people cannot be deemed governmental. When a governmental agency engages in such activities, it is acting for itself, rather than on behalf of the people. In these situations, the agency should be treated the same as a private tortfeasor.

We therefore conclude that a governmental function is an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law. When a governmental agency engages in mandated or authorized activities, it is immune from tort liability, unless the activity is proprietary in nature (as defined in § 13) or falls within one of the other statutory exceptions to the governmental immunity act. Whenever a governmental agency engages in an activity which is not expressly or impliedly mandated or authorized by constitution, statute, or other law (i.e., an *ultra vires* activity), it is not engaging in the exercise or discharge of a governmental function. The agency is therefore liable for any injuries or damages incurred as a result of its tortious conduct.[33]

We realize that the definition we have formu-

---

[33] The dissent states that under today's decision, a governmental entity can expand the scope of its immunity by promulgating an ordinance or other law. If the activities in which the governmental agency was engaged when the tort was committed were not expressly or impliedly mandated or authorized by constitution, statute, or other law (i.e., the activities were *ultra vires*), it cannot thereafter pass a law which would retroactively authorize the activities. The possibility that governmental agencies will now enact laws requiring or authorizing activities merely to immunize themselves against future unknown tort liability is remote. The suggestion of such devious motivation is unwarranted.

lated today is broad and encompasses most of the activities undertaken by governmental agencies. We have adopted this approach because we believe that this is the result envisioned by the enactors of the governmental immunity act. We note, however, that our definition may be statutorily modified to reflect more accurately the desires and needs of the public.

IV. *Vicarious Liability of Governmental Agencies for the Torts of Their Officers, Employees, and Agents*

The tort liability of a governmental agency can be premised on two distinct theories.[34] The plaintiff may allege that the agency itself acted, or failed to act, in a tortious manner.[35] In such situations, the agency will be held directly liable for its torts if the activity in which it was engaged constituted a non-governmental or proprietary function, or fell within the statutory "highway," "motor vehicle," or "public building" exceptions.

The plaintiff may also allege that the governmental agency is vicariously liable for the torts of its officers, employees, and agents. This vicarious liability is premised on the employer-employee or

[34] In *Galli v Kirkeby,* 398 Mich 527, 532, 540-541; 248 NW2d 149 (1976), four members of this Court held that plaintiffs must plead facts in their complaint in avoidance of immunity, *i.e.,* they must allege facts which would justify a finding that the alleged tort does not fall within the concept of sovereign or governmental immunity. This may be accomplished by stating a claim which fits within one of the statutory exceptions or pleading facts which demonstrate that the tort occurred during the exercise or discharge of a non-governmental or proprietary function. See *McCann, supra,* p 77 (opinion of RYAN, J.). Sovereign and governmental immunity are not affirmative defenses, but characteristics of government which prevent imposition of tort liability upon the governmental agency. *Galli, supra,* p 541, fn 5; *McCann, supra,* p 77, fn 1.

[35] Of course, a governmental agency can only "act" through its officers, employees, and agents. As with corporate entities, however, some acts are deemed to be done by the agency itself, rather than by an individual.

principal-agent relationship which exists between the agency and the individual tortfeasor. Plaintiffs often seek to impose liability even though the governmental agency played no part in the tort, did nothing whatsoever to aid or encourage it, or may have done everything possible to stop it. See Prosser, Torts (4th ed), § 69, p 458.

Unfortunately, plaintiffs often do not clearly differentiate between direct and vicarious liability theories in their pleadings. The problem lies in part with the governmental immunity act. The act focuses primarily upon the actions of the agency itself. The "motor vehicle" exception in § 5 is the only instance where a governmental agency is explicitly held vicariously liable for the negligent actions of its officers, employees, and agents. Section 8 authorizes an agency to furnish an attorney to appear on behalf of or pay claims and judgments rendered against an officer or employee who negligently causes injuries while in the course of employment and while acting within the scope of his or her authority.[36] An agency is also permitted

---

[36] MCL 691.1408; MSA 3.996(108), as amended, provides:

"(1) Whenever a claim is made or a civil action is commenced against an officer or employee of a governmental agency for injuries to persons or property caused by negligence of the officer or employee while in the course of employment and while acting within the scope of his or her authority, the governmental agency may pay for, engage, or furnish the services of an attorney to advise the officer or employee as to the claim and to appear for and represent the officer or employee in the action. The governmental agency may compromise, settle, and pay the claim before or after the commencement of a civil action. Whenever a judgment for damages is awarded against an officer or employee of a governmental agency as a result of a civil action for personal injuries or property damage caused by the officer or employee while in the course of employment and while acting within the scope of his or her authority, the governmental agency may idemnify [sic] the officer or employee or pay, settle, or compromise the judgment.

"(2) When a criminal action is commenced against an officer or employee of a governmental agency based upon the conduct of the officer or employee in the course of employment, if the employee or officer had a reasonable basis for believing that he or she was acting

under § 9 to purchase liability insurance in order to indemnify and protect itself and/or its officers, employees, and agents.[37] However, if the agency decides to take any of the aforementioned action, such action does not impose any liability on the agency. §§ 8(3), 9.

Despite the act's general silence as to if or when vicarious tort liability may be imposed upon a governmental agency, this Court impliedly acknowledged the continued existence of common-law *respondeat superior* theories of recovery in *Lockaby v Wayne County,* 406 Mich 65; 276 NW2d 1 (1979), *Galli v Kirkeby,* 398 Mich 527; 248 NW2d 149 (1976), and *McCann v Michigan,* 398 Mich 65; 247 NW2d 521 (1976). Nevertheless, courts must be careful not to destroy an agency's immunity by indiscriminately imposing vicarious liability whenever individual officers, employees, and agents are held personally liable for their torts.

Allegations of vicarious tort liability generally arise where an employment relationship exists between the governmental agency and the individ-

within the scope of his or her authority at the time of the alleged conduct, the governmental agency may pay for, engage, or furnish the services of an attorney to advise the officer or employee as to the action, and to appear for and represent the officer or employee in the action. An officer or employee who has incurred legal expenses after December 31, 1975 for conduct prescribed in this subsection may obtain reimbursement for those expenses under this subsection.

"(3) This section shall not impose any liability on a governmental agency."

[37] MCL 691.1409; MSA 3.996(109) provides:

"The purchase of liability insurance to indemnify and protect governmental agencies against loss or to protect governmental agencies and some or all of its agents, officers, and employees against loss on account of any judgment secured against it, or them, arising out of any claim for personal injury or property damage caused by such governmental agency, its officers, or employees, is authorized, and all governmental agencies are authorized to pay premiums for the insurance out of current funds. The existence of any policy of insurance indemnifying any governmental agency against liability for damages is not a waiver of any defense otherwise available to the governmental agency in the defense of the claim."

ual tortfeasor. *Respondeat superior* liability generally can be imposed only where the individual tortfeasor acted during the course of his or her employment and within the scope of his or her authority.[38] If either of these conditions is not met, a governmental agency cannot be held vicariously liable:

"The question of the liability of a municipality under the doctrine of *respondeat superior* is subject, ordinarily, to the same rules as govern the liability of any other corporation or individual. Thus, it must appear that an agent or servant was acting within the scope of his authority at the time the injury complained of occurred. If he was not, the municipal corporation is not liable. Also, the act of the agent or servant must have been done in the course of the employment. * * * [A municipal corporation is not] liable for * * * unauthorized and unlawful acts of its officers and employees which are outside the scope of their authority, although purported to be done on the behalf of the corporation; it must further appear that such persons were expressly authorized by the municipal government to do the acts complained of, or that they were done in pursuance of a general authority to act for the municipality, on the subject to which they related. A municipal corporation may, however, be liable for an unlawful and unauthorized act of one of its officers or agents if the act was done in the course of his official duty or employment, and within the general scope of his authority." 57 Am Jur 2d, Municipal, School, and State Tort Liability, § 88, pp 99-100.

Even when the tort is committed during the employee's course of employment and is within the scope of the employee's authority, the governmen-

---

[38] The existence of a tort, the individual tortfeasor's status as an employee, agent, independent contractor, etc., the question whether the tortfeasor was acting during the course of employment and within the scope of authority, and the corresponding extent of the governmental agency's vicarious tort liability will generally be determined with reference to common-law tort and agency principles.

tal agency is not automatically liable. Where the individual tortfeasor is acting on behalf of an employer, the focus should be on the activity which the individual was engaged in at the time the tort was committed. A governmental agency can be held vicariously liable only when its officer, employee, or agent, acting during the course of employment and within the scope of authority, commits a tort while engaged in an activity which is nongovernmental or proprietary, or which falls within a statutory exception. The agency is vicariously liable in these situations because it is in effect furthering its own interests or performing activities for which liability has been statutorily imposed. However, if the activity in which the tortfeasor was engaged at the time the tort was committed constituted the exercise or discharge of a governmental function (*i.e.*, the activity was expressly or impliedly mandated or authorized by constitution, statute, or other law), the agency is immune pursuant to § 7 of the governmental immunity act. See *Hirych v State Fair Comm,* 376 Mich 384, 391-393; 136 NW2d 910 (1965), and *Sherbutte v Marine City,* 374 Mich 48, 50; 130 NW2d 920 (1964) (city cannot be held vicariously liable for torts of its police officers committed during the course of an arrest because the officers were engaged in police activity, which is a governmental function entitled to immunity).

This type of analysis will require plaintiffs to plead their causes of action more precisely. Such precision is necessary to ensure that governmental agencies retain the full extent of immunity from tort liability which the Legislature intended.

## V. *Individual Immunity*

Like sovereign and governmental immunity, the scope of immunity from tort liability granted to

officers, employees, and agents of a governmental agency is not presently clear. Prior to 1979, officers, employees, and agents were immune when engaged in discretionary, as opposed to ministerial, acts which were within the scope of their authority. In *Wall v Trumbull,* 16 Mich 228, 235-238 (1867), Justice COOLEY explained that the members of a township board could not be held liable for authorizing an allegedly illegal tax:

"In determining whether the members of the township board voting for the allowance are liable, the first question which arises is, whether the nature of their duties is judicial, or ministerial only; for the rule of liability is altogether different in the two cases. A ministerial officer has a line of conduct marked out for him, and has nothing to do but to follow it; and he must be held liable for any failure to do so which results in the injury of another. A judicial officer, on the other hand, has certain powers confided to him to be exercised according to his judgment or discretion; and the law would be oppressive which should compel him in every case to decide correctly at his peril. It is accordingly a rule of very great antiquity that no action will lie against a judicial officer for any act done by him in the exercise of his judicial functions, provided the act, though done mistakenly, were within the scope of his jurisdiction[.] [Citations omitted.] This principle of protection is not confined to courts of record, but it applies as well to inferior jurisdictions * * *. Nor does the rule depend upon whether the tribunal is a court or not; it is the nature of the duties to be performed that determines its application.

* * *

"[O]fficers, judicial as well as ministerial, have been held liable when acting without jurisdiction. * * * The rule of official exemption depends in these cases upon jurisdiction; but wherever that appears and is not exceeded, the protection is complete.

"The board then had jurisdiction to determine whether the claim was within the law or not, and their

record, showing the presentation of the claim, would affirmatively show jurisdiction.

"If we were at liberty to pass upon these claims ourselves, upon the evidence appearing in this record, I should be inclined to think the board decided correctly as to some of the claims, and erred as to others. But nothing could be more apparent than the injustice of reviewing their decision in a suit against them in trespass. For whether each particular claim was within the law or not, would depend upon the proof as to whether the money was advanced upon the credit of the township; and the showing on this point might be very different before the board, and in the circuit court. To hold the members of the board responsible in such a case, we must not only hold them bound to decide correctly at their peril, upon the evidence presented to them, but we must also hold that at their peril they must come to the same conclusion as to the legality of the claim which the circuit judge will afterwards arrive at on another hearing, when the testimony may be either more or less than they acted upon, and when even the same witnesses may have told a different story. The mere statement of such a proposition seems to me sufficient to refute it."[39]

The doctrine of individual immunity even survived the abolition of common-law governmental immunity. Justice EDWARDS, in his opinion in *Williams, supra,* 364 Mich 261-262, wrote:

"[T]here are and will continue to be many situations in relation to which real or fancied grievances exist where governmental freedom from liability will persist

[39] Other decisions which have followed this rule include *Gordon v Farrar,* 2 Doug 411 (Mich, 1847); *Raynsford v Phelps,* 43 Mich 342, 344-345; 5 NW 403 (1880); *Amperse v Winslow,* 75 Mich 234, 244-245; 42 NW 823 (1889); *Pawlowski v Jenks,* 115 Mich 275, 276-277; 73 NW 238 (1897); *Nicholson v Detroit,* 129 Mich 246, 255; 88 NW 695 (1902); *Stevens v Black,* 212 Mich 281, 292; 180 NW 503 (1920); *People v O'Connell,* 214 Mich 410, 414-415; 183 NW 195 (1921); *Sherbutte v Marine City,* 374 Mich 48, 54; 130 NW2d 920 (1964). See also Littlejohn & DeMars, *Governmental Immunity After Parker and Perry: The King Can Do Some Wrong,* 1982 Det C L Rev 1, 34-35.

on wholly different grounds. Legislative bodies, for example, have the right to make many types of decisions which may do harm to some. Subsequent history may clearly demonstrate that some of those decisions were wrong. Discretion implies the right to be wrong. So long as those decisions are within the discretion vested in the legislative body, there is clearly neither breach of duty nor a right to damages. The instant case, a tort action, does not in any manner alter the fact that actions or decisions of a legislative, executive, or judicial character which are performed within the scope of authority of the governmental body or officer concerned continue to enjoy freedom from liability.

"The people place great powers of decision making in the hands of their government. In the exercise of discretionary power, governmental duty runs to the benefit of the whole public, rather than to individuals. It is of great importance that this crucial function of democratic decision making be unhampered by litigation.*

---

"* 'Government officials are liable for the negligent performance of their ministerial duties * * * but are not liable for their discretionary acts within the scope of their authority, * * * even if it is alleged that they acted maliciously. * * * Such immunity is not designed to protect the guilty, for "if it were possible in practice to confine such complaints to the guilty, it would be *monstrous* to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. * * * In this instance it has been *thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.*" Learned Hand, J., in *Gregoire v Biddle,* 177 F2d 579, 581 [CA 2, 1949].' *Muskopf v Corning Hospital District,* 55 Cal 2d 211, 220, 221 (11 Cal Rptr 89, 94, 95, 359 P2d 457 [1961])."

---

The governmental immunity act does not address whether or when individual officers, employees, and agents are immune from tort liability. It merely authorizes governmental agencies to defend, indemnify, and insure officers and employees who have committed negligent torts during the course of their employment and while acting

within the scope of their authority. §§ 8, 9. Thus, the existence and scope of individual immunity continues to be a creature of judicial decision-making.

Unfortunately, two recent decisions of this Court have obfuscated the precise parameters of individual immunity. In *Bush v Oscoda Area Schools*, 405 Mich 716; 275 NW2d 268 (1979), plaintiffs sued a school district, its superintendent, a principal, and a teacher concerning injuries incurred by a student during a science classroom explosion. Three members of the Court summarily concluded that the complaint stated a claim against the individual defendants. *Id.*, p 733 (opinion of LEVIN, J.). Justice MOODY, joined by Chief Justice COLEMAN, wrote that the superintendent, principal, and teacher were immune from liability for their ordinary negligence because they "were performing primarily discretionary activities that are of essence to government" and which were public in nature. *Id.*, p 734. Justice WILLIAMS believed that only the *ultra vires* activities of public employees are not protected by governmental immunity because the exercise or discharge of a governmental function is not involved. *Id.* Justice RYAN stated that the immunity defense was applicable if the school district and employees were engaged in the exercise or discharge of a governmental function. *Id.*, pp 734-735. The end result was that the individual officials and employees were immune from tort liability unless they had been engaged in *ultra vires* activities. None of the opinions mentioned the traditional "discretionary/ministerial" test.

*Lockaby v Wayne County*, 406 Mich 65; 276 NW2d 1 (1979), added to the confusion. There, an action was brought *inter alios* against the Wayne County Sheriff and the administrator of the county jail for the intentional assaults and mistreatment

of an inmate by unidentified jail personnel. Justice
LEVIN, joined by Justices KAVANAGH and FITZGER-
ALD, concluded that although the sheriff could not
be held responsible for the acts of his deputies by
statute, he was responsible for his own acts of
negligence and the tortious acts of employees who
were not deputies pursuant to the common-law
doctrine of *respondeat superior.* Similarly, the jail
administrator was responsible for his own negli-
gence. Although Justice LEVIN recognized that
government officials have limited immunity at
common law, the decision as to whether immunity
actually existed was deferred until after trial. *Id.,*
pp 77-78.

Justice MOODY wrote that the county officers and
employees, while acting within the scope of their
employment (*i.e.,* operating and maintaining a
jail), were primarily performing essential public
duties and therefore were immune from tort liabil-
ity for their negligent actions and selection of
personnel. In addition, plaintiff had failed to allege
that the sheriff or administrator had committed or
condoned any intentional acts. *Id.,* p 84. The re-
maining three justices essentially agreed with this
reasoning. *Id.,* pp 79, 82. However, Justice WIL-
LIAMS noted that intentional torts may be pro-
tected by governmental immunity as long as they
do not constitute *ultra vires* activities and are
within the scope of the exercise and discharge of a
governmental function. *Id.,* pp 82-83.

The tendency of this Court to define individual
immunity with respect to "governmental function"
has been criticized as blurring two separate inquir-
ies.[40] As noted in *Williams,* individual immunity
may exist where sovereign or governmental immu-
nity does not. For example, a governmental agency

---

[40] See, *e.g.,* Littlejohn & DeMars, *supra,* pp 37-38.

which runs a statutorily mandated or authorized
activity that is proprietary in nature would not be
entitled to immunity under § 13. However, those
officials and employees who are required to make
decisions as to how the proprietary activity must
be carried out should be entitled to immunity as
long as they are acting within the scope of their
authority and during the course of their employ-
ment. Individual immunity exists to ensure that a
decision-maker is free to devise the best overall
solution to a particular problem, undeterred by
the fear that those few people who are injured by
the decision will bring suit. We therefore will no
longer define the parameters of individual immu-
nity with reference to whether the tortfeasor was
engaged in the exercise or discharge of a govern-
mental function.

The *"ultra vires"* element of the individual im-
munity test also has its drawbacks. By definition,
*ultra vires* activities are those which are unautho-
rized and outside the scope of employment. Offi-
cials and employees who engage in such activities
have never been immune from tort liability, even
under the traditional "discretionary/ministerial"
test. However, under the present formulation of
the *"ultra vires"* test, immunity is extended to
every public official, employee, and agent when-
ever they engage in authorized acts, including
those which are merely ministerial. Such broad
individual immunity is not justified by either prior
case law or present-day realities. The mere fact
that individuals are employed by a governmental
agency does not relieve them of the responsibility
to perform their duties properly and conscien-
tiously.

Michigan's traditional "discretionary/ministe-
rial" approach to individual immunity is some-
what different than that of other jurisdictions.

Michigan case law affords absolute immunity to all public officials, employees, and agents for both intentional and negligent torts whenever they are engaged in discretionary acts within the scope of their authority. In contrast, other jurisdictions have extended different levels of immunity depending upon the function of the officer. Absolute immunity from tort liability is granted to judges, legislators, and the highest executive officials of all levels of government, even for malicious acts, as long as they are acting within their respective judicial, legislative, and executive authority. Lower level officers, employees, and agents are extended only qualified immunity. This immunity exists when the individual is engaged in discretionary acts which are performed in good faith. An employee therefore risks liability for negligently performed ministerial acts, regardless of good faith. Prosser, *supra*, § 132, pp 987-990, and cases cited therein; Littlejohn & DeMars, *Governmental Immunity After Parker and Perry: The King Can Do Some Wrong*, 1982 Det C L Rev 1, 25-27.

This disparate treatment of individuals based upon their official function has been justified as follows:

"It is assumed through the broad grant of immunity to certain public employees that these officials and, therefore, their governmental agencies, will not be intimidated nor timid in the discharge of their public duties. Although absolute immunity may be necessary for unfettered governmental decision-making, courts have been reluctant, understandably, to extend its protection beyond select public employees who are delegated policy-making powers.

\* \* \*

"\* \* \* The policy which only provides a limited immunity to lower level executive officials, unlike the justifications for absolute immunity, reflects a recogni-

tion that official immunity should not shield malicious or intentionally unlawful behavior when the actor is not engaged in broad, essential governmental decision-making. Holding these public servants liable does not hamper or intimidate them in the faithful discharge of their duties since they are responding to established administrative guidelines, regulations and informal policy. It is assumed, therefore, that an unreasonable burden does not fall on an administrative system when courts hold lower level executive employees liable for their acts performed in bad faith." Littlejohn & De-Mars, *supra,* pp 27-28.

We are persuaded that a similar scheme of individual immunity should be adopted in Michigan. We therefore hold that judges, legislators, and the highest executive officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their judicial, legislative, or executive authority. Lower level officials, employees, and agents are immune from tort liability only when they are

1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority;[41]

2) acting in good faith; and

---

[41] The requirement that the individual act, or reasonably believe he is acting, within the scope of his authority satisfies the concern of some commentators who believe that an individual should not be held liable merely because it is later determined that he acted under an unconstitutional statute or otherwise had no actual authority. As Dean Prosser has noted, an officer's decision as to how, when, or where to act necessarily involves a discretionary or judicial determination that he has the authority to so act. Prosser, *supra,* § 132, p 991. This reasoning was impliedly used in *Wall v Trumbull,* 16 Mich 228, 237-238 (1867), where it was stated that the township board had jurisdiction to determine whether a claim was lawful and to act accordingly.

The requirement that the individual act during the course of his employment *and* within the scope of his authority parallels the language of § 8, which authorizes a governmental agency to defend and indemnify its officers and employees.

3) performing discretionary, as opposed to ministerial acts.

Under this test, no individual immunity exists for *ultra vires* activities.

The final problem is defining "discretionary" and "ministerial" acts. Because of the longstanding difficulty of accurately differentiating between discretionary and ministerial acts, some writers have suggested that the distinction be abandoned.[42] We decline this opportunity to do so. The "discretionary/ministerial" test has a long common-law history and grants immunity to individuals only to the extent necessary to guarantee unfettered decision-making.

"Discretionary" acts have been defined as those which require personal deliberation, decision, and judgment. Prosser, *supra,* § 132, p 988. This definition encompasses more than quasi-judicial or policy-making authority, which typically is granted only to members of administrative tribunals, prosecutors, and higher level executives.[43] However, it does not encompass every trivial decision, such as "the driving of a nail,"[44] which may be involved in performing an activity. For clarity, we would add the word "decisional" so the operative term would be "discretionary-decisional" acts.

"Ministerial" acts have been defined as those which constitute merely an obedience to orders or the performance of a duty in which the individual has little or no choice. *Id.* We believe that this definition is not sufficiently broad. An individual who decides whether to engage in a particular activity and how best to carry it out engages in

[42] See Prosser, *supra,* p 991, and authorities cited therein.

[43] See Littlejohn & DeMars, *supra,* p 26.

[44] See Prosser, *supra,* p 990, quoting *Ham v Los Angeles County,* 46 Cal App 148, 162; 189 P 462 (1920).

discretionary activity. However, the actual execution of this decision by the same individual is a ministerial act, which must be performed in a non-tortious manner. In a nutshell, the distinction between "discretionary" and "ministerial" acts is that the former involves significant decision-making, while the latter involves the execution of a decision and might entail some minor decision-making. Here too, for clarity, we would add the word "operational" so the operative term would be "ministerial-operational" acts.

Many individuals are given some measure of discretionary authority in order to perform their duties effectively. Therefore, to determine the existence and scope of the individual's immunity from tort liability in a particular situation, the specific acts complained of, rather than the general nature of the activity, must be examined. The ultimate goal is to afford the officer, employee, or agent enough freedom to decide the best method of carrying out his or her duties, while ensuring that the goal is realized in a conscientious manner.

Under the rules set forth today, it is obvious that the immunity extended to individuals is far less than that afforded governmental agencies. We believe that this was the result intended by the Legislature. The threat of personal liability for engaging in *ultra vires* activities or tortiously executing one's duties may be the most effective way of deterring improper conduct. We note, however, that a governmental agency is statutorily authorized to defend or indemnify its officers, employees, and agents in its discretion under certain circumstances. This statutory authorization could be the basis for a contractual agreement of representation and indemnification.

VI. *Application of Law to Cases*

*Ross v Consumers Power Co*

Appellant, the John Saines Project I Drainage District, contracted the construction of a drain to Dunigan Brothers, Inc. Since a portion of the drain was to be constructed on property owned by appellee, Consumers Power Company, Consumers granted an easement to Jackson County. On August 24, 1971, Michael Ross, a Dunigan employee, was injured when a vehicle in or near which he was working came in contact with overhead electric power lines maintained by Consumers.

Ross sued Consumers and the action was eventually settled. Consumers filed an amended third-party complaint against the district and drain commissioner, alleging two counts in contract and one count in tort. The Court of Appeals summarized the allegations contained in the tort claim as follows:

"In its essentials, Consumers' tort claim against the District alleges negligence arising out of a failure to notify Consumers that work was being undertaken that could interfere with the power lines, a failure to make arrangements with Consumers to safeguard workers from contact with the lines, a failure to instruct and warn its contractors concerning the lines, a failure to hire a properly licensed and competent contractor, and a failure to adequately supervise and inspect the project in such a manner as to prevent the accident from occurring." 93 Mich App 687, 697; 287 NW2d 319 (1979).

The trial court granted the district and commissioner's motion for summary judgment as to all three counts. Consumers appealed only the judgment for the district. The Court of Appeals reversed as to the two contract counts because § 7 of the governmental immunity act does not grant immunity from contract liability. Applying Justice

Moody's "essence of governing" test, the Court concluded that the district was also not immune from tort liability because the construction of a drain is not of the essence of governing. The district appealed only the decision concerning the tort claim. This Court affirmed by an equally divided Court, 415 Mich 1; 327 NW2d 293 (1982), but subsequently granted rehearing. 417 Mich 1113 (1983).

This appeal involves only the direct liability of a non-sovereign governmental agency for its negligence in contracting out, supervising, and inspecting the construction of a drain. The crucial inquiry is whether these activities, from which the injuries arose, constitute the exercise or discharge of a non-proprietary, governmental function. There is no allegation that any of these activities were conducted by the district primarily for pecuniary profit. We therefore must determine whether the contracting out, supervision, and inspection of the construction were activities which the district was expressly or impliedly mandated or authorized by constitution, statute, or other law to perform.

Const 1963, art 4, §§ 51 and 52 require the Legislature to provide for the protection and promotion of public health and the state's natural resources. The Drain Code of 1956, MCL 280.1 et seq.; MSA 11.1001 et seq., is a comprehensive act governing the establishment of drainage districts and construction of drains. A drainage district has the power to contract under § 5, and the drain commissioner is specifically authorized to let out construction contracts under prescribed circumstances. See, e.g., §§ 151, 154, 221-223, 471. Furthermore, the commissioner, or a competent designatee, is required to inspect and approve all construction work. § 241. Any right to supervise the actual construction of a drain is impliedly author-

ized by the district's general power over the establishment, construction, and maintenance of drains. The trial court correctly found that the district is immune from tort liability.

## *Willis v Nienow*

## *Willis v Dep't of Social Services*

The Court of Appeals summarized the facts of these cases as follows:

"These cases arose out of the same incident and were consolidated on appeal. Plaintiff is the administratrix of the Estate of Jeffrey Willis. On August 16, 1978, 16-year-old Jeffrey was a resident of Harbor House, a juvenile care facility for delinquent and neglected youths operated by defendant Department of Social Services. At Harbor House, defendant Dennis Nienow was the director, defendant Erma Knox was a counselor, and defendant Cindy Hunt was a student-intern. Jeffrey and other Harbor House residents were taken for a swimming outing on Lake Michigan under the supervision of Knox and Hunt. Jeffrey drowned in the course of the outing.

"Plaintiff brought actions against defendants State of Michigan and Department of Social Services in the court of claims and against defendants Nienow, Knox, and Hunt in circuit court. Plaintiff's complaints alleged that Jeffrey and Knox could not swim or were of marginal swimming ability, that neither Knox nor Hunt had lifesaving training, that there were no lifeguards on duty at the time in question, that Jeffrey and other Harbor House residents were allowed to swim in areas not designated as swimming areas, and that Jeffrey and the other residents were allowed to swim under dangerous weather conditions. In each case the trial court granted summary judgment for defendants based on governmental immunity * * *." 113 Mich App 30, 32-33; 317 NW2d 273 (1982).[45]

---

[45] Plaintiff alleged claims based on negligence, gross negligence, wilful, wanton and reckless conduct, breach of fiduciary duty, and breach of implied contract. As to the latter two claims, the circuit

The Court of Appeals, applying Justice MOODY's reasoning in *Perry,* concluded that the operation of a juvenile care facility constitutes a governmental function and that recreational activities are directly related to an effective program of caring for the children. Using the traditional "discretionary/ministerial" test for individual immunity, the Court concluded that defendant Nienow's hiring decisions involved discretionary acts which were entitled to immunity, but the manner in which the swimming outing was conducted involved ministerial acts. Finally, the Court held that plaintiff had failed to state a cause of action for intentional tort. Thus, judgment for the state and DSS was affirmed, but reversed as to the individual defendants.

Plaintiff essentially alleges that Nienow, Knox, and Hunt were negligent or reckless in allowing decedent to participate in the swimming outing and in failing to adequately care for and supervise him. In deciding whether these defendants are entitled to immunity, we must determine whether they were 1) acting during the course of their employment and within the scope of their authority; 2) acting in good faith; and 3) performing discretionary-decisional acts.

There is no suggestion that the supervision of children during recreational activities was not during the course of defendants' employment or within the scope of their authority. There is no allegation of bad faith. Assuming that each defen-

court found that the complaint did not state additional significant facts which would establish a fiduciary relationship or the terms of any contract. Plaintiff was merely attempting to avoid governmental immunity. The Court of Claims did not discuss these counts separately. Since plaintiff did not specifically challenge the circuit court's conclusion in either the Court of Appeals or this Court, we need not determine whether summary judgment was properly granted for defendants as to these two counts.

dant had the authority to, and in fact did, decide who would participate in the outing, as well as when and where it would be conducted, we hold that these were discretionary-decisional acts entitled to immunity. However, the execution of these decisions, which included the care and supervision of the participating children, were ministerial-operational acts that entailed only minor decision-making.

As to defendant Nienow, plaintiff alleged that he was negligent in hiring Knox and Hunt. There is no suggestion that the hiring of personnel was outside the course of Nienow's employment or beyond the scope of his authority. Nor is bad faith alleged. We agree with the Court of Appeals that the decision to hire Knox and Hunt was a discretionary-decisional act entitled to immunity.

The complaint against the state and the DSS does not clearly differentiate between direct and vicarious liability theories. It can be read as alleging that defendants themselves did not adequately care for and supervise decedent, or that they are vicariously liable for their employees' negligent care and supervision. Assuming that a vicarious liability theory was pleaded, we have already assumed that the employees were acting during the course of their employment and within the scope of their authority. The question therefore is whether allowing decedent to participate in a swimming outing, and the care and supervision of decedent during the outing, constitute the exercise or discharge of a non-proprietary, governmental function.

There is no allegation that the swimming outing was conducted primarily for pecuniary profit. Furthermore, recreational activities for delinquent and neglected children residing in state facilities are impliedly authorized by statute. The Social

Welfare Act, MCL 400.1 *et seq.;* MSA 16.401 *et seq.,* requires the DSS, through the office of children and youth services, to operate halfway houses, regional detention facilities, etc., with the goal of providing "an effective program of out-of-home care." § 115(a). Recreational activities can be an important part of such a program. Implicit in the authority to conduct such activities is the authority to decide who will participate in them.

Finally, the DSS is expressly required by statute to care for and supervise children residing in state facilities. Sections 3 and 4(1) of the Youth Rehabilitation Services Act, MCL 803.301 *et seq.;* MSA 25.399(51) *et seq.,* require the DSS to supervise and operate state facilities and programs for the proper care of delinquent and neglected children. Even if this statute did not exist, the care of resident children implies a responsibility to supervise them in order to prevent, as far as is practicable, any unnecessary injury. We therefore conclude that the state and the DSS are entitled to sovereign immunity from tort liability since the injuries arose while they and their employees were engaged in the exercise or discharge of a governmental function.

We also conclude that plaintiff failed to state a claim of intentional tort against any of the defendants for the reasons stated by the Court of Appeals.

### Siener v Dep't of Mental Health

Plaintiff Russell Siener, Jr., was an in-patient at the Hawthorn Center, a state mental health facility for emotionally disturbed children. On July 8, 1976, plaintiff and several other patients were taken by the center's personnel on a field trip to Greenfield Village in Dearborn, Michigan. Plaintiff maintained that a supervisor had permitted five

boys, including himself, to leave the group without supervision. Subsequently, one of the boys seriously injured plaintiff by striking him in the face with a cast iron pot lid.

Plaintiff brought a negligence action against the state, the Department of Mental Health, and the Hawthorn Center alleging that they had failed to properly supervise and control the patients. The Court of Claims denied defendants' motion for summary judgment because plaintiff had pled facts in avoidance of governmental immunity. The Court of Appeals reversed. 117 Mich App 179; 323 NW2d 642 (1982). The Court found that under *Perry,* the operation of a state mental health facility for children is a governmental function. Furthermore, the field trip was directly related to the effective care of emotionally disturbed children. The Court rejected plaintiff's argument that MCL 330.1722; MSA 14.800(722) is a statutory exception to the governmental immunity act.

The complaint could be read as alleging that defendants are directly liable because of their failure to provide adequate supervision and control over plaintiff and the other patients, or that defendants are vicariously liable for their employees' negligent supervision. (Plaintiff apparently has not commenced an action against the individual employees.) Plaintiff does not argue that the field trip should not have been conducted, or that he should not have been allowed to participate. Assuming that a vicarious liability theory was pleaded, there is no suggestion that the employees who supervised the patients during the field trip were not acting during the course of their employment or within the scope of their authority. Furthermore, there is no allegation that the trip was conducted primarily for pecuniary profit. We must therefore determine whether the control and supervision of

emotionally disturbed patients by defendants and their employees during a field trip is expressly or impliedly mandated or authorized by constitution, statute, or other law.

Educational and recreational field trips for emotionally disturbed, in-patient children are impliedly authorized by constitution and statute. Const 1963, art 8, § 8 states that programs and services for the care, treatment, education, or rehabilitation of the mentally or otherwise seriously handicapped shall always be fostered and supported. Section 116 of the Mental Health Code, MCL 330.1001 *et seq.;* MSA 14.800(1) *et seq.,* authorizes the Department of Mental Health to provide directly, or through contractual arrangement, any type of patient service related to the treatment, care, education, training, and rehabilitation of the mentally ill or retarded. In addition, a child who resides in a mental health facility is entitled to an education. § 738.

Finally, the Department of Mental Health and the Hawthorn Center are expressly and impliedly required by statute to adequately control and supervise in-patients of mental health facilities. All residents are entitled to a safe, sanitary, and humane living environment. § 708. The governing body of a mental health facility is responsible for the operation of the facility, the selection of the medical staff, and the quality of care rendered. § 143. Implicit in the notion of caring for emotionally disturbed patients is the responsibility to control and supervise them to prevent, as far as is practicable, any unnecessary injury. We therefore conclude that defendants are entitled to sovereign immunity from tort liability since the injury arose while they and their employees were engaged in the exercise or discharge of a governmental function.

Plaintiff maintains the defendants are nevertheless liable because § 722 of the Mental Health Code[46] is an exception to § 7 of the governmental immunity act. Section 722 provides in part that if a recipient of mental health services is physically or otherwise abused, the recipient has a right to pursue injunctive and other appropriate civil relief. We disagree with plaintiff's argument for the reasons stated in *Rocco v Dep't of Mental Health,* 114 Mich App 792, 798-799; 319 NW2d 674 (1982):

"MCL 330.1700 *et seq.;* MSA 14.800(700) *et seq.,* enumerates certain rights possessed by recipients of mental health services. The statute's purpose is to ensure that patients are treated in a humane manner and that their privacy is maintained. The statute focuses on the duty of the health care facility towards its patients. None of the sections discusses the rights and responsibilities between patients. The statute's primary purpose is to protect the patient from certain abuses by the mental health facility or its staff. When this purpose is read into MCL 330.1722; MSA 14.800(722), it is clear that this provision was meant to prevent the staff of a mental health care facility from abusing the patients in its care. It was not the intention of the Legislature to abolish governmental immunity in those cases where one patient attacks another."

[46] MCL 330.1722; MSA 14.800(722) provides:

"(1) A recipient of mental health services shall not be physically, sexually, or otherwise abused.

"(2) The governing body of each facility shall adopt written policies and procedures designed to protect recipients of mental health services from abuse and to prevent the repetition of acts of abuse. The policies and procedures shall more particularly define abuse, shall provide a mechanism for discovering instances of abuse and for reviewing all charges of abuse, shall ensure that firm and appropriate disciplinary action is taken against those who have engaged in abuse, and shall contain those additional provisions deemed appropriate by the governing body.

"(3) A facility shall cooperate in the prosecution of appropriate criminal charges against those who have engaged in unlawful abuse.

"(4) Any recipient of mental health services physically, sexually, or otherwise abused shall have a right to pursue injunctive and other appropriate civil relief."

## Rocco v Dep't of Mental Health

The Court of Appeals summarized the facts of this case as follows:

"On January 7, 1980, plaintiffs' decedent, Daniel Rocco, was a resident patient of the Ypsilanti Regional Psychiatric Hospital (hospital). That night, while he was sleeping in his hospital bed, Rocco was murdered by another patient. The murderer was Andrew Higginbotham, a patient who had a history of violence and assaultive behavior.

"Plaintiffs filed a complaint in the Court of Claims against two state agencies (the Department of Social Services and the Department of Mental Health) which supervise the administration of the hospital, and the hospital. The state agencies and hospital are hereinafter referred to as defendants. The complaint consisted of two counts. Count I alleged negligence in that defendants failed to take steps to protect the decedent from attack by violent patients in the hospital. Specifically, plaintiffs alleged that defendants breached their duty of care and committed malpractice in that they were aware of Higginbotham's violent and criminal tendencies, yet placed him unrestrained and unsupervised in the same ward with the decedent. Count II alleged breach of implied contract, averring that plaintiffs agreed to and did in fact pay for the care and treatment of the decedent but that defendants breached their contractual duty by failing to protect the decedent from harm and abuse by other patients at the hospital." Rocco, supra, pp 794-795.

Defendants were granted summary judgment on both counts. The Court of Appeals affirmed the judgment as to Count I, concluding that the operation of a state mental hospital is a governmental function and that § 722 of the Mental Health Code is not an exception to governmental immunity. As to Count II, the majority held that the breach of an implied contract claim was not merely a restatement of the tort claim. Since the governmen-

tal immunity act does not bar contract claims, judgment for defendants was reversed.

The tort claim alleges that defendants are directly and vicariously liable. As to the vicarious liability theory, there is no suggestion that defendants' employees were not acting during the course of their employment or within the scope of their authority. Although plaintiffs paid for the care rendered to decedent by the hospital, there is no allegation that the hospital provided such care primarily for pecuniary profit. In fact, § 808 of the Mental Health Code specifically limits the total financial liability of a recipient of mental health services to the cost of the services rendered. The crucial inquiry therefore is whether the placement of patients within a mental health facility, and the care, control, and supervision of in-patients, are activities which are expressly or impliedly mandated or authorized by constitution, statute, or other law.

The evaluation of patients upon admission and periodically thereafter is expressly mandated by § 710 of the Mental Health Code. A patient may be secluded or his freedom of movement restricted only insofar as such action is necessary to prevent the patient from physically harming himself or others, or causing substantial property damage. §§ 742(2), 744. The governing body of a mental health facility is required to establish the maximum length of time seclusion may last, how often the patient must be examined, and any other appropriate regulations. § 742(6). Finally, we have previously concluded in *Willis* and *Siener, supra,* pp 638–644, that the Department of Mental Health, the DSS, and a mental health facility have an express and implied responsibility to care for, control, and supervise residents of state facilities. We therefore hold that defendants are entitled to sovereign

immunity from tort liability because the injuries arose while they and their employees were engaged in the exercise or discharge of a governmental function. As in *Siener,* we reject plaintiffs' argument that § 722 is an exception to the governmental immunity act.

Defendants recognize that the governmental immunity act grants immunity only from tort liability, but maintain that plaintiffs' contract claim should be dismissed because it merely restates the allegations contained in their tort count. We disagree. Defendants brought their motion for summary judgment under GCR 1963, 117.2(1). Such motions test the legal basis of the complaint, not whether it can be factually supported. Accepting as true a plaintiff's allegations, and any conclusions that may reasonably be drawn therefrom, the motion must be denied unless the claim is so clearly unenforceable as a matter of law that no factual development could justify a right to recover. Although most of the allegations contained in Counts I and II are identical, the latter count also alleges that plaintiffs contracted and agreed with defendants for decedent's care and treatment; plaintiffs paid valuable consideration for decedent's care; and defendants breached their contractual duties to plaintiffs and decedent. These allegations are sufficient to withstand defendants' challenge.

We recognize that plaintiffs have and will attempt to avoid § 7 of the governmental immunity act by basing their causes of action on theories other than tort. Trial and appellate courts are routinely faced with the task of determining whether the essential elements of a particular cause of action have been properly pleaded and proved. If a plaintiff successfully pleads and establishes a non-tort cause of action, § 7 will not bar

recovery simply because the underlying facts could have also established a tort cause of action.

### Regulski v Murphy

Plaintiff, a seventeen-year-old attending high school in defendant Wayne-Westland School District, was enrolled in a building trades class, which was offered as part of the school's vocational education program. Participating students were required to build a house, which was then sold by the district to a private buyer. On October 10, 1975, plaintiff was injured when he attempted to hammer a nail into a piece of wood. Apparently, he hit the nail at an angle, causing it to fly up and strike him in the eye.

Plaintiff sued the school district, the director of the vocational building trades program, and the instructor of the class. In his amended complaint, plaintiff alleged that the district was engaged in a proprietary function and that all of the defendants were negligent in failing to properly instruct, warn, and supervise plaintiff. In addition, defendants had failed to provide safety glasses, adequate first-aid supplies at the site, and transportation for emergencies. After discovery was completed, defendants moved for and were granted summary judgment. The Court of Appeals affirmed, concluding that the operation of a building trades class is a governmental function which entitled the district to governmental immunity. Since the individual defendants were engaged in a governmental function, they too were immune. 119 Mich App 418; 326 NW2d 528 (1982).

The cause of action against the school district alleges both direct and vicarious liability. As to the vicarious liability theory, there is no suggestion that the individual defendants were not acting during the course of their employment or

within the scope of their authority. We therefore must determine whether the instruction and supervision of students enrolled in a building trades class, as well as the provision of safety devices and measures, constitute the exercise or discharge of a non-proprietary, governmental function.

Plaintiff alleged that the district built and sold the house "for the purpose of producing *a* pecuniary profit." The district disagreed and offered evidence showing that the class was not designed to be a profit-making venture and that the district in fact lost money on the sale of the house. We need not decide whether a governmental agency must actually realize a pecuniary profit from the challenged activity before § 13 of the governmental immunity act will allow a tort recovery, or whether there was no genuine issue or material fact on this point. During arguments on the motion for summary judgment, plaintiff's counsel admitted that the class was not conducted *primarily* for pecuniary profit. Instead, he argued below and here that the seeking of remuneration and the possibility of any incidental profit is sufficient evidence of a proprietary function. Although at one time any incidental profit generated by an activity was sufficient to defeat an agency's claim of immunity, the Legislature in § 13 has modified this rule to require that the activity be conducted *primarily* for pecuniary profit. On the basis of these facts, we conclude that the operation of the building trades class was not a proprietary function.

The board of a school district is required under § 1282 of the School Code of 1976, MCL 380.1 *et seq.;* MSA 15.4001 *et seq.,* to establish and carry on the departments it deems necessary or desirable, determine the courses of study to be pursued, and cause its pupils to be taught in the depart-

ments it deems expedient. The board is expressly authorized by § 1287 to establish, equip, and maintain vocational education programs and facilities. Section 1288 specifically requires each pupil participating in certain vocational and industrial arts classes to wear eye protective devices.[47] Furthermore, the board must make reasonable regulations concerning anything necessary for the proper establishment, maintenance, management, and carrying on of public schools, including regulations concerning the safety of children while in attendance at school, or en route to and from school. § 1300. Thus, the district was expressly authorized to offer the building trades course and was expressly and impliedly required through its employees to instruct, warn, and supervise the students, as well as to provide safety equipment and measures, in order to prevent any unnecessary harm to the students. Since the injuries arose while the district and its employees were engaged in the exercise or discharge of a governmental function, the district is entitled to governmental immunity from tort liability.

As to the liability of the individual defendants, we have already assumed that they were acting during the course of their employment and within the scope of their authority. There is no allegation that they were acting in bad faith. The question therefore is whether they were engaged in discretionary-decisional acts.

Plaintiff has not alleged that the individual defendants were negligent in offering the class,

---

[47] The dissent notes that the district may have violated § 1288 of the School Code by not requiring each student to wear eye protective devices during the class. Since plaintiff has never alleged or argued that he is entitled to relief because of this statutory violation, we need not determine whether § 1288 authorizes the recovery of damages from a school district in spite of § 7 of the governmental immunity act.

allowing him to participate, or deciding where and when to conduct the class. Such acts are discretionary-decisional in nature. Instead, plaintiff alleged that defendants were negligent in instructing, warning, and supervising him. Although some decision-making is involved in these activities, it is relatively minor. Instruction and supervision are essentially ministerial-operational activities for which there is no immunity from tort liability.

As to the allegation of inadequate safety measures, we have previously noted that a school board is statutorily required to provide for the safety of its students and, in particular, to provide eye protective devices to those participating in certain potentially dangerous activities. It is unclear whether plaintiff alleged that the individual defendants were negligent in establishing the type and extent of safety measures, or merely failed to provide that which was required by statute and school policy. If any of the defendants were responsible for establishing the school's policy as to the type of eye protective devices that would be provided to the students, the type of first-aid supplies to have at the building site, and what emergency transportation measures would be provided, that defendant is immune from tort liability because these are discretionary-decisional acts. However, the individuals can be held liable for failing to comply with § 1288 and the school's safety policy since the actual provision of eye protective devices, first-aid supplies, and emergency transportation involves only ministerial-operational acts. Summary judgment for the individual defendants is therefore reversed and the case remanded for trial.

## Trezzi v City of Detroit

On April 23, 1978, plaintiff's parents were attacked by an unknown assailant who had forcibly

entered their Detroit home. When plaintiff walked by the house, he noticed that a refrigerator door was ajar and that there were no lights on in the house. Plaintiff called Detroit's 911 emergency assistance system six times for help. Unknown 911 operators assigned a low-priority rating to the calls and passed them on to a police dispatcher. The dispatcher sent a police vehicle approximately one and one-half hours after plaintiff's first call.

Plaintiff brought an action against the City of Detroit, the dispatcher, and the 911 operators alleging that his parents sustained fatal injuries as a result of the delayed response. When the city moved for summary judgment, plaintiff amended his complaint to allege both negligent and intentional tort. The city was granted summary judgment, the dispatcher eventually settled with plaintiff, and the suit against the unknown operators was dismissed. The city refused to defend or indemnify the dispatcher for the judgment, which apparently remains unsatisfied.

A majority of the Court of Appeals affirmed the judgment for the city. 120 Mich App 506; 328 NW2d 70 (1982). The entire panel agreed that under the "essence to governing" test, the operation of a 911 emergency system would not constitute a governmental function, although it would under the "common good of all" test. Applying Justice MOODY's "essence of governing" test, the majority concluded that the 911 system was an indispensable part of the operation of a police department with no common analogy in the private sector. The panel agreed that plaintiff's intentional tort claim actually alleged no more than gross negligence. Plaintiff does not challenge this latter holding in this Court.

As explained in the Court of Appeals dissenting opinion, the Detroit 911 system handles emergency

calls for police, fire, and medical assistance. It is staffed by civilian employees of the city, who rank the seriousness of the calls and contact police, fire, and medical dispatchers. The system is designed to make emergency assistance more effective by freeing up police and fire personnel and enabling citizens to request help by dialing three easily remembered digits. The system essentially acts as a clearinghouse for emergency calls.

This appeal involves only the vicarious liability of a non-sovereign governmental agency for its employees' negligence. There is no suggestion that the employees were not acting during the course of their employment or within the scope of their authority. There is no allegation that the 911 system was operated primarily for pecuniary profit. We therefore must determine whether the categorizing of emergency calls by a 911 operator and the dispatch of police vehicles in accordance therewith are activities which are expressly or impliedly mandated or authorized by constitution, statute, or other law.

Const 1963, art 7, § 22 gives the electors of each city the power to frame and adopt a city charter. In addition, the city has the power to adopt resolutions and ordinances relating to its municipal concerns, property, and government. Since Detroit is a home-rule city, its charter must provide for the public peace, health, and safety of persons and property. MCL 117.3(j); MSA 5.2073(j). Pursuant to these constitutional and statutory provisions, Detroit Charter, art 7, ch 11, § 7-1101 establishes a police department which is required to preserve the public peace, prevent crime, arrest offenders, protect the rights of persons, preserve order, and enforce laws and ordinances. Section 7-1103 authorizes the board of police commissioners to establish policies, rules, and regulations. In order to accom-

plish its duties, the police department necessarily needs some sort of system for accepting, processing, and acting upon calls for police assistance. Thus, the 911 emergency assistance system and the police dispatch system, including their internal procedures for determining the seriousness of calls and dispatching vehicles, are impliedly authorized by constitution, statute, and city charter. Since the injuries arose while the city's employees were engaged in the exercise or discharge of a governmental function, the city is entitled to governmental immunity from tort liability.

*Disappearing Lakes Ass'n v Dep't of Natural Resources*

Plaintiffs are property owners of land adjoining Square Lake and Little Square Lake in Oakland County. From 1966 to 1976, the Michigan Department of Conservation and its successor, the Department of Natural Resources, issued permits and extensions to a private land developer for the dredging of canals south of Lake Orion and immediately north of plaintiffs' property. In 1977, the water level of the Square Lakes began to drop precipitously. The recreational and aesthetic purposes of the lakes were eventually destroyed. Studies indicate that the water loss was caused by interference with the subsurface water flow, which occurred when the canals were dredged.

Plaintiffs filed suit in 1979 against the state and the DNR in the Court of Claims seeking damages for nuisance and negligence. A similar action was commenced in circuit court against Orion Township, Oakland County, and several municipal boards and individuals. The suits were eventually consolidated. In 1981, the circuit court granted the state and the DNR's motion for summary judgment on the ground of governmental immunity.

The Court of Appeals affirmed, holding that

regardless of which test was applied, the issuance of dredging permits by the DNR constituted a governmental function. After examining numerous cases, the Court concluded that a governmental agency cannot be held liable in nuisance unless it actually controlled the project which created the nuisance. Issuance of dredging permits alone was not sufficient evidence of control. Plaintiffs' claims that the state had taken their property without due process of law, that the DNR had acted outside the scope of its authority, and that plaintiffs were entitled to equitable relief were rejected because these claims had not been raised before the trial court. 121 Mich App 61; 328 NW2d 570 (1982).

Count II of plaintiffs' complaint essentially alleges that the state and the DNR are directly and vicariously liable for negligently issuing permits without adhering to statutory guidelines or conducting proper studies, failing to warn of the possible adverse effects of dredging, and failing to revoke the permits.[48] As to the vicarious liability theory, there is no suggestion that defendants' employees were not acting during the course of their employment or within the scope of their authority. Nor is there any allegation that the issuance of dredging permits was conducted primarily for pecuniary profit. Therefore, we must determine whether the issuance of dredging permits and extensions, and activities related thereto, are activities which are expressly or impliedly mandated or authorized by constitution, statute, or other law.

Const 1963, art 4, § 52 requires the Legislature

---

[48] We assume that plaintiffs' cause of action accrued after August 1, 1970, the effective date of § 7 of the governmental immunity act. Plaintiffs have never alleged that the holding of *Pittman v Taylor* is applicable to the facts of this case. See fn 23 and accompanying text.

to provide for the protection of the state's waters from pollution, impairment, and destruction. In 1965, the Legislature first enacted the Inland Lakes and Streams Act. See 1965 PA 291, as amended by 1968 PA 7, MCL 281.731 *et seq.;* MSA 11.451 *et seq.* This act was repealed and replaced in 1972 by a substantially similar act. See 1972 PA 346, MCL 281.951 *et seq.;* MSA 11.475(1) *et seq.* The primary purpose of both acts was the regulation and protection of the state's inland lakes and streams.[49]

Under the act, any person who wishes to dredge canals is required to obtain a permit from the DNR. §§ 3, 5. A permit must be issued if the project will not adversely affect the public trust or riparian rights. In making this determination, the DNR must consider the possible effects of the proposed project upon inland lakes, streams, and waters, as well as the impact on their recreational, aesthetic, and other uses. No permit can be issued if the project will unlawfully impair or destroy any waters or other natural resources. § 7. Once issued, the permit is effective for its stated term, unless revoked for cause, and may be renewed. The permit may specify the term and conditions under which the work is to be carried out. § 8.

Thus, the DNR is statutorily required to issue dredging permits once certain conditions are met and to revoke them if there is sufficient cause. In determining whether a permit should be issued, renewed, or revoked, the DNR is impliedly authorized to conduct studies and inspect the proposed and current dredging sites, although such actions are not required. The DNR is expressly authorized to impose conditions on the dredging in order to

---

[49] Since the relevant statutory provisions of both acts are sufficiently similar for purposes of this discussion, only current statutory provisions will be cited.

avoid adverse environmental consequences. Such conditions serve as a warning to the permittee to conduct its dredging in a careful manner. We therefore conclude that the state and the DNR are entitled to sovereign immunity from tort liability since the injuries arose while they and their employees were engaged in the exercise or discharge of a governmental function.

The Court of Appeals conclusion that plaintiffs had insufficiently pleaded a nuisance cause of action is not clearly erroneous. Plaintiffs essentially asserted only a negligence claim. The damage to the lakes may have been sufficiently severe to constitute an unconstitutional taking of private property without just compensation or warrant injunctive relief; however, plaintiffs did not raise these arguments before the trial court and have not pursued them on appeal to this Court.

*Zavala v Zinser*

The Court of Appeals summarized the facts of this case as follows:

"This controversy arose out of the shooting of plaintiff Jose Zavala outside a Detroit bar in the early morning hours of November 2, 1975. As Mr. Zavala left the bar that morning, he encountered a large group of people in front of the building; some of the people, including Mr. Zavala's brother, were fighting. After shouting at his brother to stop fighting, Mr. Zavala was shot and seriously injured by one of the participants in the fight. At the time of the incident, defendants Zinser and Harris, City of Detroit police officers, were sitting nearby in their marked police vehicle.

"Plaintiffs sued several of the participants in the fight. They were later granted permission to amend their complaint to add defendants Zinser, Harris, and the City of Detroit. They alleged that defendants Zinser and Harris had been negligent in failing to stop the fight, in failing to stop Mr. Zavala's assailant from

shooting him, and in generally failing to uphold or enforce the law. They alleged a 'special relationship' between Mr. Zavala and defendant police officers giving rise to a duty of due care toward him. Plaintiffs further alleged the vicarious liability of defendant City of Detroit for the negligent conduct of its employees.

"Defendants Zinser, Harris, and the City of Detroit moved for summary judgment under GCR 1963, 117.2(1). The court ruled that plaintiffs' claims against defendant city were barred by governmental immunity, and that any duties owed by defendant police officers in this case had been owed to the public generally and not to Mr. Zavala individually. The motion for summary judgment was, therefore, granted." 123 Mich App 352, 354-355; 333 NW2d 278 (1983).

A majority of the Court of Appeals agreed that if a police officer breaches his duty to preserve the peace, the officer is liable only to the public. Since plaintiffs failed to allege sufficiently that the officers owed some other duty to them in particular, judgment for the officers was affirmed. Judgment for the city was also affirmed on the grounds that the operation of a police department is a governmental function and a claim of intentional tort had not been alleged. However, the case was remanded for further fact-finding concerning the denial of plaintiffs' motion to amend their complaint to allege a cause of action under 42 USC 1983.

The dissent maintained that judgment for the officers was improper because they had "a ministerial duty to perform some minimum acts to preserve the peace" pursuant to statute, the city charter, and police department policy. Furthermore, plaintiffs' allegation of a "special relationship" was sufficient to give rise to a duty of due care and a question of fact as to whether the officers had acted reasonably.

As to the liability of the individual officers, we

need not decide the "public/individual" duty issue or whether the "special relationship" allegations were legally sufficient, since we conclude that the officers are entitled to individual immunity from tort liability. Plaintiffs admitted in ¶ 39 of their second amended complaint, and the trial court found during the motion for summary judgment, that the officers were acting during the course of their employment and within the scope of their authority. The only allegations of bad-faith conduct appeared in Count VIII of plaintiffs' proposed third amended complaint.[50] However, the trial court did not allow plaintiffs to add this count. Thus, the only question remaining is whether the officers' actions, or lack thereof, in dealing with the fight were discretionary-decisional in nature.

The parties agree that the officers did not sit idly by while the fight occurred. The officers decided not to deal with the disturbance alone and immediately called for backup assistance, which arrived six to ten minutes later. Plaintiffs do not allege that the officers delayed too long in requesting assistance, gave the wrong address, etc. Instead, plaintiffs maintain that the officers did not take the type of action which plaintiffs believe would have been appropriate.

Police officers, especially when faced with a potentially dangerous situation, must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public, the cessation of unlawful conduct, and the apprehension of wrongdoers. The determination of what type of action to take, *e.g.,* make an immediate arrest,

---

[50] Plaintiffs alleged in Count VIII that the officers failed to stop the fight on account of Jose Zavala's race and gender. Zavala is a Mexican-American male. Both officers are female; one is black and the other white.

pursue a suspect, issue a warning, await backup assistance, etc., is a discretionary-decisional act entitled to immunity. Once that decision has been made, however, the execution thereof must be performed in a proper manner, *e.g.*, the arrest must be made without excessive force, the pursuit of the suspect must not be done negligently, the request for assistance must include reasonably accurate information, etc. Since plaintiffs merely alleged negligent performance of a discretionary-decisional act, summary judgment for the individual officers was properly granted.[51]

Plaintiffs' claim against the city alleges vicarious liability for the officers' negligence. As previously noted, the officers were acting during the course of their employment and within the scope of their authority. There is no allegation that the city and its employees were engaged in activities conducted primarily for pecuniary profit. Thus, we must determine whether an officer's decision to request and await backup assistance is expressly or impliedly mandated or authorized by constitution, statute, or other law.

---

[51] In *Sherbutte v Marine City,* 374 Mich 48, 54-55; 130 NW2d 920 (1964), plaintiff brought an action against a police officer for allegedly using excessive force in effectuating his arrest. This Court reversed summary judgment for the officer, stating:

"Appellee's theory is that because *Williams* excluded 'discretionary' acts, and that since a police officer has discretion as to whom he will arrest, for what reason the arrest will be made, and how much force will be used, his action is a 'discretionary' one. The theory is untenable.

\* \* \*

"The action of a police officer in making an arrest cannot be considered within the broad scope of the discretion allowed a free government in its legislative, executive, or judicial branch."

This holding is not necessarily in conflict with our decision today. In *Sherbutte,* plaintiff did not allege that the officer's decision to arrest him was improper, but that the officer had effectuated the arrest in a tortious manner. Unlike the instant case, plaintiff there properly alleged the negligent performance of a ministerial-operational activity for which there is no immunity from tort liability.

As noted in *Trezzi, supra,* the city is expressly required by constitution, statute, and city charter to provide for the public peace, health, and safety of persons and property. The Detroit Police Department and its police officers are charged with the responsibility of preserving the public peace and order, preventing crime, and protecting the rights of persons. In order to accomplish these duties, the department necessarily allows its officers to exercise some judgment and discretion as to when, where, and how to act. Thus, the decision to request and await backup assistance is impliedly authorized by constitution, statute, and city charter. Since the injuries arose while the city's employees were engaged in the exercise or discharge of a governmental function, the city is entitled to governmental immunity from tort liability.

VII. *Conclusion*

In *Ross,* the decision of the Court of Appeals is reversed in part.

In *Willis,* the decision of the Court of Appeals is affirmed.

In *Siener,* the decision of the Court of Appeals is affirmed.

In *Rocco,* the decision of the Court of Appeals is affirmed.

In *Regulski,* the decision of the Court of Appeals is reversed in part.

In *Trezzi,* the decision of the Court of Appeals is affirmed.

In *Disappearing Lakes,* the decision of the Court of Appeals is affirmed.

In *Zavala,* the decision of the Court of Appeals is affirmed.

WILLIAMS, C.J., and RYAN, BRICKLEY, CAVANAGH, and BOYLE, JJ., concurred.

LEVIN, J. *(dissenting in part)*. These nine cases[1] concern sovereign, governmental,[2] and official immunity,[3] and the immunity from tort liability that § 7 of the governmental tort liability act[4] provides to (i) the state, (ii) non-sovereign political units, and (iii) public officers and employees. No constitutional issue has been presented by a party to this litigation.[5]

Section 7 provides:

"Except as in this act otherwise provided, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in

[1] In all these cases except *Disappearing Lakes,* the plaintiffs suffered a physical injury; other factors and considerations might be determinative where the alleged tortious conduct does not cause physical injury.

[2] " '[S]overeign' immunity and 'governmental' immunity are not synonymous. True, they have been over the years used interchangeably in decisions, but a delineation may be helpful. *Sovereign* immunity is a specific term limited in its application to the State and to the departments, commissions, boards, institutions, and instrumentalities of the State. The reason is the State is the only sovereignty in our system of government, except as the States delegated part of their implicit sovereignty to the federal government." *Myers v Genesee County Auditor,* 375 Mich 1, 6; 133 NW2d 190 (1965) (opinion of O'HARA, J.) (emphasis in the original). See also 2 Harper & James, Torts, § 29.1; Littlejohn & DeMars, *Governmental Immunity After Parker and Perry: The King Can Do Some Wrong,* 1982 Det C L Rev 1, 3.

[3] These three immunities have, at one time or another, been a part of the law of every state, see, *e.g., Civil Actions Against State Government* (Winborne ed, 1982). The highly formalistic traditional immunity doctrines, however, were difficult to apply and ran counter to the goals of the tort system as a whole: deterrence of wrongdoers and compensation of victims. See Smith, *Municipal Tort Liability,* 48 Mich L Rev 41. As a result, tort scholars criticized the traditional immunity doctrines. See Prosser, Torts (4th ed), § 131, p 984. That criticism had its effect in the courts in recent decades. See, *e.g., id.,* pp 984-985 & fn 50.

[4] MCL 691.1407; MSA 3.996(107).

[5] See *Thomas v Dep't of State Highways,* 398 Mich 1, 30; 247 NW2d 530 (1976) (LEVIN, J.).

the exercise or discharge of a governmental function. Except as otherwise provided herein, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed heretofore, which immunity is affirmed."

I would hold that, under the second sentence of § 7, the State of Michigan and its departments[6] are absolutely immune from tort liability except to the extent that the Legislature has waived the sovereign immunity of the state.

Under the first sentence of § 7, which immunizes non-sovereign political units (e.g., counties, townships, municipal corporations) only when "engaged in the exercise or discharge of a governmental function," the following factors relating to the specific activity that constitutes the basis of the plaintiff's complaint should be considered in determining whether the non-sovereign political unit was engaged in a "governmental function":

1) whether the specific activity complained of involved either policy formulation or quasi-judicial decision-making;

2) whether the specific activity complained of represented a failure to prevent harm from a source not subject to governmental control;

---

[6] Section 1 of the governmental tort liability act sets forth the following definitions:

"(a) 'Municipal corporation' means any city, village, township or charter township, or any combination thereof, when acting jointly.

"(b) 'Political subdivision' means any municipal corporation, county, township, charter township, school district, port district, or metropolitan district, or any combination thereof, when acting jointly, and any district or authority formed by 1 or more political subdivisions.

"(c) 'State' means the state of Michigan and its agencies, departments, and commissions, and shall include every public university and college of the state, whether established as a constitutional corporation or otherwise.

"(d) 'Governmental agency' means the state, political subdivisions, and municipal corporations as herein defined." MCL 691.1401; MSA 3.996(101).

3) whether the specific activity complained of is without a common analogy in the private sector.

The governmental tort liability act does not provide immunity from tort liability to public officers or employees. Courts should decide claims of immunity asserted by public officers or employees on the basis of the factors traditionally considered at common law:

1) Was the officer or employee acting within the scope of his official function?

2) Was the officer or employee acting in good faith?

3) Was the officer or employee exercising quasi-judicial or policy-making discretionary authority?

## I. Sovereign Immunity

### A

The opinion of the Court asserts that at common law, "sovereign immunity from tort liability was recognized as a defense only when the state was engaged in the exercise or discharge of a *governmental function*." (Emphasis supplied.)[7] The ques-

---

[7] Historically, the doctrine of sovereign immunity appears to have its origins both in the ancient English belief that "the King can do no wrong" and in the notion that it was necessarily a contradiction of the King's sovereignty to allow him to be sued as of right in his own courts. See, *e.g.,* Borchard, *Governmental Responsibility in Tort,* 36 Yale L J 1 (1926); 3 Holdsworth, History of English Law (5th ed), pp 458-469.

It has never been clearly understood how this monarchistic doctrine came to be adopted in the American democracy. See *Civil Actions Against State Government,* fn 3 *supra,* § 2.5, p 17. Some have suggested that the precarious financial condition of the states during the years immediately after the Revolution played a part in the doctrine's adoption in the states. See Prosser, fn 3 *supra,* § 131, p 975, fn 48; Gelhorn & Schenck, *Tort Actions Against the Federal Government,* 47 Col L Rev 722 (1947). Professor Kenneth Culp Davis, on the other hand, has termed the adoption of the doctrine in the United States a "misunderstanding." 3 Davis, *Administrative Law Treatise,* § 25.01, pp 434-439. In 1821, Chief Justice John Marshall gave no reason when he declared that no action could be brought against the United

tion whether the state or its agencies, prior to the governmental tort liability act, was subject to liability for torts committed in the exercise or discharge of a non-governmental activity was, however, "a question that had never been settled." Cooperrider, *The Court, The Legislature, and Governmental Tort Liability in Michigan,* 72 Mich L Rev 187, 278 (1973).[8]

Professor Cooperrider notes that the governmental tort liability act was "[d]rafted under the apparent assumption that the state and its agencies enjoyed a total sovereign immunity from tort liability * * *." Cooperrider, *supra,* p 277. This Court has said that "while a state may sue, it cannot be sued in its own courts, unless, indeed, it consents to submit itself to their jurisdiction."[9]

States without its consent. *Cohens v Virginia,* 19 (6 Wheat) US 264, 411-412; 5 L Ed 257 (1821).

[8] Some cases assumed that the state and its agencies were immune when engaged in a governmental function. See, *e.g., Mead v Public Service Comm,* 303 Mich 168, 171; 5 NW2d 740 (1942); *Manion v State Highway Comm'r,* 303 Mich 1, 19; 5 NW2d 527 (1942); *Robinson v Washtenaw Circuit Judge,* 228 Mich 225; 199 NW 618 (1924). None of these cases, though, held or said that the state and its agencies were not immune when engaged in a non-governmental function; that question never arose because the Court in each case held that a governmental function did indeed exist. See Cooperrider, *The Court, The Legislature, and Governmental Tort Liability in Michigan,* 72 Mich L Rev 187, 278, 281.

In *Ferris v Detroit Bd of Ed,* 122 Mich 315; 81 NW 98 (1899), and *Pound v Garden City School Dist,* 372 Mich 499; 127 NW2d 390 (1964), school districts were held liable in tort where a school building was designed in such a way as to cause ice and snow to fall off of the roof and thereby cause injury outside the limits of the school's premises. See *Pound v Garden City School Dist, supra,* p 502 (resting decision exclusively on the *Ferris* precedent). Although school districts have been deemed "state agencies" for some purposes, they have generally been held to have the governmental immunity of non-sovereign political units rather than the sovereign immunity of the state. See fn 55. Neither *Ferris* nor *Pound* considered the cases holding the state absolutely immune from action absent legislative waiver of immunity. See fn 9 and accompanying text.

[9] *Michigan State Bank v Hastings,* 1 Doug 225, 236 (1844). See also *Mead v Public Service Comm,* 303 Mich 168, 173; 5 NW2d 740 (1942); *Myers v Genesee County Auditor,* 375 Mich 1, 6-9; 133 NW2d 190 (1965) (opinion of O'HARA, J.); Littlejohn & DeMars, fn 2 *supra,* p 3.

The view that the state's common-law sovereign immunity was limited to torts arising out of *governmental functions* would render both the second sentence of § 7 and all of § 13 of the act superfluous. The second sentence of § 7 "affirm[s]" the common-law sovereign immunity of the state and its agencies "as it existed heretofore." If the state's common-law sovereign immunity as it existed heretofore was limited to governmental functions, this sentence would have been wholly unnecessary because the first sentence of § 7 provides statutory immunity to the state and its agencies when "engaged in the exercise or discharge of a governmental function."

Section 13 provides that the state shall not be immune in tort actions "arising out of the performance of a proprietary function as herein defined." If the state's common-law sovereign immunity had been limited to governmental functions, this statutory waiver of immunity would also have been wholly unnecessary because there would have been no immunity to waive; proprietary functions would not have been immune because they were not governmental functions.

The Legislature did not intend the second sentence of § 7 and § 13 of the act to be mere surplusage. "[T]he courts must construe the provisions of a statute together, and not isolate the provision under consideration and construe it without reference to the rest of the enactment."[10] The view that the state's common-law sovereign immunity extended only to governmental functions renders two statutory provisions superfluous and frustrates the

---

[10] 21 Michigan Law and Practice, *Statutes,* § 95, p 100. See also *State ex rel Wayne County Prosecuting Attorney v Levenburg,* 406 Mich 455; 280 NW2d 810 (1979); *General Motors Corp v Erves (On Rehearing),* 399 Mich 241; 249 NW2d 41 (1976); *Hartwick v Muir,* 338 Mich 624; 62 NW2d 596 (1954); *Taylor v Auditor General,* 360 Mich 146; 103 NW2d 769 (1960).

apparent legislative intent to affirm greater immunity for the state than the immunity being provided in the act for other units of government.[11]

## B

In *Williams v Detroit,* 364 Mich 231; 111 NW2d 1 (1961) (opinion of EDWARDS, J.), the trial court had dismissed plaintiff's complaint alleging that the City of Detroit had failed properly to protect and enclose an elevator shaft in which plaintiff's decedent had fallen to his death. Four members of the then eight-member Court, following the lead of Florida,[12] Illinois,[13] and California,[14] signed an opinion that would have abolished both sovereign and governmental immunity. Three members of the Court voted to retain both sovereign and governmental immunity. *Id.* (opinion of CARR, J.). Although Justice BLACK, in his separate opinion, agreed that the governmental immunity of the non-sovereign municipal corporation at issue in *Williams* should be abolished, he distinguished the immunity of the sovereign state and refused to

[11] In *McCann v State of Michigan,* 398 Mich 65; 247 NW2d 521 (1976), it was held that employees of a mental hospital were not engaged in the exercise or discharge of a governmental function when they encouraged customers and advertisers to refuse to do business with plaintiff's newspaper. Accordingly, the state was not statutorily immune pursuant to the first sentence of § 7. The defendants apparently did not raise—and the Court did not consider—the question whether, even if the function involved was not a governmental function, the state and its agencies were immune pursuant to the "affirm[ance]" of common-law sovereign immunity "as it existed heretofore" in the second sentence of § 7. Nor was there analysis or consideration of this question in this Court's summary disposition of *Wavro v Michigan,* 407 Mich 891; 284 NW2d 125 (1979), citing *McCann, supra,* and a case involving a county, *Lockaby v Wayne County,* 406 Mich 65; 276 NW2d 1 (1979).

[12] *Hargrove v Town of Cocoa Beach,* 96 So 2d 130 (Fla, 1957).

[13] *Molitor v Kaneland Community Unit Dist No 302,* 18 Ill 2d 11; 163 NE2d 89 (1959).

[14] *Muskopf v Corning Hospital Dist,* 55 Cal 2d 211; 11 Cal Rptr 89; 359 P2d 457 (1961).

extend the abolition of the immunity doctrine beyond municipal corporations. Thus, by a 5-3 vote, the Court abolished the doctrine of governmental immunity for municipal corporations; by a 4-4 vote, however, the Court declined to abolish the doctrine of sovereign immunity for the state.[15]

Three years later, the Legislature enacted the governmental tort liability act.[16] The primary purpose of the act,[17] which "was drafted by a special

---

[15] See *McDowell v State Highway Comm'r*, 365 Mich 268; 112 NW2d 491 (1961); *Sherbutte v Marine City*, 374 Mich 48, 52-53; 130 NW2d 920 (1964).

In the years following the *Williams* decision, this Court said that a school district "as an agency of the State [is] clothed with the State's immunity from liability." *Sayers v School Dist No 1, Fractional*, 366 Mich 217, 219; 114 NW2d 191 (1962). See fn 55.

In *Myers v Genesee County Auditor*, 375 Mich 1; 133 NW2d 190 (1965), and *Keenan v Midland County*, 377 Mich 57; 138 NW2d 759 (1966), this Court abolished the governmental immunity of counties. But see *Lewis v Genesee County*, 370 Mich 110; 121 NW2d 417 (1963) (county can, in effect, be a state agency and therefore clothed with sovereign immunity).

[16] 1964 PA 170, MCL 691.1401 *et seq.;* MSA 3.996(101) *et seq.*

[17] The title of the act stated in relevant part as follows:

"AN ACT to make uniform the liability of municipal corporations, political subdivisions, and the state, its agencies and departments, when engaged in a governmental function, for injuries to property and persons *caused by negligence* * * *." (Emphasis added.)

In 1970, the Legislature amended the title to address the argument that § 7 as originally enacted was unconstitutional because it did not fall within the object embraced in the title of the act as required by Const 1963, art 4, § 24. The potential constitutional infirmity arose because the title of the act limited the act's purpose to granting governmental immunity for injuries "caused by negligence" where a governmental entity is engaged in a governmental function, but the first sentence of § 7 granted immunity from tort liability "in all cases" where a governmental entity is engaged in a governmental function. Since the first sentence of § 7 provided governmental immunity for torts other than those caused by negligence (*e.g.,* reckless torts, intentional torts, and strict liability torts), it created a broader and more inclusive immunity than was stated in the title.

Confronted with the choice of either broadening the title or narrowing the scope of immunity, the Legislature opted to broaden the title to encompass governmental immunity for torts other than those caused by negligence. See Littlejohn & DeMars, fn 2 *supra,* pp 5-6 and fn 66. The title of the act, as amended by 1970 PA 155, now reads in pertinent part as follows:

committee of the Michigan Association of Munici-
pal Attorneys and lobbied through the legislature
with the strong backing of that association's par-
ent organization, the Michigan Municipal League,"
appears to have been to restore immunity to non-
sovereign governmental units.[18]

To achieve this purpose, the Legislature pro-
vided in the first sentence of § 7 that "[e]xcept as
in this act otherwise provided, all governmental
agencies shall be immune from tort liability in all
cases wherein the government agency is engaged
in the exercise or discharge of a governmental
function." The act thereby conferred uniform stat-
utory immunity on all governmental entities—
both the state and non-sovereign political units
alike—when engaged in the exercise or discharge
of a "governmental function."

To make clear that, by restoring to municipal
corporations immunity for governmental functions
and making uniform the immunity of all govern-
mental entities for governmental functions, it was
not thereby waiving the state's common-law abso-
lute sovereign immunity for non-governmental
functions,[19] the Legislature provided in the second
sentence of § 7 that "[e]xcept as otherwise provided

"AN ACT to make uniform the liability of municipal corporations,
political subdivisions, and the state, its agencies and departments,
when engaged in the exercise or discharge of a governmental func-
tion, for injuries to property and persons * * *."

One year after the Legislature acted, this Court declared § 7 uncon-
stitutional because of the title/object inconsistency. *Maki v City of
East Tawas,* 385 Mich 151; 188 NW2d 593 (1971). *Maki,* however, had
only a limited effect; it made the statutory immunity of § 7 unavail-
able to governmental entities in actions involving injuries suffered
before August 1, 1970, the effective date of the amendment of the
title.

[18] Cooperrider, fn 8 *supra,* p 268. See also *Thomas v Dep't of State
Highways,* 398 Mich 1, 10; 247 NW2d 530 (1976); *Maki v East Tawas,*
fn 13 *supra,* p 164 (Williams, J., *dissenting);* Littlejohn & DeMars, fn
2 *supra,* p 5.

[19] See fn 9 and accompanying text.

herein, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed heretofore, which immunity is affirmed."[20] The "which immunity is affirmed" clause codified the state's common-law sovereign immunity from tort liability—an absolute immunity except to the extent it is waived by the Legislature.[21]

[20] Those sections of the statute that fall within the "[e]xcept as otherwise provided herein" proviso, by which the Legislature waived the state's sovereign immunity, include MCL 691.1402; MSA 3.996(102), which renders the sovereign state and all non-sovereign political units liable for damages arising out of the failure to keep highways in "reasonable repair" and "in condition reasonably safe and fit for travel"; MCL 691.1405; MSA 3.996(105), which renders the sovereign state and all non-sovereign political units liable "for bodily injury and property damage resulting from the negligent operation * * * of a motor vehicle of which the governmental agency is owner"; MCL 691.1406; MSA 3.996(106), which renders the sovereign state and all non-sovereign political units liable for damages "resulting from a dangerous or defective condition of a public building"; and MCL 691.1413; MSA 3.996(113), which provides that the state's sovereign immunity "shall not apply to actions to recover for * * * damage arising out of the performance of a proprietary function as herein defined. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the state, excluding, however, any activity normally supported by taxes or fees."

[21] In *Pittman v City of Taylor*, 398 Mich 41; 247 NW2d 512 (1976), this Court abolished common-law sovereign immunity. *Pittman* was a negligence action against a municipal corporation, a board of education, and others for injuries suffered on April 24, 1969. Because the injuries were suffered before the effective date of the amendment of the title of the governmental tort liability act, see fn 17 *supra,* the claim was subject to common-law, rather than statutory, immunity. Because school districts had been held to be state agencies, see fn 15 *supra; Pittman v City of Taylor, supra,* pp 51-64 (COLEMAN, J., *dissenting),* and cases cited therein, the *Pittman* case involved the sovereign immunity of the state rather than the governmental immunity of non-sovereign political units. In *Pittman,* this Court abolished common-law sovereign immunity:

"[W]e hold that the traditional common-law judge-made immunity that the state and its instrumentalities heretofore enjoyed from its torts should be and it hereby is abrogated.

                              * * *

"The holding we announce today is prospective, with the exception of the instant case and any cases now pending in which an express challenge to the common-law defense of governmental immunity had been made and preserved." *Id.,* pp 49-50.

## II. Governmental Immunity

When a non-sovereign political unit is engaged in the exercise or discharge of a "governmental function,"[22] it has statutory governmental immunity pursuant to the first sentence of § 7.[23] When not engaged in a governmental function, it is not immune.

---

The Court thereby exercised its power to change the common-law rule, set forth in *Hastings, Mead,* and *Myers* (see fn 9), that the state was absolutely immune from tort liability unless the Legislature waived that sovereign immunity. See *Myers v Genesee County Auditor,* fn 15 *supra,* p 7.

[22] Whether a particular activity was an immune function of government at common law may have depended less on the intrinsic characteristics of the activity than on the policy inclinations of the court rendering the decision. As Dean Prosser has written, "[t]here is little that can be said about such distinctions except that they exist, that they are highly artificial, and that they make no great amount of sense. Obviously this is an area in which the law has sought in vain for some reasonable and logical compromise, and has ended with a pile of jackstraws." Prosser, fn 3 *supra,* p 982.

A governmental unit was not engaged in a function of government, and was not immune, if the particular activity constituted a nuisance or trespass. See, *e.g., Sheldon v Village of Kalamazoo,* 24 Mich 383 (1872); *Pennoyer v Saginaw,* 8 Mich 534 (1860). Taken to its logical conclusion, however, such a doctrine would hold that a governmental entity is always outside of the scope of its authority whenever it commits a tortious act. The scope of governmental liability for a tortious nuisance or a tortious trespass should, arguably, be no different from, say, the scope of governmental liability for a tortious assault. As Dean Prosser has written, "[i]t seems reasonable to say that there is no sound argument behind the distinction itself, and that resort to the more or less undefined concept of nuisance is merely one method by which the courts have retreated from municipal nonliability." Prosser, fn 3 *supra,* § 131, p 983.

[23] A critical interpretation of the emergence in Michigan jurisprudence of the governmental immunity doctrine—and its governmental function test—in Michigan jurisprudence was offered by Professor Cooperrider, fn 8 *supra,* p 187:

"The doctrine of 'governmental immunity,' as it has been known in recent years—that is, the rule that governmental entities are immune from tort liability for the acts of their employees whenever the injury-causing activity is 'governmental' in nature or involves the performance of a 'governmental function'—is not, so far as the law of Michigan is concerned, 'ancient.' It did not exist in 1850 and therefore can scarcely 'have come to us as part of the common law' or by inheritance from monarchs, absolute or otherwise. Rather it was

The details of this Court's nine-year struggle to
"determin[e] whether a particular activity is a
governmental function within the meaning of the
statute" are set forth in *Ross v Consumers Power
Co*, 415 Mich 1, 6-11; 327 NW2d 293 (1982) (opin-
ion of RYAN, J.), and need not be repeated here. It
is sufficient to note that three tests have emerged
for defining "governmental function":

1) The "common good of all" test. " 'The under-
lying test is whether the act is for the common
good of all without the element of special corpo-
rate benefit or pecuniary profit.' " *Gunther v Che-
boygan County Road Comm'rs*, 225 Mich 619, 621;
196 NW 386 (1923), citing *Bolster v City of Law-
rence*, 225 Mass 387; 114 NE 722 (1917). This is
the test most often pressed upon us by non-sover-
eign political units.[24]

imported into the law of Michigan in the first two decades of the
twentieth century by a generation of judges and lawyers who found it
easier to read about the law in Judge Dillon's treatise on municipal
corporations than to track down their own legal heritage."

By the late nineteenth century, though, Michigan courts were
holding non-sovereign political units to be immune to the extent that
they performed "governmental functions":

"Thus, as of this decision day under settled law, the State and its
immediate integral parts, enjoy absolute immunity from tort liability
by reason of the negligent acts or omissions of its servants or agents,
except as that liability has been statutorily modified. Over the years,
by judicial construction, this 'sovereign' immunity has been transmo-
grified into 'governmental' immunity and made applicable to the
'inferior' divisions of government, *i.e.*, townships, school districts,
villages, cities, and counties, but with an important distinction. These
subdivisions of government enjoyed the immunity only when engaged
in 'governmental' as distinguished from 'proprietary' functions."
*Myers v Genesee County Auditor*, fn 15 *supra*, pp 8-9.

For a discussion of the adoption by other states of the distinction
between "governmental" and "proprietary" functions, see generally
Barnett, *The Foundations of the Distinction Between Public and
Private Functions in Respect to the Common-Law Tort Liability of
Municipal Corporations*, 16 Or L Rev 250 (1937).

[24] Historically, the very establishment of government was premised
on the notion that government performs functions that are in the
"public interest" and for the "common good of all." See Rousseau,

2) The "essence of governing" test. This test would limit the term "governmental function" to activities that are "*sui generis* governmental" in that they have "no common analogy in the private sector." *Thomas v Dep't of State Highways,* 398 Mich 1, 21; 247 NW2d 530 (1976) (Kavanagh, C.J., and Fitzgerald, J., *dissenting).* This is the test most often pressed upon us by persons seeking to recover from non-sovereign political units.

3) Justice Moody's "essence of governing" test. "[T]he crux of [this] governmental essence test [is] founded upon the inquiry whether the purpose, planning and carrying out of the activity, due to its unique character or governmental mandate, can be effectively accomplished only by the government." *Parker v Highland Park,* 404 Mich 183, 200; 273 NW2d 413 (1978) (Moody, J., *concurring).* This is the test most often applied by the Court of Appeals in recent years; although espoused by only a single member of this Court, this test represented the "swing vote" at a time when the Court was otherwise evenly divided between the other two tests.

It is now apparent that the phrase "governmental function" cannot be reduced to a single, readily applied test.[25] The following factors are offered as a

*The Social Contract* (Cranston translation) (Middlesex: Penguin Books, 1968); Wood, *The Creation of the American Republic, 1776-1787* (New York: W. W. Norton & Co., 1969). In that view, the "common good of all" test would have the effect of immunizing all government activity because all government activity is in some sense directed toward the "public good." More recently, pluralist theorists have argued that no specific government action is for the "common good of all" since all decisions benefit specific interest groups. See, *e.g.,* Dahl & Linblom, *Politics, Economics, and Welfare* (Chicago: Univ. of Chicago Press, 1976). In that view, the "common good of all" test would have the effect of eliminating governmental immunity because no government activity is truly directed toward the "public good."

[25] This Justice Moody perceived six years ago:

"To delineate a complete and balanced definition of governmental

representative, though not exclusive, list to be considered in deciding whether a non-sovereign political unit is engaged in a "governmental function."

These factors should be applied to the specific activity that constitutes the basis of the plaintiff's complaint.[26] See *Thomas v Dep't of State Highways, supra,* p 12 (opinion of the Court), and p 21 (opinion of KAVANAGH, C.J.); *McCann v Michigan,* 398 Mich 65, 80; 247 NW2d 521 (1976) (opinion of RYAN, J.), and p 83 (opinion of FITZGERALD, J.); *Galli v Kirkeby,* 398 Mich 527, 536; 248 NW2d 149 (1976) (opinion of WILLIAMS, J.).[27] These factors

function within a simplistic format would be presumptuous." *Parker v Highland Park, supra,* p 200 (MOODY, J., *concurring).*

[26] The question in every case is whether *the specific activity complained of* constitutes, in light of the factors discussed below, a "governmental function." Professor Cooperrider observed:

"The word 'function' has been used in a departmental sense: The 'function' that is characterized as 'governmental' usually encompasses *all* the activities of the police and fire departments, road-building, parks, and schools, except to the extent that a department has involved itself in an isolated profit-making action. * * * [This usage is not] necessary. The search now is for reasons why a particular act or omission that would cast liability upon another entity should not have that effect if a governmental unit is the defendant. It would seem that the answer should be found in the nature of the act or omission, rather than in the over-all public or governmental objectives of the department by which the actor is employed, for, as Justice EDWARDS pointed out in *Richards v Birmingham School District,* [348 Mich 490, 521; 83 NW2d 643 (1957) (EDWARDS, J., *dissenting),]* in one sense *all* functions performed by governmental units are 'governmental.' " Cooperrider, fn 8 *supra,* pp 282-283 (emphasis in the original).

[27] "The test then, of 'governmental function' for purposes of the immunity statute, must be phrased in terms of the nature of the *specific function.*" *Thomas v Dep't of State Highways, supra,* p 21 (KAVANAGH, C.J., and FITZGERALD, J., *dissenting)* (emphasis added).

"We look to *the facts pleaded in the complaint* to determine whether *the specific tortious activity alleged* against the state or its agencies is within the protection of the immunity doctrine." *McCann v Michigan, supra,* p 80 (opinion of RYAN, J.) (emphasis added).

"We agree that the question of governmental immunity should not be considered because *the complained-of activity* does not fall within 'the exercise or discharge or a governmental function.' " *McCann v Michigan, supra,* p 83 (opinion of FITZGERALD, J.) (emphasis added).

should not be simply counted up or tallied to reach a result. The importance of each of these considerations will vary from case to case, and the proper weight to be given to each factor must be independently evaluated in light of the particular activity about which the plaintiff complains.

1) Did the specific activity complained of involve either policy formulation or quasi-judicial decision-making?[28]

"The parameter of [this consideration] will most often run along the line of distinction between decisional and planning aspects of governmental duties on the one hand, and operational [or ministerial] aspects on the other." *Thomas, supra,* p 22 (KAVANAGH, C.J., *dissenting).* Thus the policy formulation inherent in, for example, decisions

"In short, the test of whether a governmental agency can claim immunity under the statute is whether *the specific activity alleged against the governmental defendant* falls within 'the exercise or discharge of a governmental function.'" *Galli v Kirkeby, supra,* p 536 (opinion of WILLIAMS, J.) (emphasis added).

[28] Almost every jurisdiction has held that judicial and legislative activities are absolutely immune. See, *e.g., Supreme Court of Virginia v Consumers Union,* 446 US 719; 100 S Ct 1967; 64 L Ed 2d 641 (1980); *Imbler v Pachtman,* 424 US 409; 96 S Ct 984; 47 L Ed 2d 128 (1976); *Pierson v Ray,* 386 US 547; 87 S Ct 1213; 18 L Ed 2d 288 (1967); *Tenney v Brandhove,* 341 US 367; 71 S Ct 783; 95 L Ed 1019 (1951).

With respect to judicial activities, see also 63A Am Jur 2d, Public Officers and Employees, § 358.

With respect to legislative activities, see also *Russell v Tate,* 52 Ark 541; 13 SW 130 (1890); *North Atlanta v Cook,* 219 Ga 316; 133 SE2d 585 (1963); *McHenry v Sneer,* 56 Iowa 649; 10 NW 234 (1881); *City of Newport v McLane,* 256 Ky 803; 77 SW2d 27 (1934); *Commonwealth v Kenneday,* 118 Ky 618; 82 SW 237 (1904); *Coffin v Coffin,* 4 Mass 1 (1808); *Pawlowski v Jenks,* 115 Mich 275; 73 NW 238 (1897); *Jones v Loving,* 55 Miss 109 (1877); *State ex rel Oklahoma Bar Ass'n v Nix,* 295 P2d 286 (Okla, 1956).

The reasons for legislative and judicial immunity are twofold. First, the burden and risk of litigation might deter optimal decision-making. Second, it is virtually impossible to formulate standards for evaluating legislative or judicial decisions.

The same reasoning justifies immunity for policy-making and quasi-judicial activities undertaken by other public officers or employees. See *Supreme Court of Virginia v Consumers Union, supra.*

whether and where to build a road, what health services to offer, what school subjects to teach, and whether and where to build playgrounds and swimming pools, would weigh in favor of immunity in tort actions complaining of such decisions. On the other hand, the operational nature of, say, supervising road construction, and the day-to-day functioning of hospitals, schools, playgrounds, and pools, would weigh against immunity in tort actions arising out of these activities. See *id.,* pp 21-22.

2) Did the specific activity complained of represent a failure to prevent harm from a source not subject to governmental control?[29]

This consideration in effect asks whether the claim relates to what government *did to* the claimant or to what it *did not do for* him. See Cooperrider, *The Court, The Legislature, and Governmental Tort Liability in Michigan,* 72 Mich L Rev 187, 285 (1973). Professor Cooperrider has expressed the justification for this consideration:

"[W]ere there no such [immunity], there would be an essentially unpredictable exposure to miscellaneous accusations of nonfeasance. Government's ubiquity in modern life makes it vulnerable, in a legal milieu wherein the search for a plausible loss-bearer is candidly recognized, to blame for individual misfortunes that are in no real sense the product of its enterprise. The principle that government should pay *its* way could shade imperceptibly into a principle that it should pay *our* way. Such a principle may well be appropriate in given circumstances. Perhaps modern government *should* absorb, to a greater degree than it does, the burdens of personal misfortune arising from its failure to shield individual citizens from harmful occurrences, such as crime and flood, that citizens are in a poor

---

[29] This factor does not signal adoption of the common-law distinction between active and passive negligence as relevant to a resolution of the "governmental function" question.

position to avoid or to lay off in other ways, but that type of decision belongs to the political rather than to the judicial process." *Id.*, pp 285-286. (Emphasis in the original.)

This consideration, then, would weigh in favor of immunity in cases where injury has occurred because, say, the police department failed to prevent crime. *Id.*, p 286.[30]

3) Is the specific activity complained of without a common analogy in the private sector?

Merely because there is *an* analogy in the private sector does not indicate that the specific activity complained of is not a governmental function. Before immunity is lost, the specific activity complained of must have a *common* analogy in the private sector.[31] For example, although there are private security forces that have the power, under certain circumstances, to detain and question a person, arrest and questioning of persons suspected of engaging in criminal activity are commonly performed and accomplished only by the government (*i.e.*, the police).

### III. Officer and Employee Immunity

The immunity of a public officer or employee[32]

---

[30] In many such instances a court might find that no duty of care was owed by government and thus government would not be liable in tort. Professor Cooperrider stated:

"If the governmental-function defense did not foreclose these questions, the remaining control would lie in judicial manipulation of the duty question, which would mean that in those instances in which he permitted the claim to go to the jury, the judge would frequently be permitting the jury to substitute its judgment concerning the extent of public services and their deployment for that of the political and administrative authorities to whom such judgments belong." Cooperrider, *supra*, p 286.

[31] Justice MOODY defined a governmental function as an activity that, "due to its unique character or governmental mandate, can be *effectively* accomplished only by the government" (emphasis added). *Parker v Highland Park, supra* (MOODY, J., *concurring*).

[32] Traditionally, the law drew no distinction between public officers

from personal tort liability for actions within the scope of his official authority and in the performance of his official duties is an immunity separate and distinct from sovereign and governmental immunities.[33] Neither § 7 nor any other provision of the governmental tort liability act provides protection for public officers or employees. Section 7 limits statutory immunity to "governmental agenc[ies]."[34] Section 1(d) of the act defines that term to include both the state and non-sovereign political units, but does not include individuals.

The legislative intention not to provide public officers or employees with statutory immunity is manifested by § 8(1) of the act, which recognizes that an injured person may maintain an action against an officer or employee of a governmental agency for injuries caused by negligence of the officer or employee while in the course of employment and while acting within the scope of his or her authority, and provides that the governmental unit may indemnify the officer or employee.[35] It is

and employees and ordinary citizens when determining liability for tortious conduct. See *Civil Actions Against State Government,* fn 3 *supra,* § 6.2, p 230. Recently, however, courts have moved towards an increased immunity for public officers and employees. See Davis, fn 7 *supra,* § 26.01.

[33] *Smith v Cooper,* 256 Or 485; 475 P2d 78; 45 ALR3d 857 (1970); *Lister v Board of Regents of the University of Wisconsin,* 72 Wis 2d 282; 240 NW2d 610 (1976).

Official immunity is founded on considerations of public policy. See *Lister, supra;* Davis, fn 7 *supra,* § 26.01; Prosser, fn 3 *supra,* § 132, p 987. "These considerations have been variously identified in the cases as follows: (1) The danger of influencing public officers in the performance of their functions by the threat of lawsuit; (2) the deterrent effect which the threat of personal liability might have on those who are considering entering public service; (3) the drain on valuable time caused by such actions; (4) the unfairness of subjecting officials to personal liability for the acts of their subordinates; and (5) the feeling that the ballot and removal procedures are more appropriate methods of dealing with misconduct in public office." *Lister, supra,* p 299.

[34] The text of § 7 is set forth *ante,* pp 662-663.

[35] "Sec. 8. (1) Whenever a claim is made or a civil action is commenced against an officer or employee of a governmental agency for

apparent that whatever immunity public employees have in this state is provided by the common law.[36]

The following factors are generally considered when a common-law claim of immunity is asserted by a public officer or employee:

(1) Was the officer or employee acting within the scope of his official function?

A public officer or employee can only claim immunity if he is performing his official function. "No officer, of course, is absolved from liability for his private and personal torts merely because he is an officer, and the question arises only where he performs, or purports to perform, his official functions."[37]

injuries to persons or property caused by negligence of the officer or employee while in the course of employment and while acting within the scope of his or her authority, the governmental agency may pay for, engage, or furnish the services of an attorney to advise the officer or employee as to the claim and to appear for and represent the officer or employee in the action. The governmental agency may compromise, settle, and pay the claim before or after the commencement of a civil action. Whenever a judgment for damages is awarded against an officer or employee of a governmental agency as a result of a civil action for personal injuries or property damage caused by the officer or employee while in the course of employment and while acting within the scope of his or her authority, the governmental agency may idemnify [sic] the officer or employee or pay, settle, or compromise the judgment.

"(2) When a criminal action is commenced against an officer or employee of a governmental agency based upon the conduct of the officer or employee in the course of employment, if the employee or officer had a reasonable basis for believing that he or she was acting within the scope of his or her authority at the time of the alleged conduct, the governmental agency may pay for, engage, or furnish the services of an attorney to advise the officer or employee as to the action, and to appear for and represent the officer or employee in the action. An officer or employee who has incurred legal expenses after December 31, 1975 for conduct prescribed in this subsection may obtain reimbursement for those expenses under this subsection.

"(3) This section shall not impose any liability on a governmental agency." MCL 691.1408; MSA 3.996(108).

[36] See generally *Bush v Oscoda Area Schools,* 405 Mich 716; 275 NW2d 268 (1979).

[37] Prosser, fn 3 *supra,* § 132, p 987.

(2) Was the officer or employee acting in good faith?

Judges and legislators are absolutely immune.[38] The highest executive officers of the federal and state governments also were traditionally held to be absolutely immune, so long as they did not clearly exceed the discretion vested in them by law.[39] More recently, however, the governor and other executive officers of a state have been limited to a qualified immunity. Qualified immunity can only attach when a public officer or employee is acting in good faith.[40]

(3) Was the officer or employee exercising quasi-judicial or policy-making discretionary authority?

[38] See fn 28.

This rule is based on public policy, and almost every jurisdiction has reached this result:

"On this basis judges always have been accorded complete immunity for their judicial acts within the jurisdiction of courts of justice, even when their conduct is corrupt, or malicious and intended to do injury. Even though a cynic might be forgiven for pointing out just who made this rule, the reason is of course not a desire to protect the corrupt, malicious or misbehaving official, but rather the necessity of preserving an independent judiciary, who will not be deterred by the fear of vexatious suits and personal liability, together with the manifest unfairness of placing any man in a position where his judgment is required, and at the same time holding him responsible according to the judgment of others. The same absolute protection extends to members of the state and national legislatures, as well as inferior legislative bodies, such as municipal councils * * *." Prosser, fn 3 supra, § 132, pp 987-988 (and cases cited therein).

The Court today does not decide to what extent prosecutors are immune.

[39] Prosser, fn 3 supra, § 132, pp 987-988.

[40] See Civil Actions Against State Government, fn 3 supra, §§ 6.14, 6.19, pp 246-248, 255-256, and cases cited therein.

A majority of courts have held that all members of the executive branch are liable for acts undertaken with a corrupt or malicious purpose, or in a wanton, willful, or reckless manner. See, e.g., Shellburne, Inc v Roberts, 238 A2d 331 (Del Super, 1967); Simon v Heald, 359 A2d 666 (Del, 1976); Hennessy v Webb, 245 Ga 329; 264 SE2d 878 (1980); Kajiya v Dep't of Water Supply, 629 P2d 635 (Hawaii App, 1981); Vander Linden v Crews, 205 NW2d 686 (Iowa, 1973); Neal v Donahue, 611 P2d 1125 (Okla, 1980); Yotvat v Roth, 95 Wis 2d 357; 290 NW2d 524 (1980).

The qualified immunity afforded to public officers and employees generally varies with the scope of their discretion as to the specific act in question:[41]

" '[A]ctions or decisions of a legislative, executive, or judicial character which are performed within the scope of authority of the governmental body or officer concerned * * * enjoy freedom from liability.

"The people place great powers of decision making in the hands of their government. In the exercise of discretionary power, governmental duty runs to the benefit of the whole public, rather than to individuals. It is of great importance that this crucial function of democratic decision making be unhampered by litigation.' " (Emphasis in the original.) Sherbutte v Marine City, 374 Mich 48, 54; 130 NW2d 920 (1964), quoting Williams v Detroit, 364 Mich 231; 111 NW2d 1 (1961).

Public officers or employees are, however, liable for the negligent performance of ministerial acts. Id., p 54, fn 2.

The scope of immunity granted a public officer or employee in any given situation turns on the specific character of the act complained of, not on the general nature of his job.[42] Accordingly, it is not determinative that the officer or employee has some general discretionary authority if the act complained of is properly characterized as ministerial.

It is often difficult to distinguish between discretionary and ministerial activities:

"It seems almost impossible to draw any clear and definite line, since the distinction, if it exists, can be at most one of degree. '[I]t would be difficult to conceive of

[41] See, e.g., Scheuer v Rhodes, 416 US 232; 94 S Ct 1683; 40 L Ed 2d 90 (1974); Mosher v Saalfeld, 589 F2d 438 (CA 9, 1978); Slavin v Curry, 574 F2d 1256 (CA 5, 1978).

[42] See, e.g., Miree v United States, 490 F Supp 768 (ND Ga, 1980).

any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail.' " Prosser, *supra*, § 132, p 990, quoting *Ham v Los Angeles County*, 46 Cal App 148, 162; 189 P 462 (1920).

The discretionary decisions intended to be protected by official immunity are those that involve policy formulation[43] and those that are quasi-judicial in nature. In *Sherbutte v Marine City, supra*, pp 54-55, this Court said that official immunity protects "democratic decision making," namely, "*actions* or *decisions* of a *legislative, executive,* or *judicial* character." (Emphasis in the original.) The Court in *Sherbutte* held that a police officer or employee was not immune from an action alleging excessive use of force during the course of an arrest: "We think it unnecessary to expatiate on the point. The action of a police officer in making an arrest cannot be considered within the broad scope of the discretion allowed a free government in its legislative, executive, or judicial branch."

In sum, if judges and legislators are acting within the scope of their official function, they are absolutely immune. Other public officers or employees only possess official immunity if they are acting within the scope of their official function, they are acting in good faith, and, focusing upon the specific activity complained of by the plaintiff, they are exercising quasi-judicial or policy-making discretionary authority.

## IV. The Opinion of the Court

The opinion of the Court states that the phrase "governmental function" should be construed in a "broad manner" because § 7 "extends immunity to

---

[43] See, *e.g.*, *Larson v Braham Independent School Dist No 314*, 289 NW2d 112 (Minn, 1980).

*all* governmental agencies for *all* tort liability *whenever* they are engaged in the exercise or discharge of a governmental function." *Ante,* p 618. (Emphasis in original.) The language of § 7, however, might just as readily be read as providing a more limited immunity, absolving *all* governmental agencies from *all* tort liability *only when* they are engaged in the exercise or discharge of a governmental function.

All can agree that the Legislature has "evidence[d] a clear legislative judgment that public and private tortfeasors should be treated differently." *Ante,* p 618. That does not suggest, however, that the Legislature intended to immunize "most of the activities undertaken by governmental agencies." *Ante,* p 621. All can agree that "the people, by mandating or authorizing the government to engage in certain activities, have determined that these activities are governmental in nature." *Ante,* p 620. It does not follow, however, that by mandating or authorizing the government to engage in certain activities, the people have determined that the government should be immune for each and every act connected with the performance of that activity.

The opinion of the Court, for example, concludes that a right to supervise the construction of a drain is impliedly authorized by the Drain Code of 1956, MCL 280.1 *et seq.;* MSA 11.1001 *et seq.,* which grants a drainage district power over the establishment, construction, and maintenance of a drain. *Ante,* pp 637-638. Under this view, a drainage district or board would be immune if an employee operating a helicopter to supervise drain construction flies too low and strikes a person or damages property. There is nothing in the language or history of the governmental tort liability act, nor is there anything in the language or history of the

Drain Code, to suggest that the Legislature intended that operating aircraft be an immune "governmental function." Virtually all government activity is expressly or impliedly mandated or authorized by the constitution, a statute, or other law. By perusing the statute books rather than focusing on the specific activity complained of by the plaintiff, the Court casts the net of governmental immunity too far, enabling a governmental entity to expand the scope of its own immunity by promulgating an ordinance or other law relating to its activities.

The inherent difficulty in defining "governmental function" by scanning the statute books is illustrated in the Court's treatment of the *Willis* case. The opinion of the Court argues that the statutory duty imposed on the Department of Social Services to care for children residing in state facilities "implies a responsibility to supervise them in order to prevent, as far as is practicable, any unnecessary injury." *Ante,* p 641. Yet the Court then relies on that same statutory duty as a reason for immunizing the department when one of its employees breaches that statutory duty to prevent injury. Under the Court's analysis, then, the same statute that creates the responsibility to supervise children to prevent injury also immunizes the department when one of its employees breaches that very responsibility.

## V. APPLICATION IN THE INSTANT CASES

The detailed application of the factors in the individual cases is set forth in the Appendix.

Four of these cases—*Willis II, Siener, Rocco,* and *Disappearing Lakes*—are actions against the state and its departments. The Legislature has affirmed sovereign immunity in these cases, and therefore

the defendants are absolved from liability by the sovereign immunity provided by the second sentence of § 7. In *Rocco,* the plaintiff also alleges a contract claim, and that claim should be remanded for trial.

Four cases—*Ross, Regulski, Trezzi,* and *Zavala*— are actions against non-sovereign political units. On the basis of an application of the factors discussed above and set forth in detail in the Appendix, the governmental entities in *Ross* and *Regulski* were not engaged in the exercise or discharge of a "governmental function," and therefore are not immune pursuant to the first sentence of § 7; in *Trezzi* and *Zavala* the governmental entities are immune under the first sentence of § 7.

In *Regulski,* neither teaching or supervision nor providing safety goggles and emergency supplies and facilities for students in a building trades class are "governmental functions." In *Regulski* and *Ross,* non-sovereign political units are not immune with respect to the conduct and operation of construction work. In *Trezzi* and *Zavala,* the city is immune from liability for the manner of police responses to requests for assistance.

Three cases—*Willis I, Regulski,* and *Zavala*—are or include actions against public officers or employees. On the basis of an application of the common-law factors discussed above, the individual defendants in these cases are not immune. Thus, official immunity does not attach to teaching and supervising students *(Regulski),* supervising residents of a juvenile care facility on a recreational outing *(Willis I),* or the decision of police officers regarding how to respond to a request for assistance *(Zavala).* No opinion is expressed whether the police officers, or indeed any of the defendants, are subject to liability under tort principles; this opinion is addressed only to the sepa-

rate question of sovereign, governmental, and officer or employee immunity.

APPENDIX

DETAILED APPLICATION OF THE FACTORS IN
THE INSTANT CASES

*Ross*

In connection with the construction of a drain on property owned by Consumers Power Company, the John Saines Project I Drainage District provided Consumers with an easement. The district contracted the construction of the drain to Dunigan Brothers, Inc. Michael Ross, a Dunigan employee, was injured when a construction vehicle near which he was working came in contact with electric power lines maintained over the property by Consumers.

Ross commenced an action against Consumers, and the action was eventually settled. Consumers had filed a third-party action against the district. The Court of Appeals summarized the allegations of Consumers' amended complaint as follows:

"In its essentials, Consumers' tort claim against the District alleges negligence arising out of a failure to notify Consumers that work was being undertaken that could interfere with the power lines, a failure to make arrangements with Consumers to safeguard workers from contact with the lines, a failure to instruct and warn its contractors concerning the lines, a failure to hire a properly licensed and competent contractor, and a failure to adequately supervise and inspect the project in such a manner as to prevent the accident from occurring."[44]

The heart of Consumers' complaint is that the

---

[44] *Ross v Consumers Power Co*, 93 Mich App 687, 697; 287 NW2d 319 (1979).

district allowed its contractors to work too close to Consumers' power lines without notifying Consumers of the danger, without explicitly warning the workers about the lines, and without adequately supervising and inspecting the work to prevent contact with the power lines. The question is whether this specific activity complained of constitutes, in light of the factors discussed above, a "governmental function." It does not.

First, the specific activity complained of does not involve policy formulation, nor is it quasi-judicial in nature. Consumers' claim is for the conduct of construction work too close to electric power lines without proper warnings to the workers and without proper notice to the owner of the power lines.[45] That the defendant here happens to be a governmental entity does not, in and of itself, inject any degree of policy formulation into the activity. Supervision and inspection of construction work has generally been held to be operational in nature. This factor weighs against immunity.

Second, the specific activity complained of—failures to warn, supervise, and inspect in respect to a specific site where a governmental construction project was in progress—did not represent a failure to prevent harm from a source not subject to governmental control. This factor weighs against immunity in the present case.

Third, the specific activity complained of has a common analogy in the private sector; it is not an activity primarily performed and accomplished by the government. Conceding that drain construction occurs primarily pursuant to the Drain Code, there is nevertheless a common analogy in the private sector. The analogy obtains whenever construction workers are permitted to work close to

---

[45] We express no opinion whether the district owed a duty to Consumers under general tort principles.

electric power lines without notice to the owner of the power lines, without specific warnings and instructions to the workers, and without adequate supervision and inspection of the construction work. The private analogy is even more common when it is recognized that the same tort issues arise whenever a contractor is hired to do construction work near any kind of hazard; the analogy is not limited to the hazard of electric power lines. Because the specific activity complained of has an analogy in many private construction projects, this factor weighs against immunity in the present case.

In conclusion, the district is not immune under § 7 for allegedly permitting the Dunigan employees to work too close to Consumers' power lines without notifying Consumers, without warning the workers about the danger, and without supervising and inspecting the work.

Consumers' complaint also alleges that the district was negligent in hiring a contractor that was not properly licensed and competent. Evaluating this specific activity independently in light of the factors set forth above,[46] the district is not immune under § 7 for its hiring of Dunigan Brothers as the contractor for this drain.

---

[46] First, the hiring decision does not involve policy formulation and is not quasi-judicial in nature. Traditional tort standards are readily applicable to determine whether there was negligence in the hiring of a given contractor. The hiring activity is operational in nature and thus this factor weighs against immunity. Second, the nature of a district's hiring activity is such that it does not represent a failure to prevent harm from a source not subject to governmental control. Third, the hiring decision has a common analogy in the private sector. Hiring decisions in general, and the hiring of contractors for construction work in particular, occur frequently in the private sector; they are not primarily performed and accomplished by the government. The district is not immune under § 7 for its hiring of Dunigan Brothers.

## *Willis I*

Plaintiff is the administratrix of the estate of Jeffrey Willis, who was a resident of Harbor House, a juvenile care facility for delinquent and neglected youths operated by the Department of Social Services. Willis and other Harbor House residents were taken for a swimming outing on Lake Michigan under the supervision of a counselor, Erma Knox, and a student-intern, Cyndi Hunt. Willis entered the water and drowned.

Plaintiff brought this action in the circuit court against Knox, Hunt, and the director of Harbor House, Dennis Nienow, claiming against all three negligent conduct and supervision of recreational outings. The Court of Appeals summarized the allegations of the complaint as follows:

> "Plaintiff's complaints alleged that Jeffrey and Knox could not swim or were of marginal swimming ability, that neither Knox nor Hunt had lifesaving training, that there were no lifeguards on duty at the time in question, that Jeffrey and other Harbor House residents were allowed to swim in areas not designated as swimming areas, and that Jeffrey and the other residents were allowed to swim under dangerous weather conditions."[47]

The question is whether these public officers or employees are immune from liability for the specific activity that forms the basis of plaintiff's complaint. They are not.

First, all three defendants acted within the scope of their official function. It appears that recreational outings were standard activities at a facility such as Harbor House. The official functions of Knox, Hunt, and Nienow include the conduct and supervision of such recreational out-

[47] *Willis v Nienow,* 113 Mich App 30, 32-33; 317 NW2d 273 (1982).

ings. Thus, the decisions made by these defendants with respect to this swimming outing were made within the scope of their official function.

Second, the defendants were not exercising quasi-judicial or policy-making discretionary authority, but rather were performing a ministerial act. Although permitting Jeffrey Willis to swim in the lake under the circumstances as they existed at the time was a decision requiring the defendants to use their judgment, it did not require the exercise of quasi-judicial or policy-making discretionary authority to which official immunity attaches.[48]

The conclusion that these public officers or employees were not exercising the type of discretionary authority protected by official immunity renders it unnecessary to consider whether they acted in good faith. Although Knox, Hunt, and Nienow were acting within the scope of their official function, they are not immune because the specific activity complained of—permitting Willis to swim under dangerous circumstances—was not done in the exercise of discretionary quasi-judicial or policy-making authority.

*Willis II*

This action arises out of the same drowning incident involved in *Willis I.* In addition to the circuit court action against the individual defendants, Knox, Hunt, and Nienow, plaintiff brought an action in the Court of Claims against the State of Michigan and the Department of Social Services. The theories of liability here parallel those that were pled against the individual defendants.

---

[48] Because all three officers were acting within the scope of their employment, they may be eligible for agency reimbursement, pursuant to § 8(1). See fn 35.

The state has statutory sovereign immunity from tort liability pursuant to the second sentence of § 7. The scope of the statutory sovereign immunity is absolute except to the extent that it has been waived by the Legislature.

The Legislature has not waived the state's immunity for torts committed in connection with the operation of a state-operated juvenile care facility. The defendants are immune.

### Siener

Russell Siener, Jr., was an in-patient at the Hawthorn Center, a state-operated mental health facility for emotionally disturbed children. Siener was taken by personnel of the center, in the company of other patients, on a field trip to Greenfield Village. While there, the supervisor permitted five boys, including Siener, to leave the group without supervision. During this unsupervised diversion one of the boys injured Siener by striking him in the face with a cast iron pot lid. Siener brought an action in the Court of Claims against the State of Michigan, the Department of Mental Health, and the Hawthorn Center, alleging that the defendants failed to properly supervise and control the group of patients to which Siener had been assigned.

The state and its agencies have absolute sovereign immunity from tort liability pursuant to the second sentence of § 7 unless that immunity has been waived by the Legislature. Siener argues that the Legislature waived the state's immunity with respect to mental health centers in the Mental Health Code.[49] Specifically, Siener claims that the following provision constitutes such a waiver:

---

[49] MCL 330.1700 *et seq.*; MSA 14.800(700) *et seq.*

"(1) A recipient of mental health services shall not be physically, sexually, or otherwise abused.

*   *   *

"(4) Any recipient of mental health services physically, sexually, or otherwise abused shall have a right to pursue injunctive and other appropriate civil relief."[50]

The language of this section can, to be sure, be read to provide a right to civil relief for any mental health patient who is abused, whether that abuse is inflicted by a Mental Health Department employee or by another patient. In determining the legislative intent underlying this section, however, we must view the statutory provision in light of the general purpose sought to be accomplished or the evil sought to be remedied by the statute as a whole. *White v Ann Arbor,* 406 Mich 554, 562; 281 NW2d 283 (1979). The underlying purpose of the Mental Health Code is to set certain standards and requirements for the treatment of recipients of mental health services by the staff and employees of mental health facilities. The statute nowhere suggests a legislative intent to impose liability on the government for injuries inflicted by other patients.[51] The Legislature has not waived the state's sovereign immunity where a complaint

---

[50] MCL 330.1722; MSA 14.800(722).

[51] We agree with the conclusion of the Court of Appeals in *Rocco v Dep't of Mental Health,* 114 Mich App 792, 798-799; 319 NW2d 674 (1982), one of the companion cases decided today:

"The [Mental Health Code] focuses on the duty of the health care facility towards its patients. None of the sections discusses the rights and responsibilities between patients. The statute's primary purpose is to protect the patient from certain abuses by the mental health facility or its staff. When this purpose is read into MCL 330.1722; MSA 14.800(722), it is clear that the provision was meant to prevent the staff of a mental health care facility from abusing the patients in its care. It was not the intention of the Legislature to abolish governmental immunity in those cases where one patient attacks another."

alleges injuries inflicted by another patient in a
mental health facility.[52] The defendants in this
case are immune.

## Rocco

Daniel Rocco was a resident of the state-oper-
ated Ypsilanti Regional Psychiatric Hospital when
he was murdered by another patient. Plaintiffs
filed a two-count complaint in the Court of Claims
against the Department of Social Services and the
Department of Mental Health. Count I alleged
that defendants negligently placed decedent's as-
sailant, who was a patient known to have a his-
tory of violent and assaultive behavior, in an
unrestrained and unsupervised unit with the dece-
dent, who no longer required in-patient care and
was awaiting transfer to a halfway house. Count II
of the complaint alleged that plaintiffs paid for the
care and treatment of the decedent, and that the
defendants breached their implied contractual
duty to protect the decedent from harm and abuse
by other patients at the hospital.

For the reasons stated in the companion case of
*Siener,* the Mental Health Code does not provide a
cause of action where the injury complained of
was inflicted by another mental health patient,
nor does the Mental Health Code constitute a
legislative waiver of the state's sovereign immu-
nity provided by the second sentence of § 7.

The language of § 7, however, speaks only to
immunity from tort liability; it does not grant
immunity from contract claims. The state is sub-

---

[52] No opinion is expressed whether the Legislature, by providing
that a recipient of mental health services who is abused by the staff
of a mental health facility is entitled to "appropriate civil relief,"
MCL 330.1722(4); MSA 14.800(722)(d), thereby waived the state's
sovereign immunity for torts allegedly committed against mental
health patients by the staff of a mental health facility.

ject to action on contract claims.[53] Nothing in § 7 suggests an intent to establish a statutory sovereign immunity for causes of action relating to contracts. The cause should be remanded for consideration of the merits of Count II alleging breach of an implied contract.

Defendants argue that the contract count of the complaint merely restates the allegations of the tort count, and that to permit the contract claim to be heard would be to circumvent the tort immunity provided by § 7. Although all the allegations contained in Count I of the complaint are repeated in the contract count, Count II contains the critical allegations that plaintiffs agreed to and did pay defendants for the housing, care, and treatment of Daniel Rocco. In Count II the plaintiffs have moved beyond the statement of a cause of action in tort and have alleged a separate and legally distinct cause of action for breach of an implied contract.[54]

## Regulski

James T. Regulski was a 17-year old high school senior. He was enrolled in a building trades class. The class was offered as a regular part of the high school curriculum of the defendant school district.

[53] See *Hersey Gravel Co v State Highway Dep't*, 305 Mich 333, 339; 9 NW2d 567 (1943); *W H Knapp Co v Highway Dep't*, 311 Mich 186, 188; 18 NW2d 421 (1945); *Zynda v Aeronautics Comm*, 372 Mich 285, 287; 125 NW2d 858 (1964).

[54] Denying immunity for breach of contract by a governmental entity will not enable plaintiffs generally to avoid the impact of § 7 by simply labeling their complaints "contract" rather than "tort." An implied contract may be found where one engages or accepts the beneficial services of another for which compensation is customarily made and actually anticipated. *Miller v Stevens*, 224 Mich 626, 632; 195 NW 481 (1923). Where compensation has been neither requested, agreed to, nor provided for services to be rendered by the government, generally there will be no cause of action for breach of implied contract.

The students in this class erect a house during the course of the semester, which is then sold by the school district to a private buyer.

While working on the house, Regulski was injured when he attempted to drive a nail into a piece of wood. When Regulski struck the nail, it bounced free of the wood and struck him in the left eye. Regulski brought an action against the school district, the teacher of the building trades class, Leo Hansen, and the director of the vocational building trades program for the school district, William Murphy, alleging that the defendants were negligent in failing to dismiss the class when the teacher left the job site and in allowing Regulski to continue working without supervision.

Although it has been said that at common law, a school district "as an agency of the State [is] clothed with the State's immunity from liability," *Sayers v School Dist No 1, Fractional,* 366 Mich 217, 219; 114 NW2d 191 (1962), school districts have generally been held to have the governmental immunity of non-sovereign political units *(e.g.,* cities, counties), rather than the absolute sovereign immunity of the state.[55] In all events, the common-

[55] See fn 15 and accompanying text.

Early decisions of this Court involving school districts treated them as municipal corporations. See, *e.g., Marathon Twp School Dist No 4 v Gage,* 39 Mich 484, 486 (1878); *Seeley v Bd of Ed,* 39 Mich 486 (1876); *Belles v Burr,* 76 Mich 1; 43 NW 24 (1889).

The first case to consider the scope of a school district's tort liability was *Ferris v Detroit Bd of Ed,* fn 8 *supra.* In that case, the plaintiff was injured when he slipped on ice and snow that had fallen off a school roof. In finding that the school board was liable in tort, the Court treated it as a municipal corporation, not as an agent of the state:

"It is conceded by counsel for plaintiff that *municipal corporations* are not generally held liable, under the common law, for negligent injuries to individuals arising from defective plans of construction of public works or failure to keep the same in repair; but it is contended that, where the injury is the result of the direct act or trespass of the *municipality,* it is liable, no matter whether acting in a public or private capacity. We are satisfied that counsel for plaintiff are right

law immunity of school districts was abrogated by this Court in *Pittman v City of Taylor*, 398 Mich

---

in this contention. * * * It has been many times held in this court that *a city* has no more right to invade, or cause the invasion of, private property, than an individual." *Id.*, p 318. (Emphasis added.)

In *Whitehead v Detroit Bd of Ed*, 139 Mich 490; 102 NW 1028 (1905), the plaintiff's action to recover for personal injuries suffered while he was employed by the defendant school district was dismissed by the trial court because "in the State of Michigan *municipal corporations* are not liable for the negligence of their servants when in the exercise of duties in connection with the governmental capacity of the corporation, unless made so by statute." *Id.*, p 492. (Emphasis added.) The trial judge based his decision on *Nicholson v Detroit*, 129 Mich 246; 88 NW 695 (1902), where *a city* successfully demurred to an action arising out of negligent conduct by the city's board of health. This Court in *Whitehead* affirmed the trial judge's result and his conclusion that *Whitehead* "could not be distinguished in principle from the case of *Nicholson* * * *." *Whitehead v Detroit Bd of Ed*, supra, p 494.

In *Daniels v Grand Rapids Bd of Ed*, 191 Mich 339; 158 NW 23 (1916), this Court rejected the conclusion in *Whitehead* that a school district should be treated as a municipal corporation for purposes of immunity from tort liability. A school district, the Court held, is not a municipal corporation but rather a "quasi corporation":

"Although invested with certain corporate characteristics to more efficiently serve the purpose for which they are created, school districts are not municipalities, nor public corporations in the full sense, but because of their very restricted powers are distinguished and recognized as *quasi* corporations." *Id.*, p 347. (Emphasis in the original.)

The Court in *Daniels* noted, however, that the question whether a school district should be labeled a quasi corporation or a municipal corporation was not important in that case, because the same immunity from tort liability attached to each.

School districts thus had the governmental immunity of municipalities and other non-sovereign political units rather than the absolute sovereign immunity of the state. It appears that the concept that a school district is a state agency, found in *Sayers v School Dist No 1, Fractional*, supra, can be traced to *Attorney General ex rel Kies v Lowrey*, 131 Mich 639; 92 NW 289 (1902). That case, however, was a quo warranto proceeding challenging the right of certain persons to hold the office of trustee of a newly created school district. The Court's statement that "[t]he school district is a State agency [and] is of legislative creation" provided a rationale for its conclusion that the Legislature may fix, and change, school district boundaries. *Id.*, pp 644-647. *Lowrey* thus was not a tort action and had no bearing on whether school districts have governmental immunity and, if so, the immunity of non-sovereign political units or the sovereign immunity of the state. See *Ferris, supra, Whitehead, supra,* and *Daniels, supra.*

41, 49-50; 247 NW2d 512 (1976).[56] The current immunity of school districts is derived not from the common law but rather from § 7; school districts have the governmental immunity provided to "governmental agencies" by the first sentence of § 7, rather than the absolute sovereign immunity provided to the "state" by the second sentence.

The first sentence of § 7 provides governmental immunity to "governmental agencies." The act defines "governmental agency" as "the state, political subdivisions, and municipal corporations as herein defined."[57] Thus the "state" and a "political subdivision" are separate and distinct entities for purposes of the act. "Political subdivision," in turn, is defined as including a "school district."[58] Accordingly, a "school district" is a "political subdivision" and is therefore not synonymous with, but is rather distinct from, the "state."[59]

Since a school district is within the first rather than the second sentence of § 7, the question is whether the specific activities complained of constitute, in light of the factors discussed above, "governmental functions." Regulski's complaint alleges that the defendants allowed him to work on the construction project: 1) when no supervisor was present; 2) without adequate instruction concerning the dangers involved and the proper meth-

[56] See fn 21.

[57] See fn 6.

[58] See fn 6.

[59] The act defines the term "state":

" 'State' means the state of Michigan and its agencies, departments, and commissions, and shall include every public university and college of the state, whether established as a constitutional corporation or otherwise." See fn 6.

The inclusion of "every public university and college of the state" within the statutory definition of "state" also suggests that school districts operating public elementary and secondary schools are not within the statutory definition of "state."

ods for doing the work; 3) without safety goggles or
glasses; and 4) without adequate emergency sup-
plies and facilities available in case a mishap
should occur. None of these activities are "govern-
mental functions."

First, these activities neither involve policy for-
mulation nor are quasi-judicial in nature. As pre-
viously noted, supervision of construction work is
an operational activity. Policy formulation simi-
larly is not involved in instructing students about
the work, permitting students to work without
protection for their eyes, or failing to provide
sufficient emergency supplies. The decisions to
offer this vocational program and to allow Regul-
ski to participate in the program having been
made, traditional tort standards are readily ap-
plied to evaluate these allegations of negligence in
the implementation of the policy. This factor
weighs against immunity as to all four of these
allegations.

Second, while the school district did not directly
inflict the injury Regulski suffered by permitting
him to work in the building trades class without
supervision, instruction, protection for his eyes,
and sufficient emergency supplies and facilities,
and Regulski, through his own hammering, was
the direct source of his own injury, the specific
activity complained of—the failure of teachers
adequately to teach or supervise Regulski—repre-
sented a failure to prevent harm from a source
subject to governmental control. This factor
weighs against immunity.

Third, teaching has a common analogy in the
private sector. There are many private schools
with vocational courses offered as a part of their
curriculum. While educating children and youths
is an activity that today is primarily performed by
the government, a significant number of students

are educated in a large number of private schools sufficient to constitute a common analogy in the private sector. This factor weighs against immunity with respect to the allegations of negligent instruction and negligent supervision of the teaching process.

The private analogy regarding the provision of safety goggles and emergency preparedness extends beyond private schools to include all instances of construction and carpentry work. Whenever people work with wood, identical tort issues arise regarding safety goggles and emergency preparedness. Because construction work involving wood is generally performed by persons or concerns other than government, this factor weighs against immunity with respect to these two allegations.

In this case, all the factors weigh against immunity. The school district is not immune for these activities under § 7.[60]

The individual defendants also do not have official immunity against the allegations in this complaint. Both Hansen, as teacher of the class, and Murphy, as director of the vocational building trades program, were acting within the scope of their official functions with respect to the supervi-

[60] Regulski argues that because the school district sells houses constructed by the building trades class at market value, it is engaged in a proprietary function for which immunity is waived by § 13 of the act (MCL 691.1413; MSA 3.996[113]). This waiver of immunity, however, applies *only* to the state:

"The immunity of *the state* shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as herein defined." (Emphasis added.)

Nevertheless, since a school district is not a state agency (see fns 15 and 55 and accompanying text), and other units of government are immune only when engaged in the exercise or discharge of a governmental function, § 13 is not determinative. A proprietary function is not a governmental function. In all events, since teaching and supervision is not a governmental function, Regulski's cause does not depend on characterizing the activity as a proprietary function.

sion, instruction, conduct, and emergency preparations of the course, and Regulski has not alleged that either Hansen or Murphy acted with a corrupt or malicious purpose or in bad faith. The officers were not, however, exercising quasi-judicial or policy-making discretionary authority with respect to the activities alleged in the complaint.

Whether or not decisions regarding what vocational courses to offer, what prerequisites to establish, and which students are eligible to participate involve the exercise of policy-making authority, the supervision and conduct of a class does not involve the exercise of such discretion. This is particularly true with respect to the allegation that Regulski was permitted to work with inadequate supervision. In *Larson v Braham Independent School Dist No 314,* 289 NW2d 112 (Minn, 1980), the Minnesota Supreme Court held that neither the teacher of a gym class nor the school principal was immune from liability to a student for injuries allegedly suffered as a result of negligent spotting of a gymnastic exercise. The supervision of classroom activities does not involve the exercise of discretionary authority to which official immunity attaches.

### Trezzi

After walking past his parents' house and seeing through their window that the refrigerator door was ajar, Trezzi sought emergency assistance by calling 911 six times. The 911 operator attached a low-priority rating to those calls and passed them on to the police dispatcher, Philip Torbit, who then failed to dispatch any police vehicles for approximately one and one-half hours after receiving the first call for emergency assistance. During this period, Trezzi's parents were attacked by an

unknown assailant who had forcibly entered their premises; they died as a result of their injuries.

Applying the factors set forth above, the City of Detroit was engaged in the exercise or discharge of a "governmental function," and therefore the city is immune pursuant to the first sentence of § 7. The crux of Trezzi's complaint is that a 911 operator improperly assigned a low-priority classification to his call and that the dispatcher delayed unnecessarily—even permitting some police officers to take a lunch break—before sending a unit to respond to his call.[61]

The specific activities complained of—the classification of incoming calls and the dispatch of police vehicles—involve a sufficient degree of policy formulation for the first factor to weigh in favor of immunity. This case does not involve the operational implementation of a 911 system. The determination of the priority to be given to an incoming call for assistance, in light of available manpower and other demands for assistance at the time, constitutes a policy decision regarding the most effective utilization of police resources. Even a decision to send certain units to lunch before responding to a call given a low priority requires the exercise of policy-making judgment regarding the utilization of police officers who, at some point, must eat. Assuming, as Trezzi contends, 911 operators are guided by a preexisting priority designation system, the city did not, by adopting guidelines, change the nature of the decision or diminish its *statutory immunity* from liability therefor.[62]

[61] Trezzi also alleges that the defendants failed "to properly carry out its inspection, counseling and safety measures in regard to '911' calls," and that the 911 system constitutes "a complete fraud upon the public."

[62] Tort cases concerning failures to follow preexisting guidelines are not analogous.

Such policy determinations weigh in favor of immunity on these facts.

Second, because the basis of the complaint is that the government failed to prevent harm from a source not subject to governmental control, this factor weighs in favor of immunity.

Third, the classification of calls for police assistance does not have a common analogy in the private sector. Although there are private security forces, they generally do not engage in general emergency assistance analogous to a public 911 system. And although private ambulance services may maintain a priority designation system similar to that employed by a 911 system, such ambulance services are not sufficiently analogous because they do not provide police protection. The coordination of requests for police emergency assistance afforded by a 911 system is performed and accomplished uniquely by the government. This factor weighs in favor of immunity in this case.

The classification of 911 calls and the dispatching of police vehicles to respond to such calls are "governmental functions," and therefore the City of Detroit is immune when engaged in these activities under the first sentence of § 7.[63]

## Disappearing Lakes

At the request of a private land developer, the Michigan Department of Conservation (the prede-

---

[63] This is not a case in which a 911 operator erred in taking down an address from the caller, or in which the address is recorded correctly but the dispatcher nevertheless sends a police vehicle to the wrong location. Nor is this a case in which, say, a paramedic properly dispatched through the 911 system negligently treats the sick or injured victim. Cf. *DeLong v Erie County,* 89 AD2d 376; 455 NYS2d 887 (1982) (operator wrote down "219 Victoria" when 911 caller had given address as "319 Victoria," and dispatcher sent police vehicle to "Victoria Avenue" in Buffalo when caller was located on "Victoria Boulevard" in the suburb of Kenmore).

cessor of the Department of Natural Resources) issued a permit for the dredging of canals or channels in an area extending from Lake Orion southwestward. After the dredging, the water levels of Square Lake and Little Square Lake, both located just south of Lake Orion, dropped precipitously. Studies indicate that water loss in the Square Lakes was caused by interference with the subsurface water flow when the canals were dredged. The use of the Square Lakes for recreational and aesthetic purposes was destroyed, and plaintiffs, who own land adjoining the Square Lakes, brought an action claiming damage to health and property.

The state and its agencies possess absolute sovereign immunity pursuant to the second sentence of § 7 unless that immunity has been waived by the Legislature. The Legislature has not waived immunity for decisions granting or denying dredging permits.[64]

### Zavala

Jose Zavala was shot in front of the El Taurino Lounge. A fight had erupted outside the bar and, after a short period of time, Zavala was shot by one of the participants in the fight. After initially bringing an action against several of those involved in the fight, Zavala amended his complaint to add as defendants Sergeant Andrea Zinser, Officer Freida Harris, and the City of Detroit. Zavala alleged that at the time of the incident, Zinser and Harris were sitting just a few feet away in a marked police car, that they saw the fight and

---

[64] The Court in *Gerzeski v Highway Dep't*, 403 Mich 149; 268 NW2d 525 (1978), did not appear to have considered the common-law rule, "affirmed" by the second sentence of § 7, that the state is absolutely immune from tort liability except to the extent that immunity has been waived by the Legislature.

indicated to individuals requesting them to act that they would take effective police action, but that they failed to make their presence known to those who were fighting and failed to break up the disturbance, choosing instead to call and wait for back-up assistance.

The question presented with respect to the complaint against the City of Detroit is whether an officer's decision to call and wait for back-up assistance rather than to intervene in a disturbance constitutes, in light of the factors discussed above, a "governmental function." I would hold that it does.

First, a decision regarding how to handle an observed breach of the peace does not involve policy formulation and is not quasi-judicial in nature. This factor, then, weighs against immunity in the present case.

The second factor supports a finding of immunity. Zavala is complaining that the police officers failed to prevent the shooting that caused him injury. This case presents perhaps the archetypical example of a complaint relating to what the government did not do for the claimant. Professor Cooperrider observed in respect to the prevention of crime, that a decision that government should assume "a greater degree [of] the burdens of personal misfortune arising from its failure to shield individual citizens from harmful occurrences, such as *crime* and flood * * * belongs to the political rather than to the judicial process." Cooperrider, *supra,* p 286. (Emphasis added.)

Third, a decision to await back-up assistance rather than act immediately to break up a disturbance does not have a common analogy in the private sector. Although there are some private security forces, their responsibilities do not often require them to stop a fight among a number of

individuals. In all events, the task of breaking up a fight and arresting those engaged in disorderly conduct—and thus the decision concerning the number of officers required to perform that task safely—is uniquely performed and accomplished by government. This factor therefore weighs in favor of immunity in this case.

On balance, the decision to request and await back-up assistance rather than act immediately to break up the fight was a "governmental function" for which the City of Detroit is immune under the first sentence of § 7.

With respect to the individual defendants, Sergeant Zinser and Officer Harris were acting within the scope of their official function. Their responsibility as police officers was to enforce the law, and a decision to quell the disturbance by seeking back-up assistance from their fellow officers was well within the scope of that function.

The next consideration is whether Zinser and Harris were acting in good faith. The failure to intervene in a fight occurring a few feet away does not evidence recklessness or a corrupt or malicious purpose where the officers did act by requesting back-up assistance. The record as it now stands contains no allegations of bad faith on the part of officers Zinser and Harris.[65]

The officers in this case, however, were not

---

[65] In granting the officers' motion for summary judgment, the trial judge concluded "that there were no allegations as to breach of good faith; there was no allegation of intentional tort; there was no allegation of police officers acting outside the scope of their official duties; nor that they acted in bad faith."

Zavala sought to amend his complaint to allege that the officers refused to break up the fight because Zavala is a Mexican man. One of the two women officers is white and the other is black. The judge did not allow the amendment; the Court of Appeals remanded the case for supplementation of the record to disclose the findings underlying this ruling. *Zavala v Zinser*, 123 Mich App 352; 333 NW2d 278 (1983). Our decision should affirm the Court of Appeals in that regard.

exercising quasi-judicial or policy-making discretionary authority. This Court has held that although effecting an arrest requires the exercise of judgment, a police officer is not immune in an action alleging excessive force during an arrest. *Sherbutte v Marine City, supra.* Similarly, decisions by Zinser and Harris regarding whether to make an arrest or the number of officers necessary to accomplish an arrest required the exercise of their professional judgment, but did not require policy-making or quasi-judicial ·decision-making to which official immunity attaches. Zinser and Harris do not have official immunity. The opinion of the Court does not reach the duty question, and therefore no opinion is expressed thereon.[66]

KAVANAGH, J., took no part in the decision of these cases.

---

[66] The Court of Appeals found that Zinser and Harris were immune, but added that "[i]n essence, [Zavala] alleged no more than that defendant police officers had breached their duty to preserve the peace. * * * In this case, *no facts were pleaded which showed a duty owed to these plaintiffs."* *Zavala v Zinser,* fn 65 *supra,* p 356. (Emphasis supplied.) Since the opinion of the Court does not address the duty question, I express no opinion on the question whether a police officer has a tort law duty to protect a person observed being assaulted and, for failure to discharge that duty, is subject to tort liability. See also fn 45.